JUDGE PATTERSON 10 CIV 0975

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BEVERLY L. MUNTER, Individually and on Behalf of All Others Similarly Situated, | ) No. <br> ) <br> ) <br> ) **CLASS ACTION** <br> ) <br> ) <br> ) **COMPLAINT FOR VIOLATIONS** <br> ) **OF THE FEDERAL SECURITIES** <br> ) **LAWS** |
| Plaintiff, | |
| v. | |
| CRM HOLDINGS, LTD., DANIEL G. HICKEY, JR., MARTIN D. RAKOFF, JAMES J. SCARDINO, and DANIEL G. HICKEY, SR., | ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) **DEMAND FOR JURY TRIAL** |

RECEIVED
FEB 05 2010
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Beverly L. Munter, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by CRM Holdings, Ltd. ("CRMH" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by CRMH; and (c) review of other publicly available information concerning CRMH.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of CRMH's securities between December 21, 2005 and November 5, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      CRMH is a provider of workers compensation insurance products.  Its main business activities include underwriting primary workers compensation insurance policies, underwriting workers compensation reinsurance and excess insurance policies, and providing fee-based management and other services to self-insured entities.    The Company provides primary workers compensation insurance to employers in California, Arizona, Florida, Nevada, New Jersey, New York, and other states.  The Company reinsures some of the primary business underwritten and provides excess workers compensation coverage for self-insured organizations.  CRMH is also a provider of fee-based management services to self-insured groups in California and formerly in New York.

3.      On April 17, 2008, CRMH disclosed that Compensation Risk Managers, LLC ("CRM"), a wholly-owned subsidiary of the Company, received notice from the New York Workers Compensation Board (the "WCB") that, following an initial investigation, the WCB determined to pursue an administrative action in order to revoke CRM's third party administrator's license to provide third party claims administrative services to self-insured workers compensation groups in New York.  In addition, the Company disclosed that CRM received a subpoena from the New York State Attorney General's Office (the "New York Attorney General") requesting documents related to CRM's administration of the Healthcare Industry Trust of New York, and that the Company believed that the subpoena related to the concurrent investigation being conducted by the WCB.

4.      On this news, shares of CRMH declined $1.58 per share, more than 32%, to close on April 17, 2009 at $3.32 per share, on unusually heavy volume.

5.      Thereafter, on October 3, 2008, CRM further disclosed that it had received a letter

2

from the WCB indicating its intention to initiate legal proceedings against the Company on behalf of eight self-insured groups (the "Trusts") previously administered by CRM as it related to CRM's actions while acting as the administrator and broker of record for the Trusts. According to the Company, the WCB was investigating CRM's administration of the Trusts and that the WCB was alleging upon information and belief that CRM breached certain duties to the Trusts and engaged in certain self-dealing and deceptive practices.

6.     On this news, over the next two days of trading, shares of CRMH declined $0.61 per share, or 24.31%, to close on October 7, 2008 at $1.91 per share, on high volume.

7.     Subsequently, at the end of the Class Period, on November 5, 2008, CRMH reported its financial results for the 2008 fiscal third quarter and announced that during third quarter, the Company had about $2.5 million of loss reserve increases that would have otherwise been reflected in the first and second quarter of 2008.

8.     On this news, over the course of the following three days of trading, shares of CRMH declined $0.58 per share, more than 36%, to close on November 7, 2008 at $1.03 per share, on high volume.

9.     After the Class Period, on December 9, 2009, the Company received a "Notice of Imminent Enforcement Action" (the "Notice") from the New York Attorney General. The Company disclosed that, according to the Notice, the New York Attorney General intended to file civil claims against the Company, certain of its subsidiaries, and certain directors and officers to seek redress of allegedly unlawful practices unless an acceptable settlement could be reached within five days. According to the Company, the Notice came after more than nineteen months of investigation and that the Attorney General alleged that the Company and the other named parties engaged in fraudulent practices in connection with CRM's administration and

3

marketing of the Trusts, as well as in connection with the Company's initial public offering completed in December 2005.

10.     The following day, on December 10, 2009, the Company disclosed that the WCB had commenced a lawsuit against CRM on its own behalf and in its capacity as successor in interest to the Trusts, which were previously managed by CRM. The Company indicated that the WCB's lawsuit, alleged that CRM, its subsidiaries and certain directors and officers breached fiduciary duties owed to the Trusts, breached contracts between CRM and the Trusts, breached duties of good faith and fair dealing owed to the Trusts, engaged in fraudulent activities in administering the Trusts, engaged in deceptive business practices and advertising, and were unjustly enriched. The WCB alleges that the WCB and the Trusts have suffered damages in an amount that is not currently ascertainable, but which is believed to exceed $405 million.

As explained in the WCB Complaint, the WCB is a governmental agency created pursuant to the New York State Workers' Compensation Law ("WCL"), charged with administration of the WCL and attendant regulations, and has all of the powers and duties set forth in WCL § 142. The WCB's mission is to equitably and fairly administer the provisions of the WCL, including workers' compensation benefits, disability benefits, volunteer firefighters' benefits, volunteer ambulance workers' benefits, and volunteer civil defense workers' benefits on behalf of New York's injured workers and their employers.

11.     Workers' compensation benefits provide weekly cash payments and the cost of full medical treatment, including rehabilitation, for covered employees who become disabled as a result of employment-related disease or injuries.  Benefits also may be payable to qualified dependents of a covered worker who died as a result of a compensable injury or illness. Pursuant

4

to WCL §§ 10 and 50, all employers in New York State must secure the payment of workers' compensation to their employees.

12.    The WCL states that employers may secure the payment of workers' compensation to their employees in one of the following three ways: (1) by insuring and keeping insured the payment of such compensation from the State Insurance Fund (WCL § 50(1)); (2) by insuring and keeping insured the payment of such compensation with any insurance carrier authorized to transact such business in New York State (WCL § 50(2)); or (3) by becoming a self-insurer (WCL § 50(3) and WCL § 50(3-a)).

13.    In the event that an employer pursuing coverage under WCL § 50(3) is unable to demonstrate the financial wherewithal to self-insure individually, it may join with other employers in related industries and form a group self-insured trust ("GSIT"). A GSIT is defined under WCL § 50(3-a) as a group of employers who jointly self-insure for workers' compensation claims.

14.    Employers who elect to insure the payment of workers' compensation through the State Insurance Fund or a commercial insurance carrier pay money, known as a "premium," in exchange for workers' compensation coverage, whereas employers who elect to participate in a GSIT also pay money in exchange for the payment of workers' compensation to their employees, known as a "contribution."

15.    An employer may self-insure in one of two ways -- either as an individual, pursuant to WCL §50(3), or as a member of a GSIT, pursuant to WCL §50(3-a). All private employers, whether individuals or as members of a GSIT, who wish to self-insure for workers' compensation benefits, must apply to, and be duly authorized by, the WCB's Office of Self-Insurance.

5

16.    For group insurance, WCL § 50(3-a)(3) provides that all employers participating in the GSIT shall not be relieved from their liability for workers' compensation, as required under the WCL, except through payment of all claims by the GSIT or by the employer. Pursuant to WCL § 50(3-a)(2), employers "may adopt a plan for self-insurance, as a group, for the payment of compensation under this chapter to their employees." A condition of any such plan is that the group of employers provide proof to the WCB of the GSIT's financial ability to pay all compensation for which the employers may be liable under the WCL.    The WCB has promulgated additional regulations to establish application procedures, qualifications, and responsibilities for GSITs at 12 NYCRR § 317, *et seq.*

17.    The    WCB's    regulations    contain    the    definitions    pertaining    to    GSITs. "Contribution" is defined as "the annual charge to individual members of a group self-insurer to cover its workers' compensation liabilities and assessments." "Trust account or trust fund" is defined as "a trust account or fund, financed by the contributions of and assessments on members of a group self-insurer, for the exclusive purpose of paying for and otherwise administering workers' compensation liabilities." "Trust liabilities" is defined as "all claims, accrued workers' compensation board assessments, accrued expenses including administrative costs...and all other trust obligations."

18.    The WCB regulations require GSITs to, *inter alia:*

(a)    provide evidence of adequate capitalization and maintain assets in excess of liabilities;

(b)    prohibit the use of "trust funds collected from group members or earned by the trust for any purpose not directly related to the payment of claims, security deposits, assessments, penalties, reasonable costs of operation, fixed costs such as excess

insurance, the payment of earnings or refunds to group members, or other trust obligations;"

    (c)    prohibit the commingling with other funds of "funds dedicated to the payment and administration of claims, assessments, and other costs arising under the Workers' Compensation Law;" and

    (d)    comply with the remedial provisions applicable to under-funded GSITs; and

    (e)    submit annual audited financial statements evidencing the financial status of the GSIT;

    19.    These requirements provide the WCB's Office of Self-Insurance with information to ensure adequate financial strength of the GSIT, and minimize the risk of an interruption in the flow of benefits to injured workers.

    20.    The WCB employs, *inter alia*, certain procedures to identify GSITs that are in need of remedial action to ensure that the GSITs remain solvent:

    (a)    the WCB receives and reviews the annual independently audited financial statements and actuarial reports submitted by every GSIT. These documents detail the GSITs liabilities and assets;

    (b)    if the GSITs annual audited financial statements and actuarial reports indicate that the GSIT has greater liabilities than assets, known as "underfunding," the GSIT is subject to the remediation procedures set forth in 12 NYCRR § 317.9; and

    (c)    depending upon the severity of the underfunding, the WCB may take one or more of the actions designated in 12 NYCRR § 317.9(b), which are designed to restore the GSIT to a funded status in a timely manner.

21.    A GSIT whose financial analyses demonstrates continued underfunding status that is so severe that it cannot be restored to a financially stable position in a timely manner will be terminated by order of the WCB. When this occurs, the GSIT no longer provides coverage for its members. The GSIT's members still are required to meet workers' compensation obligations, which accrued prior to termination, and are payable directly to the injured employees.

22.    In the event the WCB determines that a GSIT cannot properly administer its liabilities due to its inability to pay outstanding lawful obligations, the WCB may deem the GSIT insolvent and assume administration and final distribution of the GSIT's assets and liabilities, pursuant to 12 NYCRR § 317.20.

23.    The WCB's overriding concern is to ensure that the statutorily mandated benefits to injured workers are not interrupted, even if the private self-insured employer becomes insolvent. The WCL and the WCB's regulations require that all self-insurers, including GSITs, deposit securities with the WCB pursuant to WCL § 50(4).

24.    After assuming administration and final distribution of an insolvent GSIT's assets and liabilities, the WCB makes a demand on the guarantor of the security deposit, and uses the security deposit and the GSIT's remaining assets to pay the GSIT's remaining workers' compensation obligations.  Upon the exhaustion of the GSIT's remaining assets and security deposit, the WCB must meet all of the insolvent GSIT's obligations out of its own administrative fund.

25.    According to WCB Complaint, pursuant to 12 NYCRR § 317.20, the WCB is the successor in interest to the following GSITs (collectively, the "Trusts"):

8

(a)     The Healthcare Industry Trust of New York ("HITNY"), which was authorized by the WCB to operate as a GSIT in the State of New York in or about September 1999, and was formed on or about September 12, 1999;

(b)     The Wholesale and Retail Workers' Compensation Trust of New York (f/k/a The Grocery Industry Trust of New York and f/k/a The Food and Beverage Industry Trust of New York) ("WRWCT"), which was authorized by the WCB to operate as a GSIT in the State of New York in or about September 1999, and was formed on or about November 27, 1999;

(c)     Transportation Industry Workers' Compensation Trust (f/k/a The Transportation Trust of New York) ("TRIWCT"), which was authorized by the WCB to operate as a GSIT in the State of New York in or about December 2000 was formed in or about December 27, 2000;

(d)     Trade Industry Workers' Compensation Trust for Manufacturers (f/k/a the Manufacturing Industry Workers Compensation Trust of New York) ("TIWCT"), which was authorized by the WCB to operate as a GSIT in the State of New York in or about December 2001 and was formed in or about December 27, 2001;

(e)     The Real Estate Management Trust of New York ("REMTNY"), which was authorized by the WCB to operate as a GSIT in the State of New York in or about January 2001 and was formed in or about January 1, 2001;

(f)     The Public Entity Trust of New York ("PETNY"), which was authorized by the WCB to operate as a GSIT in the State of New York in or about January 2001 and was formed in or about January 1, 2001; and

9

(g)     The New York State Cemeteries Trust (f/k/a The New York Association of Cemeteries Trust Workers) ("NYSCT"), which was authorized by the WCB to operate as a GSIT in the State of New York in or about January 2002 and was formed in or about January 27, 2002.

26.     From 1999 to September 2008, CRM acted as a group administrator and third-party administrator representing the Trusts before the WCB. Specifically, the WCB Complaint alleges, upon the WCB's information and belief:

(a)     CRM drafted all of the Trusts' Service Agreements and all of the Trusts' trust agreements (the "Trust Agreements");

(b)     CRM, for extended periods of time, exercised dominion and/or control over aspects of the Trusts' operations and flow of information;

(c)     CRM and its employees and representatives, among other things, participated in board meetings, made investment decisions, and appointed trustees;

(d)     the actions, as well as the inactions, of CRM, its affiliates, and managers, caused the Trusts to become underfunded and/or insolvent;

(e)     as of September 30, 2009, HITNY had a member deficit of approximately $220,000,000;

(f)     as of July 23, 2009, WRWCT had a member deficit of approximately $41,000,000;

(g)     as of June 23, 2009, TRIWCT had a member deficit of approximately $66,000,000;

(h)     as of September 1, 2009, TIWCT had a member deficit of approximately $7,000,000;

10

(i)     as of March 1, 2009, REMTNY had a member deficit of approximately $2,500,000;

(j)     as of September 30, 2009, PETNY had a member deficit of approximately $4,600,000; and

(k)     as of March 1, 2009, NYSCT had a member deficit of approximately $770,000;

27.     According to the WCB Complaint, "[a]s a result of, *inter alia*, the above deficits, the Trusts were unable to properly administer their liabilities and the WCB assumed administration and final distribution of the Trusts' assets and liabilities, and directed CRM to transfer all of its records pertaining to the administration of the Trusts to the WCB.

28.     The WCB Complaint further alleges, upon the WCB's information and belief, prior to June 1999, Defendant Daniel G. Hickey, Jr. ("Hickey") worked for Hickey-Finn & Co., Inc. ("Hickey-Finn"), an insurance brokerage firm owned by, among others, his father, Defendant Daniel G. Hickey, Sr. ("Hickey Sr.") Prior to June 1999, Defendant Martin D. Rakoff was employed by and part owner of Consolidated Risk Services ("CRS"), a foreign business corporation that registered with the New York State Department of State, Division of Corporations, on October 21, 1997.

29.     Furthermore, according to the WCB Complaint, CRS was a trust administrator that provided services to GSITs in New York State from 1996 to 2004, and Hickey-Finn was the firm that identified members to join GSITs formed by CRS. Defendants Rakoff and Hickey left their respective companies sometime in mid-1999. On or about May 26, 1999, CRM registered as a domestic limited liability company with the New York State Department of State, Division

of Corporations. CRM was formed by Defendants Rakoff, Hickey, and Hickey, Sr., as well as Robert Finn.

30.     In preparation for its IPO, in its initial registration statement filed with the SEC on September 19, 2005, amendments, and Prospectus (collectively the "Registration Statement") filed with the SEC on December 21, 2005, the Company stated that it is a "leading provider of fee-based management and other services for workers' compensation self-insured groups in New York and California" and that it has been in the business of forming and managing GSITs since 1999.

31.     The Registration Statement stated that the New York State GSITs accounted for $19,992,000, or 76.3%, of CRMH's $26,200,000 in "Fee-based management services revenue," and 63.24%, of CRMH's $31,610,000, in total revenues for the first three fiscal quarters of 2005 (the nine month period ending September 30, 2005). The Registration Statement also stated that CRMH derived a significant amount of its income from CRMH's reinsurance business with its managed groups.

32.     According to the WCB Complaint, upon the WCB's information and belief:

    (a)     Defendants Hickey and Rackoff served as CRM's President and Chief Executive Officer, respectively, from CRM's inception until at least 2006;

    (b)     the staff and business of CRM, its parent CRM USA Holdings, Inc. ("CRM USA"), and CRM USA's parent, Defendant CRMH, are interchangeable;

    (c)     CRM did not maintain adequate reserve levels for the Trusts because, in doing so, CRM would have been required to raise member contribution rates, making the Trusts a less financially attractive workers' compensation coverage option to current and potential trust members, thereby decreasing CRM's revenues;

12

(d)      CRM exerted control over actuarial analyses of the Trusts and manipulated actuarial estimates prepared on behalf of the Trusts;

(e)      there was a financial incentive for CRM to influence, control, and manipulate the Trusts' actuarial estimates;

(f)      the more favorable the Trusts' actuarial estimates appeared, the better chance CRM had to retain and attract new members to each of the Trusts; and

(g)      by the end of 2006, many of the Trusts reported drastic deficits, including HITNY, which reported a $75,783,819.00 deficit, and such deficits were caused by, among other things, CRM's breaches of duties to the Trusts, fraud, deceptive acts, and mismanagement.

33.      According to the WCB Complaint:

(a)      the Service Agreements entered into between the Trusts and CRM all contain provisions that are highly favorable to CRM, including, among other things, each Service Agreement provided for a five-year term that automatically renewed for successive five-year terms and precluded the trustees from discharging CRM for any reason other than a very limited set of circumstances enumerated within the Service Agreements;

(b)      the fee earned by CRM under the initial Service Agreements was a percentage of the total members' stated manual premium, and not based on what the Trust actually collected in premiums;

(c)      based on its fee structure, CRM had a financial incentive to accept Trust applicants with poor loss histories and high experience modifiers, and to continue the

13

memberships of Trust members with high actual losses, since CRM collected its fee up front based on manual premiums;

(d)    CRM improperly charged the Trusts for expenses that should have been borne by CRM, pursuant to the Service Agreements; and

(e)    CRM engaged in inadequate underwriting practices that resulted in underpricing of contributions paid by Trust members.

34.    Pursuant to regulation, all GSITs are required to submit annual audited financial statements, including an actuary report, to the WCB. According to the WCB Complaint, pursuant to the Service Agreements, "CRM was responsible for choosing a certified public accountant and an actuary to conduct such annual audits" and "CRM was responsible for choosing a certified public accountant and an actuary to conduct such annual audits."

35.    According to the WCB Complaint, the WCB allows GSITs to grow memberships and use appropriate discounts if their audited financial statements reveal a trust equity ratio of 90% or more. If this ratio is not met, the WCB subjects GSITs to greater scrutiny, restricting membership and discounts. Therefore, limited membership and lower discounts would result in fewer new members and limit the potential revenue and growth opportunities for CRM.

36.    According to the WCB Complaint, upon the WCB's information and belief:

(a)    CRM knowingly submitted to the WCB annual reports that inaccurately portrayed the financial conditions of the Trusts;

(b)    CRM did not take sufficient remedial actions to mitigate the losses sustained by the Trusts, even after they were identified;

(c)    CRM had an incentive to compel or encourage its actuary to underestimate the liabilities of the Trusts;

14

(d)     CRM improperly offered unreasonable discounts to many members of the Trusts;

(e)     CRM failed to timely disclose to the Trusts' members and trustee its relationships with affiliated entities;

(f)     CRM brokered excess insurance to the Trusts through Compensation Risk Managers Agency, Captive, LLC ("CRM Captive"), an affiliated entity and CRM Captive held the agency license that CRM used to place excess coverage on behalf of the Trusts managed by CRM; and

(g)     brokerage commissions then were remitted to CRM upon receipt by CRM Captive, and prior to CRM Captive holding the agency license, the license was held by Defendant Hickey individually.

37.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that Defendants and their affiliates engaged in a fraudulent scheme and course of business to grow membership in the Trusts by charging premiums below commercial rates; (2) that the membership growth inflated gross trust revenues while reducing net paid premium income to the level that the assets of the Trusts would become insufficient to cover liabilities; (3) that, accordingly, the Trusts would fall below "fully funded" status; (4) that, as part of their fraudulent scheme and course of business, to cover up the difference between assets and liabilities, Defendants and their affiliates disguised the true financial conditions of the Trusts by engaging in certain improprieties designed to result in minimal projected claims liability, including under-reserving individual claims and utilizing improper actuarial/accounting

methods; (5) that Defendants and their affiliates provided the WCB with materially false and/or misleading financial and actuarial reports for the Trusts which reflected artificially reduced liabilities; (6) that, as a result of the above, the Company was exposed to hundreds of millions of dollars in liabilities relating to the under funding of the Trusts; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

38.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

39.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

40.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

41.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District. Additionally, CRMH maintains offices and conducts business within this Judicial District.

42.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

16

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

43.     Plaintiff Beverly L. Munter, as set forth in the accompanying certification, incorporated by reference herein, purchased CRMH common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

44.     Defendant CRMH is a Bermuda corporation and lists the address of its principal executive offices as PO Box HM 2062, Hamilton, Bermuda, HM HX.

45.     Defendant Daniel Hickey was, at all relevant times, Chairman of the Board of Directors and Co-Chief Executive Officer of CRMH until December 28, 2006, and was, at all relevant times, Chairman of the Board of Directors and Chief Executive Officer ("CEO") of CRMH from December 28, 2006 until his resignation from the Company effective March 13, 2009. Prior to Defendant Hickey's resignation, in November 2008, the Company's office of general counsel became aware that certain members of CRMH's senior management may have instructed a consulting and public relations firm retained by the Company to post messages favorable to the Company on the Yahoo message board in June and November of 2008 in response to negative messages posted by others. Thereafter, CRMH's office of general counsel conducted an internal investigation and referred the matter to the Qualified Legal Compliance Committee of the Board of Directors (the "QLCC"), which retained special counsel to conduct an investigation, and rendered a report to the QLCC on February 27, 2009. As a result, the QLCC concluded that messages favorable to the Company had been posted on the Yahoo message board by the Company's consultant without disclosing that the source of the messages

17

was an agent of the Company and that the consultant had acted on the instructions of the Company's chief marketing officer and the Company's vice president of corporate communications, both of whom had been directed to take such actions by Defendant Hickey. Thereafter, Defendant Hickey resigned from the Company effective March 13, 2009, and the Board of Directors authorized special counsel to report its findings of fact to the enforcement division of the SEC.

46.    Defendant Rakoff was, at all relevant times, Co-Chief Executive Officer and Deputy Chairman of the Board of Directors of CRMH until his resignation from the Company effective December 28, 2006.

47.    Defendant James J. Scardino was, at all relevant times, Chief Financial Officer ("CFO") of CRMH.

48.    Defendant Hickey Sr. was, at all relevant times, a member of the Board of Directors of CRMH.

49.    Defendants Hickey, Rakoff, Scardino, and Hickey Sr., are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of CRMH's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive

representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

50.    CRMH is a provider of workers' compensation insurance products.    Its main business activities include underwriting primary workers' compensation insurance policies, underwriting workers' compensation reinsurance and excess insurance policies, and providing fee-based management and other services to self-insured entities.    The Company provides primary workers' compensation insurance to employers in California, Arizona, Florida, Nevada, New Jersey, New York, and other states. The Company reinsures some of the primary business underwritten and provides excess workers' compensation coverage for self-insured organizations.    CRMH is also a provider of fee-based management services to self-insured groups in California and formerly in New York.

### Materially False and Misleading Statements Issued During the Class Period

51.    The Class Period begins on December 21, 2005.  On this day, CRMH priced its IPO of approximately 8,850,000 shares of CRMH's common stock at $13.00 per share, which was completed on December 27, 2005, for an offering price of $115,050,000 in the aggregate.  In connection with the Company's IPO, CRMH filed a Registration Statement and Prospectus (collectively the "Registration Statement") with the SEC.    The Registration Statement was signed by Defendants Hickey, Rakoff, Scardino, and Hickey Sr., and included CRMH's financial

results for the 2000, 2001, 2002, 2003, and 2004 fiscal years, as well as the quarterly financial results for the first nine months of the 2005 fiscal year. Therein, the Company, in relevant part, also stated:

We are a leading provider of fee-based management and other services for workers' compensation self-insured groups in New York and California.

\*    \*    \*

We have formed and currently manage 14 self-insured groups in 12 industries. Eight of these groups are in New York and six are in California. We concentrate on industries that we believe have favorable risk profiles, and regularly screen and monitor the members of each group we manage. A significant amount of our existing business is dependent on a relatively small number of our managed groups.

As shown on the following chart, our fee-based management services business has increased substantially in New York since its inception in 1999 and in California since its inception in October, 2003.

Our fee-based management services accounted for approximately 83% of our total revenues and approximately 74% of our net income for the nine months ended September 30, 2005 and approximately 84% of our total revenues and approximately 85% of our net income for the year ended December 31, 2004.

We anticipate that our California business will continue its rapid rate of growth in the near term. The aggregate annualized premiums paid by their members to the groups we manage in California were $64.0 million, $24.1 million and $2.2 million as of September 30, 2005, December 31, 2004 and December 31, 2003, respectively. We believe that we have formed groups in New York for all industries we have targeted. In addition, New York has presently in effect a moratorium on the formation of new groups. We believe that our New York business will grow as a result of an increase in the number of members in these groups and recently approved manual rate increases. The aggregate annualized premiums attributable to the groups we manage in New York were $111.5 million, $110.0 million and $106.9 million as of September 30, 2005, December 31, 2004 and December 31, 2003, respectively.

Our management monitors the period to period changes in the amounts of aggregate annualized premiums because we believe that it is a meaningful indicator of the change in our expected fee-based management services revenues in the future. Our management fees are based on a percentage of the premiums our groups charge their members and are recognized as income over the year for

20

which such premiums are fixed. Increases and decreases in the aggregate of these annualized premiums are an indication of the increase or decrease in the amount of management fees we expect to earn in the future as our unearned management fees are recognized as income.

The self-insured groups are required to purchase excess workers' compensation coverage to cover claims that exceed a minimum level established by state law or regulation or by administrative determination. We act as a broker and place this excess insurance coverage and any required surety bonds for the groups. Since December 2003, we have provided reinsurance for a portion of this excess coverage through our subsidiary, Twin Bridges. We currently reinsure a portion of this excess coverage for 13 of our 14 groups.

52.    On March 27, 2006, CRMH issued a press release entitled "CRM Holdings, Ltd. Announces Fourth Quarter, Full Year Results." Therein, the Company, in relevant part, stated:

Net income for the fourth quarter of 2005 was $2.0 million, or $0.18 per diluted share, similar to the $1.9 million, or $0.19 per diluted share in the fourth quarter of 2004.

*     *     *

Total revenues reached a record $13.5 million in the fourth quarter of 2005, up 55% from $8.7 million in the same quarter of 2004. Fee-based management services revenues increased 44% to $10.3 million, primarily due to the expansion of CRM's group self-insurance business in California.

*     *     *

For the twelve months ended December 31, 2005, net income was $7.3 million, or $0.70 per diluted share, up 25% from $5.8 million, or $0.57 per diluted share, in 2004.

*     *     *

2005 total revenues were a record $45.1 million, up 37% from $32.8 million in 2004. Fee-based management services revenues increased 32%, to $36.5 million, primarily due to the expansion of CRM's group self-insurance business in California.

*     *     *

In the fourth quarter of 2005, revenues in the fee-based management services segment increased 44% to $10.3 million as compared to $7.1 million in the fourth

21

quarter of 2004. The majority of this increase was due to increased business in the California market, particularly in the Contractors and Healthcare self-insured groups. Revenues from groups in California increased to $3.2 million from $0.9 million in the fourth quarter of 2004. CRM's groups in New York also achieved revenue growth in the fourth quarter, the result of an increase in the number of group members. Revenues from groups in New York increased to $7.0 million from $6.3 million in the fourth quarter of 2005.

\*       \*       \*

53.    For the fiscal year ended December 31, 2005, revenues in the fee-based management services segment increased 32% to $36.5 million from $27.7 million in the prior year. 85% of this growth in revenues was attributable to groups situated in California. Revenues from those groups increased to $9.5 million from $2.0 million in the prior year. Revenues from groups in New York increased 5% to $27.0 million for the year compared to $25.7 million in 2004. Revenues from New York groups were adversely affected by lower fees from the Company's largest self-insured group that occurred as a result of a modification of the terms of its agreement.

\*       \*       \*

Concluded Mr. Hickey, "We could not be more excited about our future prospects given the market opportunities in front of us and the strong financial condition in which we have placed ourselves. 2006 has begun with some uncertainties in our markets but, if anything, we expect to accelerate the pace of our progress following the first quarter and look forward to a challenging and rewarding year ahead."

53.    On March 29, 2006, CRMH filed its Annual Report with the SEC on Form 10-K for the 2005 fiscal year. The Company's Form 10-K was signed by Defendants Hickey and Rakoff, and reaffirmed the Company's financial results previously announced on March 27, 2006. The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Hickey, Rakoff, and Scardino, who certified:

1.    I have reviewed the Annual Report of CRM Holdings, Ltd. (the "Company") on Form 10-K for the period ending December 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report");

2.  Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;

3.  Based on my knowledge, the financial statement, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this Report;

4.  The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by other within those entities, particularly during the period in which this Report is being prepared.

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

    c)  disclosed in this Report that there were no changes in the Company's internal control over financial reporting that occurred during the Company's fourth quarter of 2005 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.  The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and to the audit committee of the board of directors:

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

23

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

54.   On May 9, 2006, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces First Quarter 2006 Results." Therein, the Company, in relevant part, stated:

Total revenues reached a record $14.8 million in the first quarter of 2006, up 59% from $9.3 million in the same quarter of 2005. Fee-based management services revenues increased 27%, to $9.7 million.

*       *       *

In the first quarter of 2006, revenues in the fee-based management services segment increased 27% to $9.7 million as compared to $7.7 million in the first quarter of 2005. The majority of this growth was due to increased business in the California market. Revenues from groups in California were $3.3 million in the first quarter of 2006, up 97% from the first quarter of 2005. In New York, revenues increased to $6.4 million in the first quarter of 2006, up 7% from $6.0 million in the same quarter of 2005.

*       *       *

Concluded Mr. Hickey, "Thus far, 2006 has presented some challenges to the growth of our fee-based business. Nonetheless, the fundamentals of our business model remain sound and we believe the longer term prospects remain similar to those we envisioned at the start of the year."

55.   On May 12, 2006, CRMH filed its Quarterly Report with the SEC on Form 10-Q for the 2006 fiscal first quarter. The Company's Form 10-Q was signed by Defendants Hickey, Rackoff, and Scardino, and reaffirmed the Company's financial results previously announced on May 9, 2006. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Hickey, Rackoff, and Scardino, substantially similar to the certifications contained in ¶ 54, supra.

56.   On August 7, 2006, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Second Quarter 2006 Results." Therein, the Company, in relevant part, stated:

24

Net income for the second quarter of 2006 was $3.7 million, or $0.23 per diluted share, up 96% from net income of $1.9 million, or $0.19 per diluted share in the second quarter of 2005.

*       *       *

Total revenues reached a record $16.4 million in the second quarter of 2006, up 59% from $10.3 million in the same quarter of 2005. Fee-based management services revenues increased 12%, to $9.9 million.

*       *       *

In the second quarter of 2006, revenues in the fee-based management services segment increased 12% to $9.9 million as compared to $8.8 million in the second quarter of 2005. The majority of this growth was due to a higher volume of business in California. Revenues from groups in California were $2.7 million in the second quarter of 2006, up 48% from the second quarter of 2005. In New York, revenues increased to $7.2 million in the second quarter of 2006, up 3% from $7.0 million in the same quarter of 2005.

*       *       *

In the first half of 2006, revenues in the fee-based management services segment increased 19% to $19.6 million as compared to $16.5 million in the first half of 2005. Revenues from groups in California were $6.0 million in the first half of 2006, up 71% from the first half of 2005. In New York, revenues increased to $13.6 million in the first half of 2006, up 5% from $13.0 million in the first half of 2005.

57.    On August 8, 2006, CRMH filed its Quarterly Report with the SEC on Form 10-Q for the 2006 fiscal second quarter. The Company's Form 10-Q was signed by Defendants Hickey, Rackoff, and Scardino, and reaffirmed the Company's financial results previously announced on August 7, 2006. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Hickey, Rackoff, and Scardino, substantially similar to the certifications contained in ¶ 54, *supra*.

58.     On November 7, 2006, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Third-Quarter 2006 Results, Provides Update on Acquisition." Therein, the Company, in relevant part, stated:

Net income for the third quarter of 2006 was $3.3 million, or $0.21 per diluted share, up 35% from net income of $2.5 million, or $0.24 per diluted share, in the third quarter of 2005.

*     *     *

Total revenues reached a record $17.3 million in the third quarter of 2006, up 44% from $12.0 million in the same quarter of 2005. Fee-based management services revenues increased 4%, to $10.1 million.

*     *     *

In the third quarter of 2006, revenues in the fee-based management services segment increased 4% to $10.1 million as compared to $9.7 million in the third quarter of 2005. Growth of revenues in this segment arose from growth in the number of group members in the Company's self-insured groups in California, which increased by 55%, from the same quarter last year, somewhat offset by continued lower premium rates in that state when compared to the same quarter last year. Revenues in New York fell 2%, which was due to the combined effects of a 6% increase in group membership offset by reduced reinsurance commissions overall, and a lower fee structure at two of the Company's managed groups. Revenues from groups in California were $3.2 million in the third quarter of 2006, up 19% from the third quarter of 2005. In New York, revenues were $6.8 million in the third quarter of 2006, compared to $7.0 million in the same quarter of 2005.

*     *     *

In conclusion, Mr. Hickey stated, ". . . At the same time, our New York market remains steady. We are prospering in these market conditions and will continue to do so with a business model that is appropriate for the short term and thrives in the long term . . . ."

59.     On November 7, 2006, CRMH filed its Quarterly Report with the SEC on Form 10-Q for the 2006 fiscal third quarter. The Company's Form 10-Q was signed by Defendants Hickey, Rackoff, and Scardino, and reaffirmed the Company's financial results previously

announced on November 9, 2006. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Hickey, Rackoff, and Scardino, substantially similar to the certifications contained in ¶ 54, *supra*.

60.    On March 8, 2007, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Fourth Quarter, Full Year Results." Therein, the Company, in relevant part, stated:

Net income for the fourth quarter of 2006 was $4.2 million, or $0.26 per diluted share, compared to $2.0 million or $0.18 per diluted share in the fourth quarter of 2005.

\*    \*    \*

Total revenues were a record $26.6 million in the quarter, up 98% from $13.5 million in the same quarter of 2005 . . . . Growth of fee-based management services was limited primarily by lower reinsurance commission rates and flat premium volumes in both California and New York.

\*    \*    \*

Commenting on the quarter, Dan Hickey Jr., CEO of CRM Holdings Ltd., said, " . . . Disciplined underwriting of increasing amounts of workers compensation insurance with very favorable loss experience is enhancing profitability. The addition of Majestic will create a powerful strategic combination with our fee-based and reinsurance businesses that we expect to perform well over the long term."

\*    \*    \*

For the twelve months ended December 31, 2006, net income was $14.3 million, or $0.88 per diluted share, up 96% from $7.3 million, or $0.70 per diluted share in 2005.

\*    \*    \*

2006 total revenues were a record $75.0 million, up 67% from $45.1 million in 2005. Net premiums from primary insurance and reinsurance increased 267%, to $30.7 million . . . . The rise in fee-based business was due to an increase in group members both in New York, where membership increased 7% to 2,080, and in California, where membership increased by 37%, to 402.

In the fourth quarter of 2006, revenues in the fee-based management services segment were $10.3 million, similar to the $10.3 million of revenues in the fourth quarter of 2005. The number of group members in California increased 37% to 402 compared to the same quarter last year, however rates in that state were lower than at the same time last year. As a result premiums under management at $74.2 million were similar to the $74.9 million at the same time last year. The Company's membership in New York increased 7% to 2,080 and, with rates in the state remaining firm, premiums under management increased by 7%. Fees and commissions remained similar to the same quarter last year, as commission rates at certain trusts were lower.

\* \* \*

Concluded Mr. Hickey, "We are very enthusiastic about our prospects in another challenging insurance marketplace in 2007. Our increased geographic scope, larger broker network, broader base of business and continued excellent operating standards place us in a good position for another year of revenue and earnings growth."

\* \* \*

61.    On March 9, 2007, CRMH filed its Annual Report with the SEC on Form 10-K for the 2006 fiscal year. The Company's Form 10-K was signed by Defendant Hickey and reaffirmed the Company's financial results previously announced on March 8, 2007. The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Hickey and Scardino substantially similar to the certifications contained in ¶ 54, *supra*.

62.    On May 2, 2007, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces First Quarter Results." Therein, the Company, in relevant part, stated:

Net income for the first quarter of 2007 was $2.9 million, or $0.18 per diluted share, compared to $3.0 million, or $0.19 per diluted share, in the first quarter of 2006 . . . .

Total revenues were a record $34.7 million in the quarter, up 135% from $14.8 million in the same quarter of 2006.

Commenting on the quarter, Dan Hickey Jr., CEO of CRM Holdings Ltd., said, "We are pleased with the profitability of the CRM business during the first quarter. Our more diverse business model is serving us well, providing contributions to profits across primary insurance, reinsurance and fee-based sectors. The powerful combination of these models is working especially well in the risk-based part of the business, where fronting fees have been eliminated in a number of instances and underwriting disciplines have been maintained."

\*      \*      \*

In the first quarter of 2007, revenues in the fee-based management services segment were $9.5 million, a decrease of 1.9% from $9.7 million in revenues in the first quarter of 2006. The number of group members in California increased 25.1% to 404 compared to the same quarter last year; however, rates in that state were lower than at the same time last year. As a result, premiums under management at quarter end of $56.3 million declined 15.7% from $66.7 million at the same time a year ago. The Company's group membership in New York increased 5.5% to 2,082, but premiums under management decreased by 0.6% to $116.7 million, as a result of business mix, discounts, and experience modification movements.

\*      \*      \*

Fee-based business remains competitive with the prospect of some additional rate declines in California. CRM plans to remain competitive while maintaining high underwriting standards.

63.    On May 14, 2007, CRMH filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal first quarter. The Company's Form 10-Q was signed by Defendant Hickey and reaffirmed the Company's financial results previously announced on May 2, 2007. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Hickey and Scardino substantially similar to the certifications contained in ¶ 54, *supra.*

64.    On August 7, 2007, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Record Second Quarter Results." Therein, the Company, in relevant part stated:

Net income for the second quarter of 2007 was $5.2 million, or $0.32 per diluted share, compared to $3.7 million, or $0.23 per diluted share, in the same quarter of 2006, an increase of 39%. . . . .

Total revenues were a record $44.3 million in the quarter, up 171% from $16.4 million in the same quarter of 2006.

*    *    *

"We are continuing to build a solid and diversified revenue and earnings platform. Our diverse offerings of fee-based services, primary insurance, excess insurance, and reinsurance further strengthen our relationships with our broker partners. Currently, our risk-based businesses are leading the way and driving improved levels of performance, but we plan to continue to offer all workers' compensation options to our brokers, providing them our full array of products and services for their clients," said Dan Hickey Jr., CEO of CRM Holdings Ltd.

*    *    *

In the second quarter of 2007, revenues in the fee-based management services segment were $8.8 million, a decrease of 11.4% from $9.9 million in revenues in the second quarter of 2006. The number of group members in California increased 19.4% to 412 compared to the same quarter last year; however, rates in that state were lower than at the same time last year. As a result, premiums under management at quarter end of $58.3 million declined 15.0% from $68.5 million at the same time a year ago. The Company's group membership in New York increased 8.9% to 2,093, but premiums under management decreased by 13.4% to $100.7 million, mainly due to attrition in one trust.

*    *    *

65.    On August 8, 2007, CRMH filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal second quarter. The Company's Form 10-Q was signed by Defendant Hickey and reaffirmed the Company's financial results previously announced on August 7, 2007. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by

Fee-based business will continue to experience soft market conditions in California and must absorb a rate cut in New York. Nonetheless, CRM expects to continue adding members to its self insured groups and will seek opportunities to acquire books of business. CRM expects retention will remain strong, which will be beneficial to revenue and earnings when market conditions harden.

30

Defendants Hickey and Scardino substantially similar to the certifications contained in ¶ 54, *supra*.

66.    On November 7, 2007, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Third Quarter Results." Therein, the Company, in relevant part, stated:

Net income for the third quarter of 2007 was $7.2 million, or $0.44 per diluted share, compared to $3.3 million, or $0.21 per diluted share, in the third quarter of 2006. Total revenues were $39.5 million in the quarter, an increase of 129% from $17.3 million in the same quarter of 2006.

\*    \*    \*

In the third quarter of 2007, revenues in the fee-based management services segment were $8.7 million, a 14% decline from $10.1 million in revenues in the same quarter a year ago. The number of group members in California increased 10% to 415 compared to the same period last year; however, rates in California were lower than at the same time last year. Therefore, premiums under management at September 30, 2007 of $58.9 million declined 19% from $72.3 million at the same time a year ago. The Company's group membership in New York increased 4% to 2,099, but premiums under management decreased by 19% to $98.4 million, mainly due to member attrition in one trust.

67.    On November 8, 2007, CRMH filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal third quarter.  The Company's Form 10-Q was signed by Defendant Hickey and reaffirmed the Company's financial results previously announced on November 8, 2007. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Hickey and Scardino substantially similar to the certifications contained in ¶ 54, *supra*.

68.    On March 5, 2008, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Fourth Quarter Results." Therein, the Company, in relevant part, stated:

For the fourth quarter of 2007, net income was $4.9 million, or $0.30 per diluted share, compared to $4.2 million, or $0.26 per diluted share, in the same quarter of the prior year. Total revenues increased 58.5% to $42.2 million from $26.6 million in the fourth quarter of 2006.

"The fourth quarter completes a year that has demonstrated the resilience of the CRM business model," said Daniel G. Hickey, Jr., CEO of CRM Holdings Ltd. "Our management has executed our core strategies of geographic diversification and increased efficiency. The tremendous efforts of the whole CRM team have enabled us to transform CRM into a true full service provider of workers' compensation risk management services. We have integrated Majestic's primary insurance business into the overall organization, utilized it as an admitted carrier for reinsurance business, and expanded its activities into the New York and New Jersey markets. By year end, 36% of its premiums written for the year were generated outside the California market compared to 8% in 2006. This strong base of primary workers' compensation risk underwriting has allowed us to continue to offer the very important self-insured group product to our customers in California while right-sizing our fee-based operations as we reduce our exposure to the New York self-insured market, and to maintain the diversified offering which we believe the market will demand over the long term. Our whole team is to be congratulated for these achievements which have put CRM on a sound footing of profitability for 2007, and the upcoming year."

* * *

In the final quarter of 2007, fee-based management services revenues were $8.2 million, compared with $10.3 million in revenues in the same quarter the prior year. This result reflects the decline in groups and group membership in New York, lower commissions paid by Majestic to CRM, and declining insurance rates in California and New York, which were partially offset by increasing group membership in California. The number of group members in California increased to 422 from 402 at year end 2006, but rates in California declined from the previous year. Premiums under management on December 31, 2007, were $133.5 million, compared to $196.2 million at the end of 2006. The Company's group membership in New York was 1,922, and premiums under management were $74.2 million compared to 2,080 and $121.7 million respectively at the end of 2006. The decline reflects the reduction of membership of some of the Company's self-insured groups and the subsequent closure of its largest New York self-insured group, on October 1, 2007.

* * *

During 2008, CRM expects to build on its risk-based and fee-based services in California, and on its risk based business in New York. It expects that its risk-based products will appeal more to its broker network in the New York and New Jersey markets where the self-insured structure is increasingly subject to

regulatory constraints and competitive pressures. Both risk-based and fee-based products are expected to continue to attract interest from its broker network in California. In both markets premium rates have been declining. In New York a 20.5% rate reduction was mandated effective October 1, 2007. In California, where regulatory decisions are advisory only, rates appear to be declining at a slower pace than during 2006 and the early part of 2007 when three rate reductions amounted to 16%, 9% and 14.2% between June 2006 and June 2007. The most recent rating action called for a zero percent change for January 1, 2008.

With regard to profit expectations for 2008, the Company is assuming no prior period reserve development, and a rate environment as currently in place in its major markets. On that basis the Company expects earnings per share for the full year to be in the range of $1.00 to $1.15.

Concluded Mr. Hickey, "CRM is in a very strong position today in its major markets where the rate environment is still in the softening phase of the cycle. We have positioned and right-sized the business to be ideally placed in the markets as we see them. We plan to be prudent but competitive underwriters and cost-effective group plan administrators. Underwriting discipline, selective partnerships in the distribution chain, and targeted industry and geographic writings are the keys to success in this soft market. In that way, we are in the best position to grow our business while providing great value for our brokers and their clients and consistently strong return on equity for our shareholders. At no time since I founded this company have I felt more confident that we have the range of product offerings that our markets require and that we will prosper throughout all insurance cycles. I am looking forward to reporting on our performance in the year ahead."

69.     On March 7, 2008, CRMH filed its Annual Report with the SEC on Form 10-K for the 2007 fiscal year. The Company's Form 10-K was signed by Defendant Hickey and reaffirmed the Company's financial results previously announced on March 5, 2008. The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Hickey and Scardino substantially similar to the certifications contained in ¶ 54, *supra*.

70.     The statements contained in ¶¶ 52-70 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that Defendants and their affiliates engaged in a fraudulent scheme and course of business to grow membership

in the Trusts by charging premiums below commercial rates; (2) that the membership growth inflated gross trust revenues while reducing net paid premium income to the level that the assets of the Trusts would become insufficient to cover liabilities; (3) that, accordingly, the Trusts would fall below "fully funded" status; (4) that, as part of their fraudulent scheme and course of business, to cover up the difference between assets and liabilities, Defendants and their affiliates disguised the true financial conditions of the Trusts by engaging in certain improprieties designed to result in minimal projected claims liability, including under-reserving individual claims and utilizing improper actuarial/accounting methods; (5) that Defendants and their affiliates provided the WCB with materially false and/or misleading financial and actuarial reports for the Trusts which reflected artificially reduced liabilities; (6) that, as a result of the above, the Company was exposed to hundreds of millions of dollars in liabilities relating to the under funding of the Trusts; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

## The Truth Begins To Emerge

71.    On April 17, 2008, CRMH issued a press release entitled, "Compensation Risk Managers, LLC Receives Notice of Administrative Action by New York Workers Compensation Board." Therein, the Company, in relevant part, stated:

CRM Holdings, Ltd. today announced that Compensation Risk Managers, LLC ("CRM"), a wholly-owned subsidiary of the Company, has received notice from the New York Workers' Compensation Board (the "WCB") that, following an initial investigation, the WCB has determined to pursue an administrative action in order to revoke CRM's third party administrator's license to provide third party claims administrative services to self-insured workers compensation groups in New York. Pursuant to such administrative action, CRM is entitled to present evidence at an administrative hearing to adjudicate the WCB's action to revoke CRM's third party administrative license. While CRM believes the charges are

34

substantially without merit, there can be no assurances that CRM will ultimately prevail in administrative action or any further litigation that may be commenced. The Company cannot estimate what impact, if any, the New York Workers' Compensation Board's administrative action may have on its financial position, operating results or cash flows.

In addition, CRM has received a subpoena from the New York State Attorney General's Office (the "NY Attorney General") requesting documents related to CRM's administration of the Healthcare Industry Trust of New York. CRM intends to fully cooperate with the NY Attorney General's request. To CRM's knowledge, the NY Attorney General has not initiated any proceedings against CRM. CRM believes that the subpoena relates to the concurrent investigation being conducted by the WCB. The Company cannot estimate what, if any, impact this inquiry and any results from this inquiry could have on its financial position, operating results or cash flows.

72.    On this news, shares of CRMH declined $1.58 per share, or 32.24%, to close on April 17, 2008 at $3.32 per share, on unusually heavy volume.

73.    On May 6, 2008, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces First Quarter Results." Therein, the Company, in relevant part, stated:

During the first quarter of 2008, net income increased 71.7% to $5.0 million, or $0.30 per diluted share, from $2.9 million, or $0.18 per diluted share, a year ago. Total revenues were $37.7 million, up from $34.7 million in the first quarter of 2007.

*    *    *

"The first quarter represents a positive start to the year in our risk based businesses. We are growing profitably in California and now in New York and New Jersey," said Daniel G. Hickey, Jr., CEO of CRM Holdings Ltd. "Our fee-based business in New York is in run-off mode as trusts in the state close down in response to declining rates and difficult economics. The self-insured group business in California turned in a solid performance in a very competitive market. We were able to renew 97% of the expiring policies as of January 1. Overall, an increase in book value of more than 30% compared to the end of the first quarter last year and an 18% annualized return on average equity for the quarter is gratifying in these markets."

*    *    *

35

Fee-based management services revenues in the first quarter of 2008 were $5.0 million, compared with $9.9 million in revenues in the first quarter of 2007, as the number of groups and group membership in New York experienced a significant decline. Lower commissions paid by Majestic to CRM and declining insurance rates in California also contributed to the reduction in revenues. Premiums under management on March 31, 2008, were $90.9 million, compared to $173.3 million a year ago. The Company's group membership in New York was 1,466, and premiums under management were $37.6 million on March 31, 2007. The decline to 2,082 and $116.7 million, on March 31, 2008, compared of a number of the Company's self-insured groups will be substantially eliminated management of New York self-insured groups will be substantially eliminated during the second quarter of 2008, due to the voluntary termination of all of CRM's New York self-insured groups as of April 1, 2008.

\*     \*     \*

With regard to profit expectations for 2008, the Company believes that growth in primary insurance, coupled with maintenance of the California fee business and expense reductions, will produce results in line with the Company's original expectations. The Company expects earnings per share for the full year to be in the range of $1.00 to $1.15, which includes the favorable loss reserve development recorded in our primary insurance and reinsurance segments during the first quarter of 2008.

74.     On May 12, 2008, CRMH filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal first quarter. The Company's Form 10-Q was signed by Defendant Hickey and reaffirmed the Company's financial results previously announced on May 6, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Hickey and Scardino substantially similar to the certifications contained in ¶ 54, *supra*.

75.     On June 2, 2008, CRMH issued a press release entitled, "Compensation Risk Managers, LLC Reaches Settlement Agreement With the New York Workers' Compensation Board." Therein, the Company, in relevant part, stated:

CRM Holdings, Ltd., . . . announced its wholly-owned subsidiary Compensation Risk Managers, LLC ("CRM") has reached a resolution with the New York State Workers' Compensation Board ("WCB").

36

No fines, no penalties and no admission of wrongdoing were important elements of an agreement signed today between the WCB and CRM. Under the terms of the agreement, CRM, which had voluntarily exited the New York self-insured group market during the second half of 2007 and first quarter of 2008, will voluntarily surrender its third party administrator's license to provide third party claims administrative services to self-insured workers compensation groups in New York.

"I would like to thank the Workers' Compensation Board and Chairman Weiss for working with us to resolve this matter quickly. The group self-insured trust industry is facing some tremendous challenges in the months ahead and we are committed to helping them find solutions wherever we can," said Mr. Daniel G. Hickey Jr., the Company's Chairman and Chief Executive Officer.

Mr. Hickey continued, "An end to this dispute benefits our shareholders, as well as clarifies our defense of the allegations. The resolution of this matter allows us to turn our focus to meeting the needs of our brokers and end users as we continue to selectively expand our business."

*       *       *

The hearing originally scheduled for May 20, but postponed last week, has been canceled. Both sides consider the matter resolved. As part of the ongoing transfer of CRM's self-insured groups that voluntarily closed, it will continue to assist the WCB in the transfer of the administration of the groups still being managed by CRM to a new third party administrator appointed by the WCB under the Workers' Compensation Law and the WCB's regulations. In a separate matter, CRM agreed to pay $55,000 to satisfy all penalties that previously had been assessed by the WCB.

76.     On August 6, 2008, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Second Quarter Results." Therein, the Company, in relevant part, stated:

For the second quarter of 2008, net income was $3.1 million, or $0.19 per diluted share, compared to $5.2 million, or $0.32 per diluted share, a year ago . . . . Total revenues in the second quarter of 2008 were $49.0 million, up 10.7% from $44.2 million in the second quarter of 2007.

*       *       *

" . . . The overall business remains profitable as we transition out of the fee-based business in New York, and we remain set for prudent growth in the rest of our business." said Daniel G. Hickey Jr., CEO of CRM Holdings, Ltd. " . . . We are

also pleased to have two pieces of litigation behind us. First, with the New York Workers Compensation Board, where we were able to reach a settlement without admission of wrongdoing or financial penalty, and second, settlement of a contingency with Contractors Access Program of California, Inc. ("CAP") related to the Cornerstone litigation, which is now closed."

\* \* \*

Fee-based management services revenues were $3.9 million for the three months ended June 30, 2008, compared with $8.8 million in revenues in the second quarter of 2007, as the Company exited the management of self-insured groups in New York. Lower commissions paid by Majestic to CRM and declining insurance rates in California also contributed to the reduction in revenues. Total expenses for the quarter were $7.1 million, compared to $9.8 million in the prior year. Expenses were reduced by efficiencies and workforce reductions at the company's operations in Poughkeepsie, N.Y., offset in part by a $1.6 million charge related to the previously announced contract extension and settlement with CAP. Premiums under management on June 30, 2008, were $53.6 million, compared to $159.3 million a year ago. The decline reflects the voluntary termination of the Company's remaining self-insured groups in New York as of April 1, 2008.

For the first half of 2008, revenue in the fee-based management services segment were $8.9 million, compared to $18.7 million last year.

\* \* \*

The Company is also anticipating in its outlook $900,000 of expenses, or approximately $0.04 per share, spread over the next two quarters for possible legal costs associated with the closure of the New York trusts formerly managed by CRM.

\* \* \*

Based on the effects of the increased ceded premium under the 40% quota-share agreement as mentioned above and other factors, the Company is reducing its profit expectations for the 2008 fiscal year. The Company now expects earnings per share for the full year to be in the range of $0.70 to $0.80.

77.    On August 7, 2008, CRMH filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal second quarter. The Company's Form 10-Q was signed by Defendant Hickey and reaffirmed the Company's financial results previously announced on August 6, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by

Defendants Hickey and Scardino substantially similar to the certifications contained in ¶ 54, *supra*.

78.    On October 3, 2008, the Company filed a Current Report on Form 8-K with the SEC. Therein, the Company, in relevant part, stated:

On September 30, 2008, CRM Holdings, Ltd. (the "Company") received a letter from the New York State Workers' Compensation Board (the "WCB") indicating its intention to initiate legal proceedings against the Company on behalf of eight self-insured groups previously administered by Compensation Risk Mangers, LLC ("CRM") as it relates to CRM's actions while acting as the administrator and broker of record for the eight self-insured groups. *The WCB has indicated that it is investigating CRM's administration of the self-insured groups, and upon information and belief, it is alleging that CRM breached certain duties to the self-insured groups and engaged in certain self-dealing and deceptive practices.*

(Emphasis added).

79.    On this news, over the next two days of trading, shares of CRMH declined $0.61 per share, or 24.31%, to close on October 7, 2008 at $1.91 per share, on high volume.

80.    The statements contained in ¶¶ 72 and 74-79, were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that Defendants and their affiliates engaged in a fraudulent scheme and course of business to grow membership in the Trusts by charging premiums below commercial rates; (2) that the membership growth inflated gross trust revenues while reducing net paid premium income to the level that the assets of the Trusts would become insufficient to cover liabilities; (3) that, accordingly, the Trusts would fall below "fully funded" status; (4) that, as part of their fraudulent scheme and course of business, to cover up the difference between assets and liabilities, Defendants and their affiliates disguised the true financial conditions of the Trusts by engaging in certain improprieties designed to result in minimal projected claims liability, including under-reserving individual claims and utilizing improper actuarial/accounting methods; (5) that

39

Defendants and their affiliates provided the WCB with materially false and/or misleading financial and actuarial reports for the Trusts which reflected artificially reduced liabilities; (6) that, as a result of the above, the Company was exposed to hundreds of millions of dollars in liabilities relating to the under funding of the Trusts; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

## Disclosures At The End Of The Class Period

81.    On November 5, 2008, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Third Quarter Results." Therein, the Company, in relevant part, stated:

Results from continuing operations were a loss of $(0.18) per diluted share. Results for the third quarter were influenced by several unusual items. These items included, on an after-tax basis: $(0.03) of impairment charges relating to a previously-announced $1 million Lehman Brothers debt security owned by the Company; a $(0.04) charge relating to reserves created against potentially uncollectable receivables; *and a $(0.12) reserve adjustment to bring reserves for losses in the 2008 accident year accrued in the first and second quarters in line with the Company's higher third quarter reserve ratio for certain primary insurance risks.*

*      *      *

In the third quarter of 2008, the Company's net loss from continuing operations was $2.9 million, or $(0.18) per diluted share. The Company exited the business of providing services to workers' compensation self-insured groups in the State of New York in the third quarter. As a result, it closed its New York subsidiary responsible for this business, Compensation Risk Managers, LLC. The Company also closed its medical review business carried out through its subsidiary Eimar, LLC. The costs and remaining revenues from the businesses occurring during the third quarter have been classified as discontinued operations in the Company's financial statements.

*      *      *

Total expenses increased to $34.5 million from $27.6 million a year ago, as a result of several factors, including the unusual items described above: *namely, a change in the Company's accounts receivable reserves, a cumulative adjustment*

40

*to the loss ratio applied to the 2008 accident year in the Company's primary business, somewhat offset by reductions in prior years' loss reserves.*

\* \* \*

Fee-based management services revenues were $2.0 million, compared with $2.8 million in the third quarter of 2007. Total expenses for the quarter were $1.5 million, compared to $2.8 million a year ago. Expenses allocated to the Company's fee-based management services segment were lower in the third quarter of 2008 versus 2007. Premiums under management on September 30, 2008, were $52.7 million, compared to $58.9 million a year ago.

\* \* \*

Based on the effects of third quarter results and other factors, the Company is reducing its profit expectations for the 2008 fiscal year. The Company now expects earnings per share from continuing operations for the full year to be in the range of $0.58 to $0.63.

(Emphasis added).

82.    That day, CRMH held a conference call with investors, securities analysts, and other market participants to discuss the Company's financial results for the 2008 fiscal third quarter. Defendants Hickey and Scardino were present. Therein, in relevant part, Defendants Hickey and Scardino stated:

<Q - Paul Newsome - Analyst>: Okay. The next big one and then I'll let someone else [inaudible] a couple of questions is the reserve adjustment, could you go into why you felt you needed to increase the accident year for this year in particular?

<A - Defendant Scardino>: Yes. The view that our actuary took was that the pricing environment in California was such that they caution while our underlying losses are not showing any significant deterioration. The amount of premium that we are getting relative to payroll was down by an amount – percentage sufficient that the estimated ultimate loss ratio for this particular accident year – for 2008 accident year went up 4% – went up 400 basis points, let's say. But it was a function of the perceived pricing environment not of any kind of deficiencies in where we're actually carrying our reserves.

<Q - Paul Newsome>: *I don't understand that. Obviously your reserve charge means that your reserves were deficient for the first half of the year.*

41

<A - Defendant Scardino>: ***Yes, Paul.***

<Q - Paul Newsome>: ***Is this just an under pricing? Did you essentially under priced the business? Or we now assume that you didn't get a reserve charge, can you either set the reserves too low for a given level of exposure or you – and have an unexpected change in the expected claim trends for exposure...***

* * *

<A - Defendant Scardino>: We started the year – if we just give you easy numbers, we started the year thinking that 60% of the premiums we were seeing would give us an ultimate loss sufficient to meet our obligations. As we looked at where pricing was coming in, the ratio that needed to be charged – needed to be applied to our premiums to get to that same number of 64%. So, in effect, we had to increase reserves by that difference for the full year. So we have 64% ultimate loss ratio versus 60.

<A - Defendant Hickey >: This is a selected loss ratio by the third-party actuary and that's driven primarily by industry price change. Our loss frequency or loss severity, as Jim mentioned, does not in anyway indicate that potentially those losses will materialize to that level. But the actuary is looking at an industry-wide figure – in any industry-wide figure is saying that pricing is down in the current year and therefore he felt it was conservative and prudent to look at the current year. It's not in anyway an indication of an under reserve or under pricing adjustment.

<Q - Paul Newsome>: I am sorry. That doesn't really make any sense to me, because you don't say your reserves according to what you think the rest of the industry is going to lose, you set your reserves according to what you think [inaudible]. Right?

<A - Defendant Scardino>: ***Okay. That – Paul, we needed to be at 64% based on the actuarial ultimate and we had some development in increasing our loss reserve in New York as well. So the combination of those two things, net of movements in the other states, was such that during Q3, we had about $2.5 million of loss reserve increases that would have otherwise been reflected in Q1 and Q2.***

(Emphasis added).

83. On this news, over the course of the following three days of trading, shares of CRMH declined $0.58 per share, more than 36%, to close on November 7, 2008 at $1.03 per share, on high volume.

**Disclosures After the Class Period**

84.     On December 9, 2009, CRMH issued a press release entitled, "CRM Holdings, Ltd. Responds to the New York Attorney General." Therein, the Company, in relevant part, stated:

CRM Holdings, Ltd., . . . today announced that it has received a "Notice of Imminent Enforcement Action" from the New York State Office of the Attorney General ("Attorney General").

According to the Notice, the Attorney General intends to file civil claims against the Company, certain of its subsidiaries, and certain directors and officers to seek redress of allegedly unlawful practices, unless an acceptable settlement can be reached within five days. The Attorney General's Notice follows over 19 months of investigation, during which time the Company has cooperated fully with the Attorney General's office.

The Attorney General alleges that the Company and the other named parties engaged in fraudulent practices in connection with Compensation Risk Managers, LLC's administration and marketing of workers' compensation group self-insurance trusts in New York and in connection with the Company's initial public offering completed in December 2005. These practices are alleged to have violated New York's Executive Law and Martin Act. The Attorney General is intending to seek injunctive relief, restitution, damages, penalties, and costs.

The Attorney General's Notice indicated that it remains open to resolving the investigation without litigation and has provided the Company and the named directors and officers with five days to present acceptable offers of settlement.

The Company is disappointed by the Attorney General's decision to bring the lawsuit and dismayed that the Attorney General's office chose to disclose the Notice before the indicated window for discussion had expired.

85.     On December 10, 2009, CRMH issued a press release entitled, "CRM Holdings, Ltd. Responds to the New York State Workers' Compensation Board Lawsuit." Therein, the Company, in relevant part, stated:

CRM Holdings, Ltd. today announced that the New York State Workers' Compensation Board ("WCB") has commenced a lawsuit against CRM on its own behalf and in its capacity as successor in interest to the workers'

43

compensation group self-insurance trusts in New York previously managed by Compensation Risk Managers, LLC.

The WCB's lawsuit, brought in Supreme Court of the State of New York, Albany County, alleges that CRM, its subsidiaries and certain directors and officers breached fiduciary duties owed to the trusts, breached contracts between Compensation Risk Managers and the trusts, breached duties of good faith and fair dealing owed to the trusts, engaged in fraudulent activities in administering the trusts, engaged in deceptive business practices and advertising, and were unjustly enriched. The WCB alleges that the WCB and the trusts have suffered damages in an amount that is not currently ascertainable, but which is believed to exceed $405 million.

## CLASS ACTION ALLEGATIONS

Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased CRMH's securities between December 21, 2005 and November 5, 2008, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

86.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CRMH's securities were actively traded on National Association of Securities Dealers Automated Quotations Market ("NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of CRMH shares were traded publicly during the Class Period on the NASDAQ and as of November 4, 2008, shortly near the end of the Class Period, the Company had 16,085,235 shares of common stock outstanding. Record owners and

44

other members of the Class may be identified from records maintained by CRMH or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

87.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

88.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

89.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of CRMH; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

90.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

91.    The market for CRMH's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, CRMH's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired CRMH's securities relying upon the integrity of the market price of the Company's securities and market information relating to CRMH, and have been damaged thereby.

## UNDISCLOSED ADVERSE FACTS

92.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of CRMH's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about CRMH's business, operations, and prospects as alleged herein.

93.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CRMH's financial well-being and prospects.    These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant

times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

94.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

95.    During the Class Period, Plaintiff and the Class purchased CRMH securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

96.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CRMH, his control over, and/or receipt and/or modification of CRMH's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CRMH, participated in the fraudulent scheme alleged herein.

47

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

97.     The market for CRMH's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, CRMH's securities traded at artificially inflated prices during the Class Period. On February 6, 2006 the price of the Company's common stock closed at a Class Period high of $15.00 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of CRMH's securities and market information relating to CRMH, and have been damaged thereby.

98.     During the Class Period, the artificial inflation of CRMH's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CRMH's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of CRMH and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices and the price of the Company's securities fell when the fraud was revealed, and each of them has been damaged as a result.

99.     At all relevant times, the market for CRMH's securities was an efficient market for the following reasons, among others:

(a)     CRMH stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, CRMH filed periodic public reports with the SEC and the NASDAQ;

(c)     CRMH regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     CRMH was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

100.     As a result of the foregoing, the market for CRMH's securities promptly digested current information regarding CRMH from all publicly available sources and reflected such information in CRMH's stock price. Under these circumstances, all purchasers of CRMH's securities during the Class Period suffered similar injury through their purchase of CRMH's securities at artificially inflated prices and a presumption of reliance applies.

<u>FIRST CLAIM</u>
<u>Violation of Section 10(b) of</u>
<u>The Exchange Act and Rule 10b-5</u>
<u>Promulgated Thereunder Against All Defendants</u>

101.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49

102.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase CRMH's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

103.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CRMH's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

104.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CRMH's financial well-being and prospects, as specified herein.

105.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CRMH's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CRMH and its business

operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

106.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

107.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CRMH's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations,

financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

108.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of CRMH's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired CRMH's securities during the Class Period at artificially high prices and were damaged thereby when the artificial inflation was removed from the securities when the truth was revealed.

109.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that CRMH was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their CRMH securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

110.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

111.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Pursuant To Section 20(a) of
### The Exchange Act Against the Individual Defendants

112.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113.    The Individual Defendants acted as controlling persons of CRMH within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

114.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

115.    As set forth above, CRMH and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

54

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: February 4, 2010

MURRAY, FRANK & SAILER LLP

By: _____

Brian P. Murray (BM 9954)
275 Madison Avenue, Suite 801
New York, New York 10016
Telephone:    (212) 682-1818
Facsimile:    (212) 682-1892

GLANCY BINKOW & GOLDBERG LLP

Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

LAW OFFICES OF HOWARD G. SMITH

Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Plaintiff Beverly L. Munter*

55

SWORN CERTIFICATION OF PLAINTIFF

CRM Holdings, Ltd., SECURITIES LITIGATION

I, Beverly Munter, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase CRM Holdings, Ltd., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in CRM Holdings, Ltd. during the class period set forth in the Complaint are as follows:

I bought _1252_ shares on _1/1/05_ at $ _7.99_ per share.
I bought _1H_ shares on _1/16/05_ at $ _5.4.8_ per share.
I bought _1057_ shares on _1/1/7_ at $ _0.9_ per share.
I bought _303_ shares on _1/3_ of $ _7.880_ per share.
I bought _2147_ shares on _1/22_ at $ _7.880_ per share.

I sold _____ shares on _/_/_ at $ _____ per share.
I sold _____ shares on _/_/_ at $ _____ per share.
I sold _____ shares on _/_/_ at $ _____ per share.
I sold _____ shares on _/_/_ at $ _____ per share.
I sold _____ shares on _/_/_ at $ _____ per share.

SEE ENCLOSED
FOR BALANCE
OF SHARES
BOUGHT

(List Additional Transactions on a Separate Page if Necessary)

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

_____ [ ] (Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _1/29/2010_

_Beverly Munter_
(Please Sign Your Name Above)

CRM Holdings – additional shares purchased

| Type of Security | Buy Date | Number of Shares | Price Per Shares |
|---|---|---|---|
| Common | 1/25/08 | 2500 | 6.530 |
| Common | 1/29/08 | 900 | 6.840 |
| Common | 1/30/08 | 1600 | 6.780 |
| Common | 5/15/08 | 550 | 4.220 |
| Common | 5/15/08 | 450 | 4.150 |
| Common | 5/16/08 | 1500 | 4.160 |