# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE CRM HOLDINGS, LTD. SECURITIES LITIGATION | ) No.  10-cv-00975 (RPP) |
| | ) |
| | ) CLASS ACTION |
| | ) |
| | ) **CONSOLIDATED AMENDED COMPLAINT** |
| | ) **FOR VIOLATIONS OF THE FEDERAL** |
| | ) **SECURITIES LAWS** |
| | ) |
| | ) DEMAND FOR JURY TRIAL |

Lead plaintiffs Brett Brandes and Beverly L. Munter ("Lead Plaintiffs"), along with Plaintiff B&B Investors, LP (collectively, "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief is based upon, among other things, their counsel's investigation,[1] which includes without limitation: (a) review and analysis of regulatory filings made by CRM Holdings, Ltd.[2] ("CRMH" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by CRMH; (c) interviews with former employees and others; and (d) review of other publicly available information concerning CRMH.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of purchasers of CRMH's securities between the Company's December 21, 2005, Initial Public Offering ("IPO") and November 5, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     CRMH is a provider of workers compensation insurance products.  Its main business activities include underwriting primary workers compensation insurance policies,

---

[1] Plaintiffs' counsel's investigation also included examination and synthesis of numerous corroborating sources that bring to light Defendants' misconduct from a broad range of viewpoints including, but not limited to: (1) forensic audits performed on the underlying trusts by Bollam, Sheedy, Torani & Co. LLP, CPAs and Lumsden & McCormick, LLP; (2) a June 2010 Report to Governor Paterson and the New York State Legislature issued by the Task Force on Group Self Insurance; (3) the annual actuarial reports for the underlying trusts; (4) the complaint and amended complaint filed by the New York State Workers' Compensation Board against the Defendants, filed in the Supreme Court of New York, County of Albany; (5) the New York Attorney General's December 8, 2009 Notice of Imminent Enforcement Action served on Defendants; (6) the financial statements of the underlying trusts; (8) the Trust Agreements for each of the underlying trusts; and (9) the testimony of former employees of CRM.

[2] On May 5, 2010, Defendant CRM Holdings, Ltd. held its 2010 Annual General Meeting of Shareholders, at which the shareholders voted on and approved changing the name of CRM Holdings, Ltd. to Majestic Capital, Ltd.

underwriting workers compensation reinsurance and excess insurance policies, and providing fee-based management and other services to self-insured entities. The Company reinsures some of the primary business underwritten and provides excess workers compensation coverage for self-insured organizations. CRMH is a provider of fee-based management services to self-insured groups in California and formerly in the state of New York.

3.     CRMH, along with its wholly-owned subsidiary Compensation Risk Managers, LLC ("CRM"), formerly administered and provided fee-based services to eight (8) self-insured groups in the state of New York (the "Trust(s)"). The Trusts included:

| TRUST | DATE ESTABLISHED | DATE TERMINATED | APPROX. TOTAL MEMBERSHIP** |
|---|---|---|---|
| *Elite Contractors Trust of New York* ("ECTNY") | 8/27/1999 | 7/16/2008 | 2676 |
| *Healthcare Industry Trust of New York* ("HITNY") | 9/12/1999 | 12/31/2007 | 468 |
| *Wholesale and Retail Workers' Compensation Trust* ("WRWCT") | 9/27/1999 | 4/29/2008 | 905 |
| *Transportation Industry Workers' Compensation Trust* ("TRIWCT") | 12/27/2000 | 1/31/2008 | 826 |
| *Trade Industries Workers' Compensation Trust for Manufacturers* ("TIWCT") | 12/27/2001 | 1/31/2008 | 148 |
| *Real Estate Management Trust of New York* ("REMTNY") | 1/1/2001 | 1/31/2008 | 307 |
| *Public Entity Trust of New York* ("PETNY") | 1/1/2002 | 8/2/2007 | 14 |
| *New York State Cemeteries Trust* ("NYSCT") | 2/1/2002 | 3/31/2008 | 85 |

**     *Represents total members over the course of the Trusts existence from establishment to termination.*

4.     Under New York state law, employers who wish to self-insure for workers' compensation may either self-insure individually or join together and request approval to operate as a group self-insured trust ("GSIT"). The members of a GSIT proportionally share in any

surplus which may have been generated by the trust (*i.e.*, contributions for a given fiscal year which exceed expenses). Conversely, members are jointly and severally liable for any deficit which may occur when the contributions are inadequate to pay all of the GSIT's obligations for a given period. The New York State Workers' Compensation Board ("WCB") effectively requires that GSITs be "fully funded" (*i.e.*, maintain an asset/liability ratio of 90% or above).

5.     When CRMH became a public company on December 21, 2005 – selling approximately 8,850,000 shares of CRMH's common stock to the public at $13.00 per share for gross proceeds of $115,050,000 – the offering materials described the Company as "a leading provider of fee-based management and other services for workers' compensation self-insured groups in New York and California." Indeed, CRMH had "been in the business of forming and managing self-insured groups in New York since [its] inception in 1999 and expanded this business to California in 2003." As reflected in the Registration Statement and Prospectus (collectively, the "Registration Statement") for the IPO, at that time, its "fee-based management services accounted for approximately 83% of [CRMH's] total revenues and approximately 74% of [its] net income for the nine months ended September 30, 2005."

6.     At the time of the IPO – when the Company raised nearly $70 million and certain insiders reaped more than $37 million by selling their personal holdings – the Trusts were essentially ticking time bombs, waiting to implode. In reality, the perceived growth in CRMH's business and fee revenue during the years leading up to the IPO was the result of increasing membership in the trusts by offering the Trusts' members steep premium discounts relative to commercial rates. Even though membership growth increased gross trust revenue, these discounts actually reduced net paid premium income to the point that trust assets became

insufficient to cover liabilities.  The result: asset/liability ratios for the trusts fell below "fully funded" status.

7.      To compensate and maintain the appearance that the Trusts were "fully funded," CRMH engaged in various improper practices, including under-reserving individual claims, and using improper actuarial and accounting methodologies to minimize projected claims liability. Aiding and abetting CRMH in these illicit practices was its actuary, Charles Gruber ("Gruber"), of the actuarial firm of SGRisk, LLC ("SGRisk"), and its accountant, UHY LLP, who produced misleading financial and actuarial reports for the Trusts.  These practices had the net effect of artificially reducing liabilities as reported in the trusts' financial statements that CRMH filed with the WCB.

8.      Of the eight (8) Trusts, the largest and most important to CRMH was HITNY, which accounted for approximately 50% of CRMH's New York trust administration business. As the New York Attorney General ("NYAG") has noted, "HITNY was the crown jewel of CRM's business model.  CRM could ill-afford to allow HITNY, in particular, to be seen as underfunded, as doing so would fatally undermine CRM's image as a sound, financially healthy business."  HITNY, like CRMH's other Trusts, was under-funded and CRMH falsely made HITNY appear more financially sound than it was in reality.

9.      Unbeknownst to investors, shortly after the IPO, on August 25, 2006, the Board of Trustees of HITNY was "frustrated by the poor financial performance of HITNY due to the lack of reliable forecasts and actuarial projections being provided by [CRM]."  The HITNY Trustees subsequently retained a separate actuary, Milliman, to perform an independent loss reserve assessment, a draft of which was issued late in November 2006.  This report estimated

that HITNY's loss reserve requirements were in excess of $110,000,000, or approximately $63,000,000 more than SGRisk's most recent report, which the author of the report described the difference in estimates as "extreme."

10.     Around the beginning of December 2006, the WCB sent letters to the trustees of other Trusts indicating serious concerns with the accuracy of SGRisk's actuary reports and that an independent actuarial review must be performed.

11.     A December 20, 2006, report issued by a claims consultant hired by WRWCT to analyze CRM's claim practices noted the following: (1) CRM was manipulating reserves; (2) the reserves showed an inadequacy of $4.5 million; (3) CRM was artificially reducing reserves and that the reserves should not have been reduced; (4) CRM was hiding and suppressing reserves; and (5) CRM was reducing its reserves even when contradictory information existed. WRWCT000476-WRWCT000490.  Indeed, the summary of the report began by stating:

> **SUMMARY of Audit Results**
>
> 1.     Reserve adequacy.  A monumental problem.  Document reserve increases proposed on cases reviewed but not yet posted is in excess of $4,500,000. Additional reserve requirements on files without pending reserve recommendation is in excess of $700,000.  *A failing grade is assigned to this category.*

WRWCT000477 (Emphasis in original).

12.     By the end of 2006, unbeknownst to investors, a massive storm had formed around CRMH.  At the helm of the ship were CRMH's co-captains, Defendant Daniel G. Hickey, Jr. ("Hickey") and Defendant Martin D. Rakoff ("Rakoff"), who had co-founded CRM and each served as co-Chief Executive Officer ("CEO") of CRMH.  In the face of the storm, Defendant Rakoff made for the life-boat.  On December 28, 2006, the Company announced that

Defendant Rakoff was resigning effective as of that day.  Pursuant to a separation agreement, dated as of December 19, 2006, the Company agreed to, among others, pay Defendant Rakoff $3.3 million and to make arrangements for a secondary public offering of Defendant Rakoff's shares of the Company's stock.  On or around February 8, 2007, the Company conducted a secondary offering of all 1,934,691 of Defendant Rakoff's shares of CRMH stock at $7.55 per share, for proceeds to Defendant Rakoff of more than $14.6 million.  While Defendant Rakoff made off on the lifeboat (although more of a "life-yacht" if such a term existed) with a payout of nearly $18 million, Defendant Hickey stayed onboard to act as sole CEO and to go down with the ship.

13.    On  April 17, 2008, CRMH disclosed that CRM had received a notice from the New York Workers Compensation Board (the "WCB") that, following an initial investigation, the WCB was taking administrative action to revoke CRM's third party administrator's license to provide third party claims administrative services to self-insured workers compensation groups in New York.  Moreover, the Company disclosed that CRM received a subpoena from the New York State Attorney General's Office (the "New York Attorney General") requesting documents related to CRM's administration of the Healthcare Industry Trust of New York, and that the Company believed that the subpoena related to the concurrent investigation being conducted by the WCB.

14.    On this news, shares of CRMH declined $1.58 per share, more than 32%, to close on April 17, 2009, at $3.32 per share, on unusually heavy volume.

15.    Thereafter, on October 3, 2008, CRM further disclosed that it had received a letter

from the WCB indicating its intention to initiate legal proceedings against the Company on behalf of eight (8) self-insured groups (the "Trusts") previously administered by CRM as it related to CRM's actions while acting as the administrator and broker of record for the Trusts. According to the Company, the WCB was investigating CRM's administration of the Trusts and that the WCB was alleging upon information and belief that CRM breached certain duties to the Trusts and engaged in certain self-dealing and deceptive practices.

16.     On this news, over the next two days of trading, shares of CRMH declined $0.61 per share, or 24.31%, to close on October 7, 2008 at $1.91 per share, on high volume.

17.     Subsequently, at the end of the Class Period, on November 5, 2008, CRMH reported its financial results for the 2008 fiscal third quarter and announced that during third quarter, the Company had about $2.5 million of loss reserve increases that would have otherwise been reflected in the first and second quarter of 2008.

18.     On this news, over the course of the following three days of trading, shares of CRMH declined $0.58 per share, more than 36%, to close on November 7, 2008 at $1.03 per share, on high volume.

19.     After the Class Period, on December 9, 2009, the Company issued a press release announcing that CRMH had received a "Notice of Imminent Enforcement Action" (the "Notice") from the New York Attorney General.  The Company disclosed that, according to the Notice, the New York Attorney General intended to file civil claims against the Company, certain of its subsidiaries, and certain directors and officers to seek redress of allegedly unlawful practices unless an acceptable settlement could be reached within five days.  According to the Company, the Attorney General alleged that the Company and the other named parties engaged in

fraudulent practices in connection with CRM's administration and marketing of the Trusts, as well as in connection with the Company's initial public offering completed in December 2005.

20.     The Notice succinctly described[3] the fraudulent and unlawful practices that had been revealed during the NYAG's investigation that had been ongoing for more than nineteen (19) months:

> Dear Sir or Madam:
>
> You are hereby notified that it is the intention of the Office of the New York Attorney General (the "Attorney General") to file civil fraud charges on behalf of the People of the State of New York against CRM Holdings, Ltd. and certain of its subsidiaries (collectively, "CRM"), as well as the individuals and other entities addressed above (collectively, the "Subjects"), pursuant to the Executive Law of the State of New York, Sections 63(1) and 63(12), and Article 23-A of the General Business Law of the State of New York, Section 352, et seq. (the "Martin Act"), and to seek, in redress of certain fraudulent and unlawful practices in which CRM and the Subjects have engaged, injunctive relief, restitution, damages, penalties, costs, and such other relief as the Court may deem proper.  The Attorney General is prepared to take immediate legal action should CRM and the Subjects fail to come forward at once with acceptable offers of settlement to resolve the Attorney General's investigation.
>
> **<u>CRM and the Subjects Engaged in Fraudulent and Illegal Practices in Connection with CRM's Administration and Marketing of Certain Group Self-Insured Workers' Compensation Trusts</u>**
>
> An investigation by the Attorney General has revealed that CRM and the Subjects engaged in repeated and persistent fraudulent, deceptive and illegal business practices in connection with CRM's administration and marketing of certain group self-insured workers' compensation trusts.
>
> From 1999 until its license to operate was revoked by the Workers' Compensation Board ("WCB") effective September 2008, CRM was a third-party administrator of group self-insured workers' compensation trusts ("the trusts") established under New York State's Workers' Compensation Law ("WCL"). WCL permitted small businesses to self-insure their workers' compensation exposure by pooling together into trusts created especially for that purpose, as an

---

[3] A copy of the Notice was not provided with CRMH's December 9, 2009, press release.

alternative to obtaining workers' compensation insurance from the New York State Insurance Fund or from commercial insurance carriers.

As administrator of the trusts, CRM's responsibilities included ensuring that the trusts set aside, from the premium income received from trust members, sufficient reserves to pay claims as they emerged. However, because CRM and its principals – including Daniel G. Hickey, Jr. (former co-CEO), Martin D. Rakoff (former co-CEO), Louis J. Viglotti (Secretary and General Counsel), Daniel G. Hickey, Sr. (Director), Joseph F. Taylor (Chief Financial Officer), James J. Scardino (CEO), Thomas J. Spendley (Senior Vice President of Underwriting), Chester J. Walczyk (Chief Operating Officer), and Learle Kilmer (former Vice President of Claims) (collectively, the "Principals") – wanted to grow CRM's business and generate ever greater fee revenue for CRM, CRM and the Principles sought to increase membership in the trusts by offering trust members steep premium discounts relative to commercial rates. Although the growth in membership meant an increase in gross trust revenue, the discounts reduced net paid premium income to the point that trust assets became insufficient to cover liabilities – meaning that asset/liability ratios for the trusts fell below "fully funded" status. To compensate for the disparity between assets and liabilities, CRM and the Principals engaged in various improper practices, including under-reserving individual claims, and using improper actuarial and accounting methodologies to minimize projected claims liability. CRM and the Principals were assisted in implementing these improper practices by CRM's actuary, Charles Gruber, of the actuarial firm of SGRisk, LLC, and its accountant, Donald Neubecker, of the accounting firm of UHY LLP, who produced misleading financial and actuarial reports for the trusts. These practices had the net effect of artificially reducing liabilities as reported in the trusts' financial statements that CRM and the Principals filed with the WCB.

Since the funding status of a trust is an indication of the trust's financial health, adverse consequences would ensue if a trust fell short of being fully funded. If a trust were to be deemed "under-funded", it would become unattractive to new and existing members alike, driving down membership and undermining the confidence of the trusts' boards in the third-party administrator's skill as a trust manager. It would also invite unwelcome attention from the WCB, which could subject the trust to increased supervision, special assessments to increase the amount of available assets, and possible restrictions on how the trust operates, including limits on new membership and premium discounts. For CRM and the Principals, managing underfunded trusts would negatively impact CRM's trust administration business by limiting its ability to market effectively to new members and by reducing gross revenue. In order to avoid these consequences, CRM utilized the various improper practices referred to above, so as to portray to the WCB and to the trusts' existing and potential new members that the trusts

were fully funded.  All the while, CRM and the Subjects at least knew that these portrayals did not accurately reflect the trusts' true financial condition.

Maintaining a trust's "fully funded" status with the WCB (i.e., an asset/liability ratio of 90% or above) was the primary concern of CRM and the Principals during the years that CRM administered the New York State trusts. Deliberately misstating the funding status of the trusts was an essential element in CRM's efforts to market the trusts and promote growth in trust membership. In effect, CRM's business model was based upon fraud – to establish trusts, retain management control over them, rapidly grow their membership by steeply discounting premiums, maximize administrative fees, and stave off any scrutiny by the WCB or others by disguising the true state of the trusts' financial condition.

During the relevant period, CRM managed eight New York State trusts. The largest was the Healthcare Industry Trust of New York ("HITNY").  Since it represented approximately 50% of CRM's New York trust administration business, HITNY was the crown jewel of CRM's business model. CRM could ill-afford to allow HITNY, in particular, to be seen as underfunded, as doing so would fatally undermine CRM's image as a sound, financially healthy business. Like CRM's other trusts, HITNY, too, was under-funded. And, as was the case with the other trusts, CRM and the Subjects falsely made HITNY appear to be more financially sound than it was in reality.

The uncorrected funding shortfalls attributable to CRM's conduct have exposed the New York State workers' compensation system to hundreds of millions of dollars of unfunded liabilities, and have subjected the members of CRM's trusts, as well as other participants in the New York State workers' compensation system, to assessments to cover those shortfalls.

## CRM and the Subjects Committed Fraud in Connection with the Initial Public Offering of CRM's Securities in December 2005

The Attorney General's investigation has also revealed that CRM and the Subjects engaged in fraudulent practices relating to the issuance of securities by making material misrepresentations and omissions in connection with its initial public offering ("IPO") in December 2005 of CRM's stock. Specifically, CRM and the Subjects failed to disclose in CRM's registration statement, offering documents, and road show presentations, the true financial condition of certain of the trusts it administered. CRM and the Subjects misled the investing public by projecting an unduly positive picture of the financial health of the trusts that it managed in order to demonstrate strong corporate operations and higher fee potential for CRM, and make its offering more attractive to investors.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

CRM's IPO generated more than one hundred million dollars for CRM and certain of the Principals.

**CRM and the Subjects Must Take Immediate Action**

The Office of the Attorney General remains open to resolving this investigation without litigation.  In order to avoid imminent legal action by the Attorney General, CRM and the Subjects must come forward within five days of the date of this letter with acceptable offers of settlement.  Also, it is our understanding the WCB may file a separate civil lawsuit against various subjects related to the matters described above.  The WCB is not bound, however, by the Attorney General's Office's legal obligation to provide five-day notice before filing its action.

Very truly yours,

Steven M. Cohen
Counselor and Chief of Staff

CRMMISC000001-000005.  (Emphasis in original.)[4]

21.    The following day, on December 10, 2009, the Company disclosed that the WCB had commenced a lawsuit against CRM on its own behalf and in its capacity as successor in interest to the Trusts, which were previously managed by CRM.  The Company indicated that the WCB's lawsuit, alleged that CRM, its subsidiaries and certain directors and officers breached fiduciary duties owed to the Trusts, breached contracts between CRM and the Trusts, breached duties of good faith and fair dealing owed to the Trusts, engaged in fraudulent activities in administering the Trusts, engaged in deceptive business practices and advertising, and were unjustly enriched.  The WCB alleges that the WCB and the Trusts have suffered damages in an amount that is not currently ascertainable, but which is believed to exceed $405 million.

---

[4] Plaintiffs will be serving an Appendix on Defendants concurrently herewith.  Plaintiffs will file a copy of the Appendix with the Court if needed or requested during the briefing on Defendants yet to be filed motion to dismiss.  An Index of the Appendix is attached hereto as Exhibit "A."

22. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that Defendants and their affiliates engaged in a fraudulent scheme and course of business to grow membership in the Trusts by charging premiums below commercial rates; (2) that the membership growth inflated gross trust revenues while reducing net paid premium income to the level that the assets of the Trusts would become insufficient to cover liabilities; (3) that, accordingly, the Trusts would fall below "fully funded" status; (4) that, as part of their fraudulent scheme and course of business, to cover up the difference between assets and liabilities, Defendants and their affiliates disguised the true financial conditions of the Trusts by engaging in certain improprieties designed to result in minimal projected claims liability, including under-reserving individual claims and utilizing improper actuarial/accounting methods; (5) that Defendants and their affiliates provided the WCB with materially false and/or misleading financial and actuarial reports for the Trusts which reflected artificially reduced liabilities; (6) that, as a result of the above, the Company was exposed to hundreds of millions of dollars in liabilities relating to the underfunding of the Trusts; and (7) that, as a result of the above, the Company's financial statements were materially false and/or misleading at all relevant times.

23. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

26.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.  Additionally, CRMH maintains offices and conducts business within this Judicial District.

27.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

28.     Lead Plaintiffs Brett Brandes and Beverly L. Munter, as set forth in the certifications previously filed with the Court in connection with their motion to be appointed Lead Plaintiffs (*see* Doc. ##2, 4 at Ex. B), incorporated by reference herein, purchased CRMH common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

29.     Plaintiff B&B Investors, LP, is an investment partnership that was established in April 1993. The general partner of Plaintiff B&B Investors, LP, is Prestige Capital Management, LLC ("PCM"), which was established by Lead Plaintiff Brett Brandes, a principal of PCM. Plaintiff B&B Investors, LP, as set forth in the certifications previously filed with the Court in connection with Lead Plaintiffs motion to be appointed Lead Plaintiffs (see Doc. ##2, 4 at Ex. B), incorporated by reference herein, purchased CRMH common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

30.     Defendant CRMH is a Bermuda corporation and lists the address of its principal executive offices as PO Box HM 2062, Hamilton, Bermuda, HM HX.

31.     Defendant Hickey was, at all relevant times, Chairman of the Board of Directors and Co-Chief Executive Officer of CRMH until December 28, 2006, and was, at all relevant times, Chairman of the Board of Directors and Chief Executive Officer ("CEO") of CRMH from December 28, 2006 until his resignation[5] from the Company effective March 13, 2009. Hickey was, at all relevant times until his March 13, 2009 resignation: the Chairman of the Board of Twin Bridges and President of CRM, CRM CA, and Eimar. According to CRMH's

---

[5] Shortly after the Class Period, the Company's office of general counsel became aware that certain members of CRMH's senior management may have instructed a consulting and public relations firm retained by the Company to post messages favorable to the Company on the Yahoo! message board in June and November of 2008 in response to negative messages posted by others. Thereafter, CRMH's office of general counsel conducted an internal investigation and referred the matter to the Qualified Legal Compliance Committee of the Board of Directors (the "QLCC"), which retained special counsel to conduct an investigation, and rendered a report to the QLCC on February 27, 2009. As a result, the QLCC concluded that messages favorable to the Company had been posted on the Yahoo message board by the Company's consultant without disclosing that the source of the messages was an agent of the Company and that the consultant had acted on the instructions of the Company's chief marketing officer and the Company's vice president of corporate communications, both of whom had been directed to take such actions by Defendant Hickey. Thereafter, Defendant Hickey resigned from the Company effective March 13, 2009, and the Board of Directors authorized special counsel to report its findings of fact to the enforcement division of the SEC.

definitive proxy filed on March 30, 2006, Hickey as of that date had "more than 16 years of insurance industry experience."   As fully set forth below, as part of his resignation, Hickey received, among other things, a $3.3 million cash severance and the immediately accelerated vesting of over 46,000 shares of restricted stock.

32.     Defendant Rakoff was, at all relevant times, Co-Chief Executive Officer and Deputy Chairman of the Board of Directors of CRMH until his resignation from the Company effective December 28, 2006.  Rakoff also was, at all relevant times until his resignation on December 28, 2006: CEO of CRM; CEO of CRM CA; CEO of Eimar; and Deputy Chairman of the Board of Twin Bridges.  As fully set forth below, as part of his resignation, Rakoff received, among other things, a $3.3 cash million severance and CRMH's obligation to have his 1.9 million CRMH shares registered and sold by the Company pursuant to a secondary offering. While a December 28, 2006 Company press release indicated that the secondary offering would "allow him to diversify his portfolio," Rakoff went on to "diversify" his portfolio by selling *100%* of his CRMH holdings, selling his remaining 1,934,691 shares for proceeds of *over $14 million*.

33.     Defendant James J. Scardino was, at all relevant times, Chief Financial Officer ("CFO") of CRMH.  Scardino also served as: Executive Vice President, CFO of Majestic from July 2007 to May 2009; as CFO of CRM, CRM CA, and Eimar from August 2005 to May 2009. Scardino's prior insurance experience included his position as Senior Vice President, Finance with RSC Insurance Brokerage, Inc. from 2003 to 2005, and his position as Executive Vice President of Allied American Insurance Agency, Inc. from March 2000 until May 2003.

34.     Defendant Daniel G. Hickey, Sr. ("Hickey Sr.") was, at all relevant times, a member of the Board of Directors of CRMH.  Hickey Sr. has also been: a member of the Board of Directors of Majestic since November 2006; a member of the board of managers of CRM from 1999 to December 2005; a member of the board of managers of CRM CA from 2001 to December 2005; and a member of the board of managers of Eimar from 2003 to December 2005. Hickey Sr. also was, at all relevant times, a director of Twin Bridges.  Hickey Sr. was also one of the owners, and has served as the President, of Hickey-Finn & Co., Inc., an insurance brokerage firm that also employed prior to June/July 1999, among others, his son Defendant Hickey.

35.     Defendants Hickey, Rakoff, Scardino, and Hickey Sr., are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of CRMH's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### New York State Workers' Compensation Laws and the WCB

36.     Every employer in New York State is required by the laws of New York to secure workers' compensation coverage for its employees.  The WCB is a governmental agency created pursuant to the New York State Workers' Compensation Law ("WCL"), charged with administration of the WCL and attendant regulations, and has all of the powers and duties set forth in WCL § 142.  The WCL states that employers may secure the payment of workers' compensation to their employees in one of the following three ways: (1) by insuring and keeping insured the payment of such compensation from the State Insurance Fund (WCL § 50(1)); (2) by insuring and keeping insured the payment of such compensation with any insurance carrier authorized to transact such business in New York State (WCL § 50(2)); or (3) by becoming a self-insurer (WCL § 50(3) and WCL § 50(3-a)).

37.     In the event that an employer pursuing coverage under WCL § 50(3) is unable to demonstrate the financial wherewithal to self-insure individually, it may join with other employers in related industries and form a group self-insured trust ("GSIT").  A GSIT is defined under WCL § 50(3-a) as a group of employers who jointly self-insure for workers' compensation claims.  All private employers, whether individuals or as members of a GSIT, who wish to self-insure for workers' compensation benefits, must apply to, and be duly authorized by, the WCB's Office of Self-Insurance.

38.     For group insurance, WCL § 50(3-a)(3) provides that all employers participating in the GSIT shall not be relieved from their liability for workers' compensation, as required under the WCL, except through payment of all claims by the GSIT or by the employer.  Pursuant

to WCL § 50(3-a)(2), employers "may adopt a plan for self-insurance, as a group, for the payment of compensation under this chapter to their employees." A condition of any such plan is that the group of employers provide proof to the WCB of the GSIT's financial ability to pay all compensation for which the employers may be liable under the WCL. The WCB has promulgated additional regulations to establish application procedures, qualifications, and responsibilities for GSITs at 12 NYCRR § 317, *et seq.*[6]

39. The WCB allows GSITs to grow memberships and use appropriate discounts if their audited financial statements reveal a trust equity ratio of 90% or more. If this ratio is not met, the WCB subjects GSITs to greater scrutiny, restricting membership and discounts.

40. The WCB regulations require GSITs to, *inter alia*, provide evidence of adequate capitalization and maintain assets in excess of liabilities, comply with the remedial provisions applicable to under-funded GSITs; and submit annual audited financial statements evidencing the financial status of the GSIT.

41. These requirements provide the WCB's Office of Self-Insurance with information to ensure adequate financial strength of the GSIT, and minimize the risk of an interruption in the flow of benefits to injured workers. The WCB employs, *inter alia*, certain procedures to identify GSITs that are in need of remedial action to ensure that the GSITs remain solvent:

(a) the WCB receives and reviews the annual independently audited financial

---

[6] The WCB's regulations contain the definitions pertaining to GSITs. "Contribution" is defined as "the annual charge to individual members of a group self-insurer to cover its workers' compensation liabilities and assessments." "Trust account or trust fund" is defined as "a trust account or fund, financed by the contributions of and assessments on members of a group self-insurer, for the exclusive purpose of paying for and otherwise administering workers' compensation liabilities." "Trust liabilities" is defined as "all claims, accrued workers' compensation board assessments, accrued expenses including administrative costs...and all other trust obligations."

statements and actuarial reports submitted by every GSIT. These documents detail the GSITs liabilities and assets;

> (b)     if the GSITs annual audited financial statements and actuarial reports indicate that the GSIT has greater liabilities than assets, known as "underfunding," the GSIT is subject to the remediation procedures set forth in 12 NYCRR § 317.9; and

> (c)     depending upon the severity of the underfunding, the WCB may take one or more of the actions designated in 12 NYCRR § 317.9(b), which are designed to restore the GSIT to a funded status in a timely manner.

42.     A GSIT whose financial analyses demonstrates continued underfunding status that is so severe that it cannot be restored to a financially stable position in a timely manner will be terminated by order of the WCB.  When this occurs, the GSIT no longer provides coverage for its members.  The GSIT's members still are required to meet workers' compensation obligations, which accrued prior to termination, and are payable directly to the injured employees.

43.     In the event the WCB determines that a GSIT cannot properly administer its liabilities due to its inability to pay outstanding lawful obligations, the WCB may deem the GSIT insolvent and assume administration and final distribution of the GSIT's assets and liabilities, pursuant to 12 NYCRR § 317.20.

### The History of CRMH and CRM

44.     Prior to June/July 1999, Defendant Hickey worked for Hickey-Finn & Co., Inc. ("Hickey-Finn"), an insurance brokerage firm owned by, among others, his father, Defendant Hickey Sr..  Prior to June 1999, Defendant Martin D. Rakoff was employed by and part owner of

Consolidated Risk Services ("CRS"), a foreign business corporation that registered with the New York State Department of State, Division of Corporations, on October 21, 1997.

45.     On May 26, 1999, Compensation Risk Managers, LLC ("CRM") registered as a domestic limited liability company with the New York State Department of State - Division of Corporations.  Defendants Hickey and Rakoff served as CRM's President and Chief Executive Officer, respectively.  CRM was formed by Defendants Rakoff, Hickey, and Hickey Sr., as well as Robert Finn (the latter two were principals of Hickey-Finn & Co., Inc.).

46.     CRM was a third-party trust administrator that began to provide administration services to GSITs in August 1999.  Between 1999 and 2002, CRM assisted in the formation of the various Trusts, which CRM administered until September 2008.

47.     Additionally, on January 16, 2001, Eimar, LLC ("Eimar") registered with New York State as a domestic limited liability company.  Eimar is a CRM affiliate that since 2002 provided medical claims services for the Trusts administered by CRM.

48.     In addition to administering the Trusts, CRM provided a broad range of other services for the Trusts.   These services included, among others, general management, underwriting, risk assessment, medical bill review and case management, general recordkeeping, regulatory compliance, loss control services to help reduce workers' compensation risks and expenses, and claims management services.

49.     In New York, the fees CRM received from all but one of the Trusts were based on a percentage of the manual workers' compensation rates set by the WCB that were attributable to the members of the Trusts CRM managed, and its fees included claims management services. Fee-based management services accounted for approximately 83% of CRMH's total revenues

and approximately 74% of its net income for the nine months ended September 30, 2005 and approximately 84% of its total revenues and approximately 85% of its net income for the year ended December 31, 2004.

50.     When CRMH conducted its IPO on December 21, 2005, a significant amount of its existing business was dependent on a relatively small number of the Trusts.   For example, HITNY provided approximately 26% and 38% of its revenues from fee-based management services for the nine months ended September 30, 2005 and the year ended December 31, 2004, respectively.  Two other groups, ECTNY and TRIWCT, provided approximately 21% and 13%, respectively, of its revenues from fee-based management services for the nine months ended September 30, 2005 and approximately 22% and 14%, respectively, of its revenues from fee-based management services for the year ended December 31, 2004.

51.     CRM (and CRMH) also acted as a broker and placed excess insurance coverage and any required surety bonds for the Trusts.  The Trusts were required to purchase excess workers' compensation coverage to cover claims that exceed a minimum level established by state law or regulation.  Since December 2003, CRM (and CRMH) provided reinsurance for a portion of this excess coverage through CRMH's subsidiary, Twin Bridges.

52.     In the course of administering the Trusts, CRM engaged SGRisk and Gruber to perform professional actuarial services for each of the Trusts.  The loss reserves were initially established by CRM upon notification and examination of the injury claims filed by the Trusts' members.   The loss reserve amounts established by CRM were, in turn, relied upon by the Trusts' actuary when estimating loss reserves that were to be used as the basis for reporting the claim liability and expense in the Trusts' financial statements.  Additionally, CRM, by virtue of

its administrative role, was responsible for preparing the Trusts financial statements and corresponding financial statement footnotes, which were required to be prepared in accordance with GAAP and certified by an independent certified public accountant. CRM engaged UHY to act as the independent account for the Trusts.

53.     Axiomatic within GAAP is the principle of conservatism, which requires the prepares of financial statements to make evaluations and estimates, to deliver opinions, and to select procedures, and to do so in a way that neither overstates nor understates the affairs of the business or the results of operations. Thus, while CRM had the responsibility to apply the concept of conservatism, it was UHY's responsibility to determine whether the claims liability/expense amounts reported by CRM were not materially misstated, and opining on the overall fairness of the Trusts' financial statements.

54.     Unexpectedly in 2007 and 2008, 7 of the 8 Trusts CRM administered defaulted. Unlike the insolvencies the WCB had dealt with previously, prior to the default of these 8 groups, there was little to no indication in the financial and actuarial reports submitted that there was financial distress of the magnitude ultimately identified.

**CRM Trusts**
**Historical GAAP Funding Levels**

| Group Name | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Elite Contractors Trust of New York | 109% | 102% | 102% | 103% | 94% | 93% * |
| Real Estate Management Trust | 96% | 92% | 96% | 92% | 52% | 23% |
| Trade Industries WC Trust | 90% | 92% | 91% | 90% | 45% | 9% |
| Wholesale and Retail WC SI Trust | 101% | 95% | 93% | 95% | 65% | 34% |
| Transportation Industry WC SI Trust | 101% | 101% | 102% | 95% | 74% | n/a ** |
| Healthcare Industry Trust of New York | 101% | 93% | 95% | 85% | 29% | 8% |
| New York State Cemeteries Trust | n/a | 100% | 102% | 103% | 104% | 66% |
| Public Entity Trust of New York | 90% | 96% | 100% | 56% | 34% | 2% |

*Elite's 2007 financials were prepared by CRM. The 2008 trust equity ratio was reduced to 34% in 2008 once the reserves were restated.

**Financials not available

55.     According to the "Report to Governor Paterson and the New York State Legislature" (the "Task Force Report") issued in June 2010 by the Task Force on Group Self-Insurance, the dramatic decrease in the funding position for the majority of these trusts, from 2005 to 2006, was the result of the failure of the GSITs administered by CRM to recognize adequate reserves which understated liabilities in the prior years.  The total CRM trusts' GAAP assets reported to the WCB in 2005 and 2006 remained virtually unchanged at $93 million and $96 million, respectively. Contrarily, the total CRM trusts' GAAP liabilities reported in 2005 were $101 million and increased to $194 million in 2006.

56.     As a result of these sudden and unexpected failures, the WCB hired consultants and ultimately conducted forensic reviews to determine the causes of the various insolvencies. Among others, the findings included:

(a)     Execution of contracts with affiliate companies to redirect more money from the trust to the administrator;

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(b)    Self serving contracts that benefited the administrator such as payment based on membership size not performance;

(c)    Administrators having complete autonomy with regard to the underwriting and acceptance of members;

(d)    Significant growth in membership with unsubstantiated discounts which resulted in higher fees to the administrator;

(e)    Administrators paying themselves unreasonable brokerage fees for placing excess coverage even when placed with affiliates.

57.    Moreover, as noted by the Task Force Report, the forensic audits reflected that the administrator was able to manipulate the data so that the GSITs appeared more funded.  These types of manipulations included: suppressing claims reserves; recording questionable accounting transactions; using unsupported discount rates; failing to terminate chronic non-performing members; and providing questionable data to actuaries and accountants when generating yearend financial statements.

58.    Due to the factors noted above, the deficits originally reported on the financial statements of a number of GSITs were substantially restated.  For example, for HITNY, the GAAP deficit in 2005 was reported to be approximately $6 million.  The post forensic review estimated deficit has grown to $220.9 million.

59.    The various forensic audits noted the overwhelming incentive CRM had to monkey with the Trust's reserves:

> CRM's financial incentive to suppress the reserve liabilities is of paramount importance, as it allowed them to avoid more stringent oversight by the WCB. For example, the WCB allows the group self-insured trusts to grow and use discounts they deem appropriate if the trust has a trust equity ratio of 90% or more.

Otherwise, the group self-insured trusts became subject to greater scrutiny, and membership and discounts would be restricted. ***Therefore, limited membership and lower discounts would result in fewer new members and limit the potential revenue and growth opportunities for CRM. Consequently, it was imperative that CRM ensure that the trust equity ratio remain at 90% or higher***.

(Emphasis added).

60.     Moreover, the various reports opined on the remarkably unusual and suspicious timing of CRMH's IPO in relation to the subsequent unexpected collapse of the various Trusts. These reports noted that at least half of the Trusts were effectively insolvent within a year of the IPO.  For example, with respect to HITNY:

> ***Of further interest, the success of the IPO, which raised millions for CRM's owners, could not have been timed more perfectly, as within nine months of the IPO, HITNY had a $76,068,287 member deficit and was for all intents and purposes, insolvent.***  As noted above in more detail below, the possible suppression of contradictory actuarial liabilities/expenses estimates may have hidden a more accurate picture of HITNY's financial condition, and may have been a good indication that CRM would no longer be managing HITNY, as subsequently evidenced by CRM's voluntary surrender of its license to represent group self-insured trusts during September 2008.  ***Furthermore, the possible suppression of the claims reserves may have hidden the true value of the CRM Holdings, Ltd. shares on the date of the IPO.  Consequently, investors may have been intentionally deceived and may have purchased the IPO shares at an inflated cost***.

HITNY000047 (emphasis added).[7]

61.     Former employees of CRM, interviewed by plaintiffs' investigators, confirm that the Company's business model was to grow trust membership aggressively at the expense of collecting sufficient premiums and setting sufficient reserves.  For example, CW1, an account coordinator who worked at CRM from June 2006 to August 2007, confirmed the CRM

---

[7] *See also* REMTNY000038 (noting REMTNY had a $1.6 million member deficit within 12 months of the IPO and was for all intents and purposes insolvent); WRWCT000040 (noting WRWCT had a $5,169,595 member deficit within 9 months of the IPO and was for all intents and purposes insolvent); TRIWCT000051 (noting TRIWCT had a $5,735,964 member deficit within 12 months of the IPO and was for all intents and purposes insolvent).

executives' singular focus on growing the Company.  During his/her review of a list of all claims files for HITNY in November and December 2006, CW1 noted that nearly "everything in the Health Insurance Trust of New York was under reserved."  CW1 reported to the Company's director of claims that well over 50% of the claims he/she personally reviewed were obviously under reserved.  CW1 explained that reserves were set low so that the Company could charge less premiums in order to attract membership.  CW1 also explained that the very purpose of his/her review of the HITNY files was to see if the company could *lower* premiums (notwithstanding the obvious under reserving) to attract membership and that projects such as his/her were widespread at the Company and occurred often when trusts were up for renewal.  CW2, an information security manager (Sarbanes-Oxley) at CRM from 2002 to 2007, also confirmed the Company's singular focus on membership growth.

<div align="center">**Materially False and Misleading**
**Statements Issued During the Class Period**</div>

62.    Defendants artificially inflated the price of CRMH's common stock by issuing materially false and/or misleading statements during the Class Period, including, press releases, registration statements/ prospectuses, Form 10-Q quarterly reports and Form 10-K annual reports filed with the SEC, statements of compliance with SOX filed with the SEC, and conference calls with investors, securities analysts, and other market participants, as set forth below.

**Defendants' Materially False and/or Misleading Statements/Omissions**
**Regarding Fee Based Underwriting Services**

63.    During the Class Period, the Defendants misrepresented the quality of the underwriting CRMH was providing to the GSITs it was administering.  For example, in the IPO

Registration Statement, the Company's 2005 Form 10-K, the SPO Registration Statement, and the Company's 2006 Form 10-K, in relevant part, stated:

> *Underwriting*
>
> Our management services include a determination of the appropriate level of premium for each member of a group. Our underwriting department achieves this by adjusting base premium rates based on:
>
> • the historical modification factor applicable to the member;
>
> • the member's loss history for the past three years; and
>
> • our loss control and risk assessment of the member.
>
> By individually analyzing the appropriate premium for each member of a group, we distinguish ourselves from other self-insurance services that typically maintain common pricing among group members. Our underwriting department attempts to determine premiums that are sufficient to cover the expected losses and loss adjustment expenses and fixed costs of the groups we manage.

64. Similarly, the Company's 2007 Form 10-K, in relevant part, stated:

> Underwriting
>
> Our management services include underwriting services. The underwriting process involves an estimation of the amount of premiums that are sufficient to cover the expected losses and loss adjustment expense and fixed costs of the self-insured groups. Our underwritings attempt to determine the appropriate level of premium for each member of a group by adjusting base premium rates based on: (1) the historical modification factor applicable to the member; (2) the member's loss history for the past three years; and (3) our loss control and risk assessment of the member. By individually analyzing the appropriate premium for each member of a group, we distinguish ourselves from other self-insurance services that typically maintain common pricing among group members.

65. Moreover, during the Class Period, during various conference calls and public communications, Defendants routinely and repeatedly represented that the Company's underwriting was not only conservative and disciplined, but that CRMH would not sacrifice its "underwriting integrity for short-term fee based gains." For example, among other statements:

(a)      On May 9, 2006, the Company held a conference call with industry analysts to discuss the Company's Q1 2006 financial results.  Defendants Hickey, Rakoff and Scardino were present.  Defendant Hickey, who was uncorrected by Defendants Rakoff or Scardino, described underwriting as one of the Company's "core disciplines" when stating: "We will look at that and look at acquisitions that make sense and can allow us to add to our fee based revenue and have a good stream of Twin Bridges' revenue that we feel is completely in line with our **core disciplines** and those are **underwriting**, official claims handling, and state-of-the-art safety services."  (Emphasis added).

(b)      Similarly, on August 7, 2006, the Company held a conference call with industry analysts to discuss the Company's Q2 2006 financial results.  Defendants Hickey, Rakoff and Scardino were present.  Defendant Hickey, who was uncorrected by Defendants Rakoff or Scardino, proclaimed, "One thing is clear **CRM will not compromise our underwriting integrity for short-term fee based gains**."  (Emphasis added).

(c)      In a letter to shareholders signed by Defendant Hickey contained in the Company's 2006 Annual Report, Defendant Hickey stated:

> **Moving Forward**
>
> We built CRM on a foundation of trust and service – answering the unmet needs of brokers and clients in a variety of industries.  We will hold true to this commitment and to the guiding principles that have served us so well:
>
> **Exceptional Service.** We will continue to provide exceptional service to brokers, clients and insured members that is second to none in the industry.  Aggressive loss control and claims management are our hallmarks.
>
> **Disciplined underwriting standards.**  Writing profitable business to achieve superior underwriting results, as opposed to simply growing our top line, is our overriding rule.

66.     The statements in ¶¶63-65 were knowingly and/or recklessly materially false and/or misleading because CRM instituted loose, unsound underwriting guidelines, at best, and systematically disregarded even those loose underwriting principles by, among other things, providing excessive premium discounts with no correlation to losses incurred by the individual member and admitting risky members into the Trusts without requiring higher premiums to correspond to the heightened risks.

67.     For example, according to the HITNY Forensic Audit Report, with respect to CRM's largest trust HITNY, CRM "admitted members whose experience modification rates exceeded that of the reinsurance carriers and possibly its own internal guidelines" that "substantially contributed to the Trust's member deficit."  HITNY000077.  CRM management also failed to adjust experience modification rates for members that had increasing and adverse loss runs; in fact, contrary to industry-wide sound underwriting practices, CRM kept the same experience modification for many Trust members for several years.  HITNY000077.  Indeed, there was no "financial disincentive for CRM to offer insurance to members with risky experience modifications or poor loss histories, as CRM collected its fee up front regardless of the subsequent performance of the new member."  HITNY000077.

68.     As early as January 29, 2003, PwC reported the shoddy underwriting at HITNY: "[u]nderwriting guidelines appear weak with respect to criteria, processes, information gathering, and decision-making"; "[t]here [was] no distinction between new and renewal underwriting"; "[t]hey were not sure where the use of the experience modification entered into the underwriting process."  HITNY000075.  In a November 13, 2003 internal CRM memo from CRM's general counsel to Defendant Rakoff, the general counsel described how the Company had not

consistently applied underwriting criteria, citing the generous discounts given to the Trust's then-Chairman.  HITNY000075.

69.     Furthermore, the PETNY Forensic Audit Report describes how unsound underwriting guidelines and "improper member admittance/termination decisions" contributed significantly to the financial deterioration of PETNY.  PETNY000049.  Specifically, the PETNY Forensic Audit Report recounts the numerous instances where the underwriting guidelines were abandoned and members entered the trust without meeting the minimum underwriting guidelines in effect at the time of their admittance.  PETNY000049.  Additionally, the report notes that the "prescribed forms used by CRM in the initial and renewal underwriting of members were often incomplete, contained unexplained handwritten revisions, and were not consistently approved by management as required by CRM's internal quality control standards."  PETNY000049.  CRM also utilized a clearly erroneous non-claim expense factor which may have led to "inaccurate decisions regarding member discounts and retention."  PETNY000049.

70.     CRM's unsound underwriting practices were not limited to HITNY and PETNY; the Forensic Audit Reports of other CRM GSITs recount the similar shoddy underwriting practices across the board.   *See* REMTNY000053-000057;  TRIWCT000069-000072; WRWCT000069-000072; NYSCT000044-000047.

71.     CRM's rampant practice of providing excessive premium discounts to trust members also renders the above statements at ¶¶63-65 false and misleading.  In fact, CRM was *not* charging the "appropriate premium for each member of a group" that would be "sufficient to cover the expected losses and loss adjustment expenses and fixed costs of the groups [CRM] manage[s]."

72.    As set forth in the PETNY Forensic Audit Report, CRM exercised broad discretion to apply discounts to trust members, often with "*no correlation to losses incurred or [experience modification factors] of the individual member*."   PETNY000055 (emphasis added).   Indeed, the premium discounts allowed by CRM "were excessive" and member companies affiliated with a trustee received preferential treatment with respect to discounts. PETNY000049-000055.

73.    Similarly, with respect to HITNY, "the discounts provided were inconsistent with member loss runs or experience modifications, and the discounts seemed especially large for certain Trustee firms associated with then HITNY Board of Trustees Chairman." HITNY000080; HITNY000078-79.

74.    Again, CRM's practices of providing excessive premium discounts affected all of the CRM Trusts, contrary to Defendants' public representations touting sound underwriting and the proper determination of premiums to be charged to trust members.  *See* REMTNY000057-000060; WRWCT000072-000072; TRIWCT000072-000075.

**Defendants' Materially False and/or Misleading Statements/Omissions**
**<u>Regarding Claims Management and Group Reserving Services</u>**

75.    During the Class Period, the Defendants also falsely and/or misleadingly portrayed the quality of the claims management services and group reserving CRMH was providing to the GSITs it was administering.   For example, the following was stated in Company's IPO Registration Statement and substantially repeated in each of the Company's 2005 Form 10-K, the SPO Registration Statement, 2006 Form 10-K, and 2007 Form 10-K (with emphasis added):

Our claims management services involve the administration and management of a claim from the time it is brought to our attention until the claim is finally settled. We perform these services for our New York groups, but do not perform claims services for our California groups because California law prohibits self-insured group managers from providing claims management services. We have established procedures to record reported insurance claims, regardless of size, in a claims database upon receipt of notice of the claim. ***We attempt to make contact with the injured worker, treating physician and employer within 24 hours after receiving a claim. This focus on timely reporting and follow up allows us to mitigate claims and loss adjustment expenses and identify potential fraud.*** We periodically update our database for any developments affecting a claim.

76.     The statements in ¶75 were knowingly and/or recklessly materially false and/or misleading because CRM continually ***ignored*** the need for timely reporting and proper claim management.  For example, Harry G. Kickey, of Harry G. Kickey Consulting Services, was hired by CRM to perform a claim file audit of cases handled by CRM on behalf of WRWCT.  In his December 20, 2006 audit report to CRM, Kickey slammed CRM for its poor claims management and group reserving services.  Kickey found:

(a)     that in terms of "overall handling" ***only 7%*** of the claims were rated as having been handled as "good" with 40% being graded as "poor";

(b)     that in terms of reserving for claims ***only 3%*** of the claims were rated as having been handled as "good" with ***80%*** being graded as "poor";

(c)     that "three point contact, within the parameters of the [CRM] Best Practices Guidelines, is met in ***less than 15%*** of the reviewed cases" and that in "a number of instances there is ***no contact*** with the injured worker for a significant period of time"; and

(d)     that "there appears to be a significant delay in recognizing significant exposure on cases, reserving for the exposure and settling them in a timely fashion." WRWCT000487-000491.

77.     Kickey further stated that CRM's claim reserving was "the ***biggest problem area of the entire audit***," finding that CRM manipulated claims reserves to remain artificially low and erected onerous barriers to prevent the proper setting of higher claims reserves on a timely basis:

> Reserves are stair stepped, rather than established for the ultimate expected cost of the case.  Reserve adjustments are done to cover paid to date amounts or payments scheduled for the immediate future.  Reserves are adjusted keeping the total within a specific level of authority, reserves in one category, such as indemnity are reduced to accommodate increases in another category, such as medical to maintain the reserve at a specific level.  Reserve increases outside the supervisor level of authorization can and often do take more than 60 days to post. In a number of cases, recommended reserves are dramatically reduced rather than posting the recommend[ed] and justified reserve….   Reserves in excess of $250,000 must be reviewed by the claims committee, which is comprised of Lori Brahs-Jackson, John Dubois, Chet Walczyk, Martin Rakoff, Tom Spendly, Jim Hickey, Jim Scardino and Joe Taylor.  It obviously does not meet frequently.  There is no continuity to the reserving practice and as such the use of industry standard Loss Development Factors in development of ultimate expected loss loses some of its credibility.  ***When you fail to meet your own guidelines for reserving practices in 80% of the cases, something is very wrong.***

WRWCT000488-000489  (emphasis added).

78.     Indeed, Quality Assurance Claim Audits performed on CRM GSITs reported, across the board, that there were serious deficiencies with respect to the "reporting and filing timeliness" as well as "overall claim management."  *E.g.*, TRIWCT000458; WRWCT000507; REMTNY000163; PETNY000177; NYSCT000163; HITNY000617.

**Defendants' Materially False and/or Misleading Statements/Omissions Regarding**
**The Company's Medical Bill Review and Case Management Services**

79.     During the Class Period, the Defendants further made materially false and/or misleading statements about its medical bill review and case management services for the GSITs it administered.   For example, the following was stated in Company's IPO Registration

Statement and substantially repeated in each of the Company's 2005 Form 10-K, the SPO

Registration Statement, 2006 Form 10-K, and 2007 Form 10-K:

> In 2002, we expanded our fee-based management services to include medical bill review and case management services.
>
> The services include:
>
> • Medical Bill Review. This service reviews medical bills, reconciles them to the appropriate state fee schedule and subsequently reduces them to the allowable amount of payment. We attempt to be competitive by providing superior turn-around time and a quality review process which produces relatively few errors.
>
> • Independent Medical Examinations. This service provides for the scheduling of independent medical examinations *for verification of the medical diagnosis and treatment plan for injured workers.* We believe that this service is very competitive because we have assembled a high-quality physician network to provide the members of our groups with objective medical opinions.
>
> • Medical Case Management/ Utilization Review. Through this service we supplement our claims management services by hiring registered nurses to coordinate communication among claims adjusters, treating physicians and injured workers.
>
> Currently, nearly all of the income we receive for these services is attributable to our self-insured groups.

80.     The statements mentioned in ¶79 were knowingly and/or recklessly materially

false and/or misleading because CRM *did not* schedule Independent Medical Examinations

("IME's") "for verification of the medical diagnosis and treatment plan for injured workers."

Instead, CRM scheduled excessive and often unnecessary IME's in order to have Eimar – a

CRMH company – pocket the excessive IME fees.  CRM profited by abusing its role as the

administrator of the Trusts, funneling excessive IME's and the corresponding fees to its

company, Eimar.  For example, the REMTNY Quality Assurance Claim Audit, dated September

2009 and prepared by KBM Management, Inc., noted that the frequency of IME's were high relative to the condition of the claimants and that many of the results simply parroted the findings of the attending physician.  *E.g.,* REMTNY000151.  The Audit further noted that "excessive usage of IME's can be considered ***harassment of the claimant***" and that "it appears ***unscrupulous to order excessive IME's*** in fairly short time frames ***when the company providing the IME service has common ownership with the Administrator ordering the exams***." REMTNY000151 (emphasis added).  Quality Assurance Claim Audits of the other CRM Trusts are in accord.  *E.g.*, TRIWCT000449;  WRWCT000498;  PETNY000168;  NYSCT000151; HITNY000613.

**Defendants' Materially False and/or Misleading Statements During the Class Period Regarding the Funding of the Trusts (Including HITNY) and CRMH's Business, Operations, and Prospects**

81.   The Class Period begins on December 21, 2005.  On this day, CRMH priced its IPO of approximately 8,850,000 shares of CRMH's common stock at $13.00 per share, which was completed on December 27, 2005, for an offering price of $115,050,000 in the aggregate.  In connection with the Company's IPO, CRMH filed a Registration Statement and Prospectus (collectively the "IPO Registration Statement") with the SEC.  The IPO Registration Statement was signed by the Individual Defendants, and included CRMH's financial results for the 2000, 2001, 2002, 2003, and 2004 fiscal years, as well as the quarterly financial results for the first nine months of the 2005 fiscal year.  Therein, the Company described itself as "a leading provider of fee-based management and other services" for GSITs in New York, and, in relevant part, also stated:

> . . . Eight of these groups are in New York and six are in California.  We . . . ***regularly screen and monitor the members of each group we manage. A***

*significant amount of our existing business is dependent on a relatively small number of our managed groups.*

\*       \*       \*

Our fee-based management services accounted for approximately 83% of our total revenues and approximately 74% of our net income for the nine months ended September 30, 2005 and approximately 84% of our total revenues and approximately 85% of our net income for the year ended December 31, 2004.

(Emphasis added).

82.    In identifying "key elements of [CRMH's] strategy," the IPO Registration Statement stated, "New York  — *We believe growth will result from an increase in the membership in our New York groups and from recently approved rate increases*, which we expect to average approximately 8% over all of our New York groups commencing in 2006." (Emphasis added).  Elsewhere, the Registration Statement noted a moratorium on the formation of new GSITs in the state of New York but stated, "*We believe that our New York business will grow as a result of an increase in the number of members in these groups and recently approved manual rate increases*.  The aggregate annualized premiums attributable to the groups we manage in New York were $111.5 million, $110.0 million and $106.9 million as of September 30, 2005, December 31, 2004 and December 31, 2003, respectively."  (Emphasis added).

83.    The IPO Registration Statement highlighted the extent to which CRMH's business was dependent on HITNY, ECTNY, and TRIWCT, and noted the potential harm if the Company were to lose one of these Trusts:

A significant amount of our existing business is dependent on a relatively small number of our managed groups. The Healthcare Insurance Trust of New York, or HITNY, provided approximately 26% and 38% of our revenues from fee-based management services for the nine months ended September 30, 2005

and the year ended December 31, 2004, respectively. Two other groups, Elite Contractors Trust of New York and Transportation Industry Workers' Compensation Trust of New York, provided approximately 21% and 13%, respectively, of our revenues from fee-based management services for the nine months ended September 30, 2005 and approximately 22% and 14%, respectively, of our revenues from fee-based management services for the year ended December 31, 2004. The loss of one or more of these groups would have a material adverse effect on our business, financial condition and results of operations.

84.     Moreover, the IPO Registration Statement purported to warn of the potential fallout if a large trust were to fail:

…The failure of a single large self-insured group in New York or California, even if it is a group that we do not manage, could have an adverse effect on the other groups in the state and could affect the regulation of groups by the state. Any such developments may seriously hamper our ability to retain existing members, attract new members to our managed groups and form new groups, each of which could have a material adverse effect on our business, financial condition and our results of operations.

85.     The IPO Registration Statement also purported to warn about the potential implications if the Company were to underestimate liabilities:

…To the extent the loss reserves for any of our managed groups is insufficient to cover such group's actual losses and loss adjustment expenses, the group will have to adjust its loss reserves and it may incur charges to its earnings, which could have a material adverse effect on its financial condition and cash flows and could require the group to assess its members. This could expose us to liability for our management of the group, have a negative impact on our future management of the group, and adversely affect our reputation as a manager.

86.     As explained in the IPO Registration Statement, the Company and the underwriters of the IPO entered into an underwriting agreement with respect to the shares being offered to the public.  Attached to the IPO Registration Statement as Ex. 1.1, and incorporated therein, was the "Form of Underwriting Agreement to be entered into by and between the Company and Sandler O'Neill & Partners, L.P. and KeyBank Capital Markets" (the "IPO

Underwriting Agreement").[8]   The IPO Underwriting Agreement stated that "[t]he Company

represents and warrants to, and agrees with, each of the Underwriters," among others, that:

> (xlv) …*each of such self-insured groups was duly formed and is validly existing under the laws of the state in which it was formed; and none of such self-insured groups, other than the Public Entities Trust of New York, is currently deemed to be "underfunded" as determined by the New York Workers' Compensation Board or the California Department of Industrial Relations, as applicable*.

(Emphasis added).

87.     The above statements in ¶¶79-86 made in connection with the IPO were false

and/or misleading when made because Defendants failed to disclose that the CRM GSITs were

*already* in dire straits.  These Trusts were *already* plagued with substantial member deficits and

were either already deemed underfunded, or were underfunded in truth but disguised by

Defendants through, among other things, the manipulation of the Trusts' financials to appear to

be adequately funded.  For example:

(a)     as indicated in the WCB letter to CRM dated April 15, 2008, CRM

"*obscured HITNY's true liabilities*" by indicating in HITNY's 2005 audited financial report that

69 HITNY claims were "resolved" by Section 32 agreements for total payments of more than $3

million when only "a small portion of the claims allegedly settled had in fact settled"

(CRMMISC000376) (emphasis added);

---

[8] As noted in the IPO Registration Statement, "This prospectus, which is a part of the registration statement, does not contain all of the information set forth in the registration statement and the exhibits and schedules to the registration statement. Refer to the registration statement, exhibits and schedules for further information with respect to the common shares offered by this prospectus. Statements contained in this prospectus regarding the contents of any contract or other documents are only summaries. With respect to any contract or document filed as an exhibit to the registration statement, you should refer to the exhibit for a copy of the contract or document, and each statement in this prospectus regarding that contract or document is qualified by reference to the exhibit."

(b)     when PwC issued a report in 2003, commissioned by the Workers'
Compensation Board, finding that the "loss and loss expense reserves reported by HITNY as of
September 30, 2002 are inadequate by $4,912,943," Defendant Hickey hired his own auditor,
Jeffrey Kadison of PAS, to discredit PwC's report and Hickey indicated to Kadison that he
wanted Kadison to "make sure the door didn't close," *i.e.* to make sure that HITNY was deemed
solvent (HITNY000011; HITNY000049);

(c)     Gruber and CRM informed the HITNY Board of Trustees in November
2005 that HITNY was underfunded with a funding level of 83.4% (HITNY000054);

(d)     the September 27, 2005 HITNY Board of Trustees minutes "clearly reflect
that CRM's assertions about loss development rates were ***admittedly incorrect***" (HITNY000067)
(emphasis added);

(e)     as indicated in HITNY's 2005 GAAP financial statements, HITNY was
***already underfunded*** with a funding level (regulatory assets/liabilities) of 81.6%
(HITNY000713);

(f)     as indicated in the HITNY Deficit Reconstruction and 2009 Assessment,
HITNY had a reconstructed members' deficit total of ***over $161 million*** as of September 30,
2005 (HITNY001145);

(g)     as indicated in the WRWCT Deficit Reconstruction and 2010 Assessment,
WRWCT had a reconstructed members' deficit total of ***over $44 million*** as of September 30,
2005 (WRWCT000939);

(h)     as indicated in the TIWCT Deficit Reconstruction and 2010 Assessment, TIWCT had a reconstructed members' deficit total of *over $27 million* as of December 31, 2004 and *over $66 million* as of December 31, 2005 (TRIWCT000866);

(i)     as indicated in the WCB Level I Review of TIWCT dated August 11, 2006, while TIWCT reported in its 2005 GAAP financial statements a 95.12% funding level, TIWCT's funding level after necessary adjustments of the financial statements was actually 84.19% – TIWCT was therefore actually *underfunded as of December 31, 2005* (TRIWCT000366-000374);

(j)     as indicated in the REMTNY Deficit Reconstruction and 2010 Assessment, REMTNY had a reconstructed members' deficit total of *over $5 million* as of December 31, 2004 and as of December 31, 2005 (REMTNY000564);

(k)     as indicated in the PETNY Deficit Reconstruction and 2010 Assessment, PETNY had a reconstructed members' deficit total of *over $5 million* as of December 31, 2004 and as of December 31, 2005 (PETNY000657);

(l)     ECTNY had a reconstructed members' deficit total of over *$24 million* as of September 2005 (ECTNY000417); and

(m)     NYSCT had a reconstructed members' deficit total of over $1 million as of January 31, 2006.

88.     On March 27, 2006, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Fourth Quarter, Full Year Results." Therein, Hickey stated: "We could not be more excited about our future prospects given the market opportunities in front of us and the strong financial condition in which we have placed ourselves. 2006 has begun with some uncertainties

in our markets but, if anything, we expect to accelerate the pace of our progress following the first quarter and look forward to a challenging and rewarding year ahead."

89.    On March 29, 2006, CRMH filed its 2005 Form 10-K for the 2005 fiscal year. The Company's Form 10-K was signed by the Individual Defendants.   Therein, the Company in relevant part, stated:

> *We believe that self-insured groups, when managed effectively, provide lower and more stable premium rates to their members than other methods of insuring workers' compensation liabilities for small and mid-sized businesses. For that reason, we believe that self-insured groups will continue to be an attractive workers' compensation insurance option for small and mid-sized companies.*

<div align="center">*        *        *</div>

> The key elements of our strategy are:
>
> •    *Continued Growth of Fee-Based Business.  . . . In New York, we believe growth will result from increases in the number of members in our existing groups and recently approved manual rate increases that allow our established groups to increase the premiums they charge their members.*

 (Emphasis added).

90.    The Company's 2005 Form 10-K highlighted significance of HITNY to the Company's core financial and operating performance:

> *A significant amount of our existing business is dependent on a relatively small number of our managed groups. The Healthcare Industry Trust of New York ("HITNY") provided approximately 27% and 38% of our revenues from fee-based management services for the years ended December 31, 2005 and 2004, respectively.* Three other groups, Elite Contractors Trust of New York, Contractors Access Program of California and Transportation Industry Workers' Compensation Trust of New York, provided approximately 20%, 13% and 11%, respectively, of our revenues from fee-based management services for the year ended December 31, 2005. Two groups, Elite Contractors Trust of New York and Transportation Industry Workers' Compensation Trust of New York, provided

approximately 22% and 14%, respectively, of our revenues from fee-based management services for the year ended December 31, 2004.

*     *     *

A significant amount of our existing business is dependent on a relatively small number of our managed groups. *HITNY provided approximately 27% and 38% of our revenues from fee-based management services for the years ended December, 2005 and the year ended December 31, 2004, respectively. Two other groups, Elite Contractors Trust of New York and Contractors Access Program of California, provided approximately 20% and 13%, respectively, of our revenues from fee-based management services for the year ended December 31, 2005. Elite Contractors Trust of New York and Transportation Industry Workers' Compensation Trust of New York provided approximately 22% and 14%, respectively, of our revenues from fee-based management services for the year ended December 31, 2004. The loss of one or more of these groups would have a material adverse effect on our business, financial condition and results of operations.*

91.     Further, the Company's 2005 Form 10-K again purported to warn of the potential consequences if the Company were to underestimate the liabilities of its managed groups: "To the extent the loss reserves for any of our managed groups is insufficient to cover such group's actual losses and loss adjustment expenses, the group will have to adjust its loss reserves and it may incur charges to its earnings, which could have a material adverse effect on its financial condition and cash flows and could require the group to assess its members. This could expose us to liability for our management of the group, have a negative impact on our future management of the group, and adversely affect our reputation as a manager."

92.     In discussing "Business Trends and Conditions," as specifically pertaining to the New York market, the 2005 Form 10-K, in relevant part, stated:

…New York is in the process of reevaluating its regulations relating to the formation of new groups. This has led to a temporary moratorium on the formation of new groups. *This moratorium should not affect our ability to grow in New York as we believe we have formed groups in all desired industry classes that we have targeted. We believe growth in our New York business will occur*

*as a result of increases in the number of members in our existing groups and recently approved manual rate increases.* Following three years of relatively stable rates, the New York Workers' Compensation Board passed a rate increase in July 2005 averaging five percent across all industry groups. This increase became effective in October 2005, and manual rates across the industries in which we have formed self-insured groups will increase by approximately 8% on average commencing in 2006.

93.     Attached as Ex. 1.1 to the Company's 2005 Form 10-K was the executed copy of the IPO Underwriting Agreement quoted above in ¶86.  The executed version attached as Ex. 1.1 to the Company's 2005 Form 10-K, was signed by Defendants Hickey, Hickey Sr., and Rakoff, was dated December 20, 2005 (i.e., the date of the IPO), and repeated the same statements, representations, and warranties quoted above in ¶86.

94.     The above statements ¶¶88-93 were knowingly and/or reckless materially false and/or misleading for the same reasons contained in ¶87, and, because, among other things, HITNY was *already underfunded* with a funding level (regulatory assets/liabilities) of 81.6%, as indicated in HITNY's 2005 GAAP financial statements audited by UHY and presented to the HITNY Board of Trustees on January 10, 2006.  HITNY000713.   Moreover, the excess insurance carrier, New York Marine and General Insurance Co. and Midlands Claim Administrators, Inc. performed an audit on CRM on about March 17, 2006 for the HITNY account and two other CRM trust accounts and the key findings of the audit included: (1) after the initial reserve, many reserves were changed in small amounts (stair stepping) as the file progressed; (2) CRM had a practice of reserving claims in which non-scheduled permanent disability is anticipated for two years of disability benefits, which delays the setting of proper permanent disability reserves; (3) there was little evidence of the adjusters making a decision

regarding the final reserves necessary early in the claim files; and (4) in most of the claims files, the reserve at 180 days was inadequate. HITNY000090-91.

95.     On May 9, 2006, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces First Quarter 2006 Results." Therein, the Company, among others, reported its Q1 2006 financial and operational results, including the results relating to its New York fee-based management services to the Trusts. Rakoff also stated that "[i]n the first quarter of 2006, our fee-based workers' compensation businesses in both New York and California grew more slowly than anticipated." Hickey added that "[t]hus far 2006 has presented some challenges to the growth of our fee-based business. Nonetheless, the fundamentals of our business model remain sound and we believe the longer term prospects remain similar to those we envisioned at the start of the year…."

96.     On May 9, 2006, the Company held a conference call with investors, industry analysts, and other market participants, to discuss the Company's financial results for Q1 2006 (the "Q1 2006 Conference Call"). Defendants Hickey, Rakoff, and Scardino were present. Therein, Defendant Rakoff made the following statement, which was uncorrected by Defendants Hickey or Scardino: "New York is our established market and is relatively mature and we do believe that any future growth will come from increases in the number of group members or the acquisition of established groups."

97.     During the Q1 2006 Conference Call, Defendant Hickey made the following statement, which was uncorrected by Defendant Rakoff or Scardino: "In sum this was a solid quarter for CRM. We achieved the revenues and net income we expected, and had satisfactory growth in both our top and bottom lines in spite of a soft market in California. This

demonstrates the power of our business model. We have the utmost confidence in the fundamentals of our model and recognize that the key to successful and profitable growth is increasing both the number of programs and the number of brokers. It is also about retaining flexibility in the face of changing market conditions."

98.    On May 12, 2006, CRMH filed its Q1 2006 Form 10-Q with the SEC, which was signed by Defendants Hickey, Rackoff, and Scardino. The Company's Form 10-Q, in relevant part, stated:

> …New York is in the process of reevaluating its regulations relating to the formation of new groups. This has led to a temporary moratorium on the formation of new groups. ***This moratorium should not affect our ability to grow in New York as we believe we have formed groups in all desired industry classes that we have targeted. We believe growth in our New York business will occur as a result of increases in the number of members in our existing groups and recently approved manual rate increases.*** Following three years of relatively stable rates, the New York Workers' Compensation Board passed a rate increase in July 2005 averaging five percent across all industry groups. This increase became effective in October 2005, and manual rates across the industries in which we have formed self-insured groups will increase by approximately 8% on average commencing in 2006. ***Some of the prospective revenue growth created by the rate increase was offset by attrition in group membership due to underwriting actions and competitive business conditions.***
>
> \*       \*       \*
>
> . . . Revenues attributable to our New York groups were adversely affected by lower fees received from the Healthcare Industry Trust of New York, or HITNY, our largest group, as a result of a modification to our agreement with HITNY. This modification changed the basis on which HITNY's rates are calculated to negotiated rates from New York manual premium rates. ***The increase to New York manual premium rates passed by the New York Workers' Compensation Board in July 2005 are effective for new and renewal business after October 1, 2005 and should positively impact management fee revenue that we receive from most of the New York groups we manage. Over the next year, we expect moderate growth in New York and relatively more rapid growth in California*** . . .

99.     The above statements ¶¶95-98 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶¶87, 94, and as evidenced by, among other things, the increasing push back faced by CRM from the HITNY Board of Trustees that was increasingly questioning the actuarial work of SG Risk, to wit "the adequacy of loss reserves previously estimated by Gruber and SGRisk."   At an April 2006 HITNY Board meeting, the Trustees expressed their interest in replacing SGRisk and accordingly resolved to contact Milliman.  HITNY000054.

100.    On August 7, 2006, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Second Quarter 2006 Results."  Therein, the Company, in relevant part, reported its Q2 2006 financial and operational results, including the results relating to its New York fee-based management services to the Trusts, and, in relevant part, stated:

> Martin D. Rakoff, Co-CEO of CRM Holdings, Ltd., said, "In the second quarter of 2006, our fee-based workers' compensation businesses in New York and California were affected by difficult market conditions which resulted in slower than anticipated growth. While we gained additional market share in California, the rate decreases we saw earlier this year persisted. We continue to believe California presents attractive opportunities for long-term growth, and our focus is to continue increasing our market share in that state."
>
> *          *          *
>
> ". . . We will continue to devote time, resources and energy into generating increased premiums under management in New York and California and putting capital to use in the reinsurance business as we move into the second half of 2006 and beyond. We are also working to establish new self-insured groups in Texas, where we recently opened an office and hired staff," said Mr. Hickey. ". . . Although we face these immediate challenges in growing our fee-based business in California, *we still believe in the fundamental effectiveness of our business model* and our prospects for long-term growth in that state.  *In order to meet the earnings expectations we have, we are working strenuously but responsibly to expand our business* while continuing to manage operating and overhead expenses carefully. In the absence of any significant transactions, however, our

best estimate for earnings from operations for 2006 is in the range of $0.87 to
$0.96"

(Emphasis added).

101.    On August 7, 2006, the Company held a conference call with investors, industry

analysts, and other market participants, to discuss the Company's financial results for Q2 2006

(the "Q2 2006 Conference Call").   Defendants Hickey, Rakoff, and Scardino, were present.

Defendant Hickey (who was not corrected by Defendants Rakoff or Scardino) affirmatively

represented, "One thing is clear CRM will not compromise our underwriting integrity for short-

term fee based gains."

102.    During the Q2 2006, Conference Call, an analyst inquired about information

indicating that the Company had lost approximately 50 group members during the quarter in its

New York Trusts.   Defendant Hickey (who was not corrected by Defendants Rakoff or

Scardino), in responding to an analyst question regarding decreased trust membership, stated:

> And again I don't where you find that number. In New York we have well over
> 2000 insureds [ph], the majority of cancellations that we have an eye, and by that
> I would say the overwhelming majority of cancellations. Typically, our
> cancellations generated by non-payment, again those as a percentage of our total
> insureds [ph] are added around 2%, which is in line with our historical 98%
> retention, so retention is not a problem for CRM in either New York and
> California I noted earlier in my discussion that our premium reduction expiring
> into 2006, was all driven by pure rate reduction and not member attrition, so
> member royalty and renewal remains very strong.

103.    Another analyst questioned Defendant Hickey about his response about the

attrition in the state of New York.   Defendant Hickey (who was left uncorrected by Defendants

Rakoff or Scardino), in relevant part, stated:

> <Q - Daniel Smith>: ***To go back on your question that previous caller asked
> about New York members, I'm looking at your Q1 press release and you did
> report 1,974 members at March 31st, and 1,922 at June 30th, but does look like***

*there was sequential decline, do you guys you know, have any comment on that, I hope?*

<A[Hickey]>: You know, as I mentioned to the previous answer, the majority of our – there has been no significant member loss that we feel is material. Again typically what you look at in normal attrition in the programs is in a premium relationship has kept us inline with our historical...

<Q - Daniel Smith>: *Well let's just – then you didn't add any members. If you didn't add any members the sequential decline is 2.5%; that will be 10% annualized attrition. [indiscernible] normal.*

<A[Rakoff]>: *Two things that have occurred, it's Marty one is our three largest trust renewed on 4/01. so, you might have seen some minimal attrition and of those three trust, because those members had an opportunity to chop around and look at other options. That's not to say that in the second half we haven't written any business, we have written new members over the last quarter in New York and continued to grow with new members. But at any time you're looking at a significant percentage of our premium days renewing on a given day, you're going to expect to have some attrition.*

<Q - Daniel Smith>: Okay, so you're just saying higher than normal, basically contracts coming out in one quarter?

<A>: Yeah, significantly higher on 4/01.

<center>*       *       *</center>

<A[Hickey]>: 95% was a number that we mentioned on our renewal rates in the State of California, *and on a whole we're still maintaining number circles for that in the State of New York. Our retention is not a concern of management and we've had no significant change and not even a material change in our retentions*. Retentions we remain strong in both states and well above the industry averages.

(Emphasis added).

104.    On August 8, 2006, CRMH filed its Quarterly Report with the SEC on Form 10-Q for Q2 2006, which was signed by Defendants Hickey, Rackoff, and Scardino.  Therein, the Company, in relevant part, stated:

A significant amount of our existing business is dependent on a relatively small number of our managed groups. The Healthcare Insurance Trust of New York, or HITNY, provided approximately 24% and 27% of our revenues from fee-based management services for the six months ended June 30, 2006 and 2005, respectively. Elite Contractors Trust of New York, Contractors Access Program of California and Transportation Industry Workers' Compensation Trust of New York provided approximately 17%, 16% and 14% of revenues from fee-based management services, respectively, for the six months ended June 30, 2006. Elite Contractors Trust of New York, Transportation Industry Workers' Compensation Trust of New York and Contractors Access Program of California, provided approximately 20%, 14% and 10%, respectively, of our revenues from fee-based management services for the six months ended June 30, 2005.

<p style="text-align:center">*      *      *</p>

In contrast to the California market, self-insured groups have existed in New York since the mid-1990s and the market is substantially more mature, with approximately 64 groups in existence. New York is in the process of reevaluating its regulations relating to the formation of new groups. This has led to a temporary moratorium on the formation of new groups. ***This moratorium should not affect our ability to grow in New York as we believe we have formed groups in all desired industry classes that we have targeted. We believe growth in our New York business will occur as a result of increases in the number of members in our existing groups and recently approved manual rate increases.*** Following six years of relatively stable rates, the New York Workers' Compensation Board passed a rate increase in July 2005 averaging five percent across all industry groups. This increase became effective in October 2005, and manual rates across the industries in which we have formed self-insured groups increased by approximately 8% on average commencing in 2006. Some of the prospective revenue growth created by the rate increase was offset by attrition in group membership due to underwriting actions and competitive business conditions.

(Emphasis added).

105.   The above statements ¶¶100-04 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶¶87, 94, 99.

106.   On November 7, 2006, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Third-Quarter 2006 Results, Provides Update on Acquisition."  Therein, the Company, in relevant part, reported its Q3 2006 financial and operating results, including the

results related to its New York fee-based services provided to the Trusts, and, in relevant part,

state:

> …*Revenues in New York fell 2%, which was due to the combined effects of a 6% increase in group membership offset by reduced reinsurance commissions overall, and a lower fee structure at two of the Company's managed groups*….
>
>                      \*      \*      \*
>
> In conclusion, Mr. Hickey stated, "Increases in market share and our upcoming acquisition of Majestic demonstrate our ability to deliver on our plans for the year, both operationally and strategically. We continue to operate in very competitive markets, particularly in California. Nonetheless, we have been able to grow our premiums under management by 55% and we have added 130 new members, or 55%, to our California group membership over the past year. *At the same time, our New York market remains steady. We are prospering in these market conditions and will continue to do so with a business model that is appropriate for the short term and thrives in the long term* . . . The profitability we are generating from our combined fee-based and reinsurance businesses is providing a solid platform that will position us very well to capitalize on the opportunities afforded by the acquisition of Majestic."

(Emphasis added).

     107.     On November 7, 2006, the Company held a conference call with investors,

industry analysts, and other market participants to discuss the Company's Q3 2006 financial and

operating results (the "Q3 2006 Conference Call"). Defendants Hickey, Rakoff, and Scardino

were present. Defendant Hickey (who was uncorrected by Defendants Rakoff and Scardino), in

relevant part, stated: "We added 133 companies to our self-insured groups over the last 12

months in California, an increase of 55%. *Also, we are continuing to provide similar levels of

excellent services in our more mature home market of New York*." (Emphasis added).

     108.     Also during the Q3 2006 Conference Call, Defendant Hickey (who was not

corrected by Defendants Rakoff and Scardino), stated:

We will, of course, focus on execution, and make sure we manage both our existing business and the integration of Majestic in a careful and well planned manner. *We will continue to focus on the key factors that have brought CRM to its current position. This includes servicing and expanding our value broker network, remaining disciplined and patient in soft markets, like California, and maintaining and growing our customer base in New York.*

*Our strength in risk management for workers' compensation remains the bedrock of our business. When we started CRM we knew there was a better way and we believe we found it. Our hands-on, highly personalized approach provides the service that is very important to companies in industries such as healthcare, construction, and transportation. The increase in group membership that we continued to experience is proof that we are gaining market share and gives us encouragement that our model will work in other states across the country. CRM is now a strong, well capitalized Company that is positioned to succeed and drive both today and into the future.*

*Having put ourselves in advantageous position*, it is up to us to maximize the potential that we gained and I look forward to providing you with more detailed plans for the upcoming year.

(Emphasis added).

109.    In response to an analyst's question about the Company's New York Trusts, Defendant Scardino and Hickey (who were not corrected by the other defendants participating in the Q3 2006 Conference Call), in relevant part, stated:

<Q - Kelly Nash>: I wonder if you could provide a little bit more detail on what's going on in New York? Obviously, it looks like you have some good member growth, but it looks like as far as the contribution from the specific members with some of the contracts, if you can provide a little bit more detail that would be great?

<A[Defendant Scardino]>: *Okay, we have that growth there. We – couple of things that we have had when dynamics changed within the groups – we have a large group who is determined to take higher retention on the reinsurance, which changes the dynamics with both the commission and to enrich the participation. We also, as groups get to a certain scale, we, you know, and as you would expect, are going to adjust the rate that we charge groups. So, the realization of revenues is not a straight linear function. We, you know, market demand or trends just call for us to have the revenue realized from large groups be proportional. That combined with you seeing the full effects this year of*

*lower commission rates, you may recall last year, we were getting about 20 points per reinsurance commission under the contracts that we built. And in our current arrangements it is about 15. So, those things are, in combination, they are creating the impression of sort of a flat performance in the north.*

<A[Defendant Hickey]>: One other comment on New York, Kelly, is our construction group did have a rate decrease of a 11%, which went into effect on the 4-1 renewal. ***But we continued to add members in our core business, and again find New York and view New York as a key long term strategic market. And we were pleased with the progress that we've made in that market.***

(Emphasis added).

110.    In response to a follow up question about the Company's New York Trusts, Defendant Scardino (who was left uncorrected by the other defendants participating in the Q3 2006 Conference Call), in relevant part, stated:

<A[Defendant Scardino]>: …And, with our healthcare group being as large as it is, it certainly made some sense for them to look at perhaps taking on a large layer of risk within the group. Their premiums exceed 50 million in annualized premiums. So, they did go from $500,000 self-insured retention to $750,000 self-insured retention, which does have an impact on the gross premium written on that excess comp obviously. With the higher retention level that a group takes, there is a premium reduction there.

111.    Finally, during the Q3 2006 Conference Call, Defendant Hickey (who was not corrected by Defendants Rakoff and Scardino) in relevant part, stated: "We are bullish on our long-term business, which is still our [indiscernible] self-insurance model."

112.    On November 9, 2006, CRMH filed its Q3 2006 Form 10-Q with the SEC, which was signed by Defendants Hickey, Rackoff, and Scardino.  Therein, the Company, in relevant part, stated:

A significant amount of our existing business is dependent on a relatively small number of our managed groups. The Healthcare Insurance Trust of New York provided approximately 23% and 26% of our revenues from fee-based management services for the nine months ended September 30, 2006 and 2005,

respectively. Elite Contractors Trust of New York, Contractors Access Program of California and the Transportation Industry Workers' Compensation Trust of New York provided approximately 18%, 17% and 14% of revenues from fee-based management services, respectively, for the nine months ended September 30, 2006. Elite Contractors Trust of New York, Transportation Industry Workers' Compensation Trust of New York and the Contractors Access Program of California provided approximately 21%, 13% and 11%, respectively, of our revenues from fee-based management services for the nine months ended September 30, 2005.

<p style="text-align:center">*       *       *</p>

In contrast to the California market, self-insured groups have existed in New York since the mid-1990s and the market is substantially more mature, with approximately 64 groups in existence. New York is in the process of reevaluating its regulations relating to the formation of new groups. This has led to a temporary moratorium on the formation of new groups. This moratorium should not affect our ability to grow in New York as we believe we have formed groups in all desired industry classes that we have targeted. We believe growth in our New York business will occur as a result of increases in the number of members in our existing groups and recently approved manual rate increases. Following six years of relatively stable rates, the New York Workers' Compensation Board passed a rate increase in July 2005 averaging 5% across all industry groups. This increase became effective in October 2005, and manual rates across the industries in which we have formed self-insured groups increased by approximately 8% on average commencing in 2006. Some of the prospective revenue growth created by the rate increase was offset by reductions in the amount of management fees charged to certain of our groups.

113.    The above statements ¶¶106-12 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶¶87, 94, 99, and, as evidenced by, among other things, the HITNY Board of Trustee's growing frustration with CRM.  At an August 2006 HITNY Board meeting, the Trustee expressed that they were "frustrated by the poor financial performance of HITNY due to the lack of reliable forecasts and actuarial projections being provided by the Administrator [CRM]."  HITNY000054.  At this August 2006 HITNY Board meeting, Gruber made a presentation and stated that HITNY may be "severely under-funded" – a curious turnabout coming only after the Company's successful IPO.  HITNY000054.  In a

subsequent August 25, 2006 telephonic conference, the Board of Trustees decided to contact Milliman and subsequently engaged Milliman, who issued a draft report on November 29, 2006. HITNY000055.

114.     On December 28, 2006, the Company issued a press release entitled, "CRM Holdings, Ltd. Announces Management Changes."   Therein, the Company announced that Rakoff would be resigning from the Company and its affiliates and subsidiaries, effective as of December 28, 2006.  The press release also indicated that Hickey would transition from Co-CEO to CEO while remaining Chairman of the Board of Directors

115.     In accordance with the terms of the separation agreement entered into between the Company and Defendant Rakoff, the following day, on December 29, 2006, the Company filed a Registration Statement on Form S-1 with the SEC for a secondary offering, which occurred on or around February 8, 2007 (the "SPO").  The purpose of the SPO was so that Defendant Rakoff could sell all of his stock in the Company, or as artfully described in the Company's December 28, 2006, press release, "in order to allow him to diversify his portfolio."  The Company filed a Prospectus for the offering on February 8, 2007 (which along with the Registration Statement on Form S-1 filed with the SEC on December 29, 2006 is collectively referred to herein as the "SPO Registration Statement").   Pursuant to the SPO, on or around February 8, 2007, Defendant Rakoff sold all 1,934,691 shares of the Company's stock to the public at a price of $7.55 per share, for gross proceeds in excess of $14.6 million.  In the SPO Registration Statement, which was signed by Defendants Hickey, Hickey Sr., and Scardino the Company, in relevant part, stated:

> In contrast to the California market, self-insured groups have existed in New York since the mid-1990s and the market is substantially more mature, with

approximately 59 groups in existence. New York is in the process of reevaluating its regulations relating to the formation of new groups. This has led to a temporary moratorium on the formation of new groups. ***This moratorium should not affect our ability to grow in New York as we believe we have formed groups in all industry classes that we currently desire to target. We believe growth in our New York business will occur as a result of increases in the number of members in our existing groups and recently approved increases in the rates set by the New York Workers' Compensation Board. Following six years of relatively stable rates, the New York Workers' Compensation Board passed a rate increase in July 2005 averaging 5% across all industry groups. This increase became effective in October.***

<p style="text-align:center">*       *       *</p>

*Continue to Grow our Fee-Based Business.* We believe that our underwriting expertise, loss control, claims management and audit services position us to continue the growth we have experienced in the California self-insured market during our three-year history there. In California, this should occur through both an increase in membership in our existing groups and through an increase in the number of groups we manage. ***In New York, we believe growth will result from an increase in the membership in our groups***.

<p style="text-align:center">*       *       *</p>

A significant amount of our existing business is dependent on a relatively small number of our managed groups. Our four largest groups, The Healthcare Reinsurance Trust of New York, or HITNY, Elite Contractors Trust of New York, Contractors Access Program of California and Transportation Industry Workers' Compensation Trust of New York, provided approximately 23%, 18%, 17% and 14%, respectively, of our revenues from fee-based management services for the nine months ended September 30, 2006 and approximately 27%, 20%, 13% and 11%, respectively, of our revenues from fee-based management services for the year ended December 31, 2005. The loss of one or more of these groups would have a material adverse effect on our business, financial condition and results of operations.

116.    The SPO Registration Statement, in relevant part, stated:

***We believe that as of the date of this prospectus, adverse claims development has caused HITNY's estimated ratio of regulatory assets to total liabilities to decrease significantly***. As a result of HITNY's underfunded status, HITNY's Board of Trustees has determined that the group will not accept any new members until the underfunding has been substantially corrected. We are presently in discussions with HITNY's

Board of Trustees and the New York Workers' Compensation Board to develop a remediation plan to resolve HITNY's funding status. *Since the discussions on the remediation plan are in the early stages, we are unable to predict how they will conclude.*

*Connected with HITNY's adverse claims development, the New York Workers' Compensation Board is conducting an inquiry into the actuarial work done by a third-party actuary. We have been requested to provide testimony and copies of the underlying data that was submitted to the actuary. The New York Workers' Compensation Board has already received testimony from the actuary. We understand that the actuary provided the New York Workers' Compensation Board with a written independent report from another qualified independent actuary that specializes in performing such reviews. This report verified that all actuarial methods used and actuarial judgments made were in accordance with sound actuarial principles and standards. Although we expect that the materials and testimony that are being asked of us will substantiate all underlying data, we cannot predict the outcome of the New York Workers' Compensation Board's inquiry.*

*We have also recently determined that adverse claims development has similarly caused the estimated ratio of regulatory assets to total liabilities to decrease significantly for another of our groups. This group accounted for less than 7% of our fee-based revenue for the nine months ended September 30, 2006. Although the group has not been deemed underfunded at this point, we expect that the New York Workers' Compensation Board will make such a determination following its review of the group's financial statements.* Accordingly, at its most recent meeting, we presented a remediation plan to the group's board of trustees, who preliminarily approved it. We expect to work with the group and the New York Workers' Compensation Board to finalize this remediation plan to resolve the group's funding status, but are unable to predict the ultimate outcome of the discussions or the proposed plan.

The New York Workers Compensation Board has the regulatory authority to require underfunded groups to increase the premiums their members pay to such groups, cause their members to pay an additional assessment for the coverage provided by such groups during prior years, review all expenses of the group, including the management fees paid by such groups, request substantial reductions in such expenses and, in extreme circumstances, order the group to disband. In the past, we have been able to assist our underfunded groups, including HITNY, to develop and implement successful remediation plans and restore such groups to funded status. However, we cannot assure you that either of the groups will be

able to remediate their funding status successfully and in such an event, our business, financial condition and results of operations, as well as our reputation with respect to the provision of management services to self-insured workers compensation groups, could be materially and adversely affected. Furthermore, either of the groups may assert a claim against us, which we would vigorously defend; if any such claim results in payments to the groups or a reduction in the management fees the groups pay to us, our business, financial condition and results of operations could also be materially and adversely affected.

117.   Pursuant to the "Form of Underwriting Agreement" between the Company and the underwriters of the SPO (the "SPO Underwriting Agreement") that was attached as Ex. 1.1 to the SPO Registration Statement and incorporated therein, the Company represented and warranted that, among others:

(xliii) …Each of such self-insured groups was duly formed and is validly existing under the laws of the state in which it was formed and none of such self-insured groups, other than the Public Entities Trust of New York or as set forth in the Registration Statement, Time of Sale Disclosure Package and Prospectus, is currently deemed to be "underfunded" as determined by the New York Workers' Compensation Board or the California Department of Industrial Relations, as applicable, except as disclosed in the Registration Statement, Time of Sale Disclosure Package and Prospectus.

118.   The above statements at ¶¶115-17 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶¶87, 94, 99, 113, and because, among other things:

(a)   WRWCT was, in fact, underfunded at that time (WRWCT000047);

(b)   REMTNY was, in fact, underfunded at that time (REMTNY000043); and

(c)   PETNY was, in fact, underfunded at that time.  (PETNY000072-000075).

119.   The above statements at ¶¶115-17 were also knowingly and/or recklessly materially false and/or misleading as evidenced by reports issued by Milliman on November 29, 2006, Kickey on December 20, 2006, and PwC on January 9, 2007 slamming the works of

SGRisk and CRM.  And contrary to the statement in ¶116 that "this report verified that all actuarial methods used and actuarial judgments made were in accordance with sound actuarial principles and standards," the Company failed to disclose that there were numerous reports not only finding SGRisk's actuarial methods unsound, but also questioning the supposed report provided by the actuary:

> (a)    The Milliman November 29, 2006 draft report estimated that HITNY's loss reserve requirement were in excess of $110 million, or approximately $63 million more than SGRisk's most recent report – an "extreme" difference in estimates.  HITNY000055.  "CRM should have realized at this point that SGRisk's estimate and/or CRM's reserve estimates were grossly inadequate, as the two other group self-insured trusts in which CRM was the administrator also had similar funding issues primarily related to the loss reserves."  HITNY000055.

> (b)    The WCB sent a letter to the PETNY Board of Trustees on December 5, 2006 indicating serious concerns with the accuracy of reports of PETNY's actuary, SGRisk, and that an independent actuarial review must be performed (PETNY000011).

> (c)    The WCB, in fact, sent out a group mailing regarding SGRisk's actuarial reports, also indicating that REMTNY, among others, would have to have an independent actuarial review performed.  REMTNY000011.

> (d)    The Kickey December 20, 2006 report heavily criticized CRM's claims reserving, grading *80%* of CRM's reserving for WRWCT claims as "poor" and explicitly stated that CRM was suppressing the reserves for claims.  Kickey concluded: "[w]hen you fail to meet

your own guidelines for reserving practices in 80% of the cases, something is very wrong." WRWCT000488-000489.

(e)     The PwC January 9, 2007 report to the WCB indicated that SGRisk's report dated December 13, 2005 was not adequately documented and in part based on incorrect, incomplete, or potentially misleading documentation.  PwC further criticized SGRisk's report, finding that SGRisk's report utilized a flawed methodology, did not reflect HITNY's actual experience, and lacked appropriate statistical analysis to validate or measure the impact of CRM's claimed reserve strengthening.  HITNY000356-000383.

120.    The statement in ¶116 was also false and misleading because it created the impression that HITNY's deteriorating financial condition was caused by "adverse claims developments" and not the true cause, which was the correction of SGRisk's prior flawed actuarial conclusions.  The statement in ¶116 was also false and misleading because it created the false impression that a potential remediation plan could restore HITNY to funded status when, in fact, HITNY's funding was grossly deficient and its demise was assured.  As noted in HITNY000054, at a August 2006 HITNY Board of Trustees meeting, according to the minutes Rakoff advised the Trustees that CRM would be able to provide the members a commercial alternative should HITNY prove to be financially unviable.

121.    On March 8, 2007, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Fourth Quarter, Full Year Results."  Therein, the Company, in relevant part, reported its financial and operating results for Q4/FY 2006, including the results related to its fee-based management services to the New York Trusts, and, in relevant part, stated:

Commenting on the quarter, Dan Hickey Jr., CEO of CRM Holdings Ltd., said, ". . . Disciplined underwriting of increasing amounts of workers compensation insurance with very favorable loss experience is enhancing profitability. The addition of Majestic will create a powerful strategic combination with our fee-based and reinsurance businesses that we expect to perform well over the long term."

<div align="center">*     *     *</div>

. . . Fee-based management services revenues increased 10%, to $40.0 million. The rise in fee-based business was due to an increase in group members both in New York, where membership increased 7% to 2,080, and in California, where membership increased by 37%, to 402 . . . .

<div align="center">*     *     *</div>

Mr. Hickey continued, "2006 was a year in which we built on the financial foundation established by our IPO a year ago. We stayed the course during challenging times in the California marketplace and maintained our high operating standards, while at the same time moving ahead and establishing Twin Bridges as a significant business and a major part of CRM.

<div align="center">*     *     *</div>

Concluded Mr. Hickey, "We are very enthusiastic about our prospects in another challenging insurance marketplace in 2007. Our increased geographic scope, larger broker network, broader base of business and continued excellent operating standards place us in a good position for another year of revenue and earnings growth."

122.    On March 8, 2007, the Company held a conference call with investors, industry analysts, and other market participants, to discuss the Company's financial results for FY/Q4 2006 (the "Q4 2006 Conference Call").  Defendants Hickey and Scardino were present.  During the Q4 2006 Conference Call, Defendant Hickey (who was not corrected by Defendant Scardino) answered a questioned about the funding status relating to HITNY and boldly stated that it was in its "final stages" and would involve "minimal premium adjustments:"

<A - Daniel Hickey, Jr.>: Yeah, that is in its *final stages* of an active remediation plan, the plan will call for *some minimal premium adjustments* to the trust *we*

*expect to continue to retain our membership* and it is including no lump sum assessments by the Comp Board, which is really the critical piece whenever a trust goes into the underfunded status, there is really three things that can happen, the worst that can happen is the Comp Board can close the trust down and immediately reassess members, the second is they can keep the trust open, but led the assessments and then the third is that the trust can entry into a remediation plan to get back to the no funding issues status that if the direction the Comp Board has taken with the HITNY trust and we are very confident in the remediation plan. One of the most significant factors that's helping the HITNY trust is the fact that there was a 20% rate increase. That went into effect in – in the financial period that that trust's underfunding status is based on only had six months of its seven years of earned premium at the elevated premium rates. So, there is adequate premium reduction, we still have hard market in New York and we would expect to continue to retain our members, *we have a very loyal and dedicated Board of Trustees and we expect no material erosion in the program*.

(Emphasis added).

123.   On March 9, 2007, CRMH filed its 2006 Form 10-K with the SEC, which was signed by Defendants Hickey, Hickey Sr., and Scardino.  Therein, the Company, in relevant part, stated:

. . . We believe growth in our New York business will occur as a result of increases in the number of members in our existing groups and recently approved increases in the rates set by the New York Workers' Compensation Board. Following six years of relatively stable rates, the New York Workers' Compensation Board passed a rate increase in July 2005 averaging 5% across all industry groups. This increase became effective in October 2005, and the rates set by the New York Workers' Compensation Board across the industries in which we have formed self-insured groups increased by approximately 8% on average commencing in 2006.

124.   The Company's 2006 10-K further stated:

We believe that as of the date of this annual report, adverse claims development has caused HITNY's estimated ratio of regulatory assets to total liabilities to decrease significantly. As a result of HITNY's underfunded status, HITNY's Board of Trustees has determined that the group will not accept any new members until the underfunding has been substantially corrected. We are presently in discussions with HITNY's Board of Trustees and the New York Workers' Compensation Board to develop a remediation plan to resolve HITNY's funding status. Discussions regarding the plan are ongoing, and we hope to have a plan

finalized by April 1, 2007, which is HITNY's program renewal date. If adopted, we expect that the remediation plan will incorporate a reduction in management fees paid by HITNY and lower excess insurance cost when the existing coverage through NY Marine and General expires and is likely replaced with coverage through Majestic. The remediation plan may also include HITNY purchasing additional coverage for prior year's losses. Although negotiations are on-going, we are optimistic that a remediation plan can be agreed to by all parties and approved by the New York Workers' Compensation Board. We cannot, however, say with any certainly that the proposed plan will be approved by the parties and what the ultimate terms of the plan will be.

Connected with HITNY's adverse claims development, the New York Workers' Compensation Board is conducting an inquiry into the actuarial work done by a third-party actuary. We have provided testimony and copies of the underlying data that was submitted to the actuary to the New York Workers' Compensation Board. The New York Workers' Compensation Board has also received testimony from the third-party actuary. We also understand that the actuary provided the New York Workers' Compensation Board with a written independent report from another qualified independent actuary that specializes in performing such reviews. This report verified that all actuarial methods used and actuarial judgments made were in accordance with sound actuarial principles and standards. Although we expect that the materials and testimony that we provided to the New York Workers' Compensation Board will substantiate all underlying data, we cannot predict the outcome of the New York Workers' Compensation Board's inquiry.

We have also recently determined that adverse claims development has similarly caused the estimated ratio of regulatory assets to total liabilities to decrease significantly for another of our groups. This group accounted for approximately 6% of our fee-based revenue for the year ended December 31, 2006. Although the group has not been deemed underfunded at this point, we expect that the New York Workers' Compensation Board will make such a determination following its review of the group's financial statements. Accordingly, at its most recent meeting, we presented a remediation plan to the group's board of trustees, who preliminarily approved it. We expect to work with the group and the New York Workers' Compensation Board to finalize this remediation plan to resolve the group's funding status, but are unable to predict the ultimate outcome of the discussions or the proposed plan.

The New York Workers Compensation Board has the regulatory authority to require underfunded groups to increase the premiums their members pay to such groups, cause their members to pay an additional assessment for the coverage provided by such groups during prior years, review all expenses of the group, including the management fees paid by such groups, request substantial reductions in such expenses and, in extreme circumstances, order the group to

disband. In the past, we have been able to assist our underfunded groups, including HITNY, to develop and implement successful remediation plans and restore such groups to funded status. However, we cannot assure you that either of the groups will be able to remediate their funding status successfully and in such an event, our business, financial condition and results of operations, as well as our reputation with respect to the provision of management services to self-insured workers compensation groups, could be materially and adversely affected. Furthermore, either of the groups may assert a claim against us, which we would vigorously defend; if any such claim results in payments to the groups or a reduction in the management fees the groups pay to us, our business, financial condition and results of operations could also be materially and adversely affected.

125.    The above statements ¶¶121-24 were knowingly and/or recklessly materially false

and/or misleading for the same reasons contained in ¶¶87, 94, 99, 113, 118-120.

126.    On May 2, 2007, CRMH issued a press release entitled, "CRM Holdings, Ltd.

Announces First Quarter Results."  Therein, the Company, in relevant part, stated:

Commenting on the quarter, Dan Hickey Jr., CEO of CRM Holdings Ltd., said, "We are pleased with the profitability of the CRM business during the first quarter. Our more diverse business model is serving us well, providing contributions to profits across primary insurance, reinsurance and fee-based sectors. The powerful combination of these models is working especially well in the risk-based part of the business, where fronting fees have been eliminated in a number of instances and underwriting disciplines have been maintained."

*       *       *

. . . The Company's group membership in New York increased 5.5% to 2,082, but premiums under management decreased by 0.6% to $116.7 million, as a result of business mix, discounts, and experience modification movements.

*       *       *

Fee-based business remains competitive with the prospect of some additional rate declines in California. ***CRM plans to remain competitive while maintaining high underwriting standards.***

(Emphasis added).

127.    On May 14, 2007, CRMH filed its Q1 2007 Form 10-Q with the SEC, which was

signed by Defendant Hickey.  Therein, the Company, in relevant part, stated:

> Adverse claims development has caused a number of our groups, including HITNY, which was previously our largest group, to become significantly underfunded.
>
> HITNY's estimated ratio of regulatory assets to total liabilities has decreased significantly due to adverse claims development. As a result of HITNY's underfunded status, the New York Workers' Compensation Board has determined that the group will not accept any new members until the underfunding has been substantially corrected. In addition to this, HITNY experienced 18% attrition in the number of its members when the group policies renewed on April 1, 2007. Although we reached an initial agreement during the first quarter with HITNY's Board of Trustees on certain parts of a preliminary remediation plan to resolve HITNY's funding status, we continue to discuss other remaining details with the Board of Trustees, along with the New York Workers' Compensation Board. The parts of the plan that have been agreed to include a reduction in management fees paid by HITNY and a reduction in the excess insurance cost for the policies that were placed with Majestic. An agreement was also reached between HITNY and Twin Bridges, such that HITNY will purchase an additional policy of frequency (or aggregate) coverage from Twin Bridges for prior years' losses. The issuance of the policy from Twin Bridges, however, is subject to various conditions, all of which have not yet been fulfilled, to become effective. Further, given the significant amount of attrition from the group on April 1, the parts of the remediation plan already agreed to may have to be re-examined and may now prove more difficult to achieve, since the plan was based, in large part, upon renewals with increases in premiums and member contributions. Although negotiations remain on-going with HITNY, we cannot say with any certainly that a remediation plan will be approved by all parties and what the ultimate terms of the plan will be.
>
> Connected with HITNY's adverse claims development, the New York Workers' Compensation Board is conducting an inquiry into the actuarial work done by a third-party actuary. We have provided testimony and copies of the underlying data that was submitted to the actuary to the New York Workers' Compensation Board. The New York Workers' Compensation Board has also received testimony from the third-party actuary. We also understand that the actuary provided the New York Workers' Compensation Board with a written independent report from another qualified independent actuary that specializes in performing such reviews. This report verified that all actuarial methods used and actuarial judgments made were in accordance with sound actuarial principles and standards. The proceeding remains on-going and we continue to provide testimony and documentary

evidence as requested. Although we expect that the materials and testimony that we provided to the New York Workers' Compensation Board will substantiate all underlying data, we cannot predict the outcome of the New York Workers' Compensation Board's inquiry.

We have also recently determined that adverse claims development has similarly caused the estimated ratio of regulatory assets to total liabilities to decrease significantly for a number of our other groups in New York. Although these groups have not been deemed underfunded at this point, we expect that the New York Workers' Compensation Board may make such a determination following its review of the groups' financial statements. Accordingly, we will be working with the groups to develop remediation plans over the next several months, but are unable to predict with any certainty what the ultimate outcome of the discussions or the proposed plans will be.

The New York Workers Compensation Board has the regulatory authority to require our underfunded groups to increase the premiums their members pay to such groups, cause their members to pay an additional assessment for the coverage provided by such groups during prior years, review all expenses of the group, including the management fees paid by such groups, request substantial reductions in such expenses and, in extreme circumstances, order the group to disband. In the past, we have been able to assist our underfunded groups, including HITNY, to develop and implement successful remediation plans and restore such groups to funded status. However, we cannot assure you that any of the groups will be able to remediate their funding status successfully and in such an event, our business, financial condition and results of operations, as well as our reputation with respect to the provision of management services to self-insured workers compensation groups, could be materially and adversely affected. Furthermore, the groups may assert a claim against us, which we would vigorously defend. If any such claim results in payments to the groups or a reduction in the management fees the groups pay to us, our business, financial condition and results of operations could also be materially and adversely affected.

128.    The above statements ¶¶126-27 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶125.

129.    On August 7, 2007, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Record Second Quarter Results."  Therein, the Company, in relevant part stated:

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

66

Fee-based management services revenues declined to $8.8 million from $9.9 million in the prior year. The decline is attributable to lower insurance rates in California, attrition in one New York self-insured group, and reduced commissions on the renewing excess compensation policies issued by Majestic.

*       *       *

"We are continuing to build a solid and diversified revenue and earnings platform. Our diverse offerings of fee-based services, primary insurance, excess insurance, and reinsurance further strengthen our relationships with our broker partners. Currently, our risk-based businesses are leading the way and driving improved levels of performance, but we plan to continue to offer all workers' compensation options to our brokers, providing them our full array of products and services for their clients," said Dan Hickey Jr., CEO of CRM Holdings Ltd.

*       *       *

. . . The Company's group membership in New York increased 8.9% to 2,093, but premiums under management decreased by 13.4% to $100.7 million, mainly due to attrition in one trust.

*       *       *

Fee-based business will continue to experience soft market conditions in California and must absorb a rate cut in New York. Nonetheless, CRM expects to continue adding members to its self insured groups and will seek opportunities to acquire books of business. CRM expects retention will remain strong, which will be beneficial to revenue and earnings when market conditions harden.

130.    On August 7, 2007, the Company held a conference call with investors, industry analysts, and other market participants, to discuss the Company's Q2 2007 financial results (the "Q2 2007 Conference Call").  Defendant Hickey and Scardino were present.  During the Q2 2007 Conference Call, Defendant Hickey (who was not corrected by Defendant Scardino) responded to a question about the New York market and the recent reforms:

. . . [T]he New York market which is very different from the California market. Number one, we -- prior to reform have not had a large number of players in the workers compensation market. I think that the reform that has been proposed presents opportunity for CRM, both in a fee-based self insured model and certainly in the selective primary model. *Early indication is that possibly the*

*market can harden.* We look at selective groups that we underwrite and we have had benefits: the capping of permanent partial particularly in the healthcare industry is going to have a material impact on ultimate costs, and we want to be again selective primary market, ***but we think that the tide will turn on the self-insured model in the state***.

(Emphasis added).

131.    On August 8, 2007, CRMH filed its Q2 2007 Form 10-Q with the SEC, which was signed by Defendant Hickey.  Therein, the Company, in relevant part, stated: "In addition, 29% of the trust members representing 34% of expired premiums of what had been the largest New York self-insured group we manage chose not to renew on April 1, 2007."

132.    The above statements ¶¶129-31 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶¶87, 94, 99, 113, 118-120, 125, 128, and as evidenced by the PwC June 13, 2007 reports issued to the WCB regarding the CRM GSITs' loss reserves.    In these reports, PwC heavily criticized SGRisk for utilizing unsupported, inappropriate and/or incorrect actuarial methods in calculating loss reserves.    *E.g.*, REMTNY000113-000131;          NYSCT000115-000130;          TRIWCT000388-000403; WRWCT000249-000264.

133.    On September 17, 2007, the Company issued a press release entitled, "CRM Holdings, Ltd. Receives Notice From Healthcare Industry Trust of New York of Potential Voluntary Termination." Therein, the Company, in relevant part, stated:

. . . [CRMH] said today that it has been notified by the Board of Trustees ("the Board") of the Healthcare Industry Trust of New York ("HITNY") that the Board has voted to solicit HITNY's membership for the voluntary termination of HITNY, effective 60 days after member votes are tallied. Termination requires an approval of two-thirds of HITNY's active members. If approved, the program will terminate on or about November 30, 2007.

The Board's decision to terminate stems from several factors that, when combined, would make remediation from underfunded to funded status difficult. *The factors include a significant reduction in the workers' compensation rates set by the New York State Workers' Compensation Board that are attributable to the healthcare industry, increased competitive market pricing pressure, past and anticipated member attrition, regulatory restrictions on discounts offered to the members, and regulatory restrictions against adding new members. The Board believes these issues indicate that it is more likely than not that the viability of HITNY going forward will be compromised.*

"*We are disappointed that HITNY, which has been a major option for workers' compensation risk management for many brokers and their healthcare clients, was faced with this difficult set of circumstances,*" said Mr. Daniel G. Hickey Jr., CRM's Chairman and CEO. "*We at CRM have been in the business of providing reliable and responsible workers' compensation risk management services and solutions for our broker customers since our foundation. We will continue to support and offer workers' compensation insurance solutions in the healthcare market in every state in which we operate. And we will do so in a measured and prudent fashion. Our primary insurance company, Majestic, which has been approved to write workers' compensation in New York, is able to offer a standard insurance product for all viable risks, including those HITNY members in good standing.*"

Despite the potential termination of HITNY, management reconfirms its current fiscal year 2007 guidance of between $1.10 per share and $1.20 per share. *The Company anticipates that any impact on earnings from HITNY's termination will be offset by other business activities*, but cannot provide any assurances that it will achieve such plans, intentions or expectations.

134.   The above statements ¶133 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶¶87, 94, 99, 113, 118-120, 125, 128, 132, and, because, among other things, HITNY had been massively underfunded due to the Company's improper setting of reserves, the deficient underwriting, and the Company failed to disclose that its other Trusts were also massively underfunded.

135.   On November 7, 2007, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Third Quarter Results."  Therein, the Company, in relevant part, stated:

Fee-based management services revenues decreased to $8.7 million from $10.1 million in the prior year. The decline was due to lower insurance rates in California, attrition in the membership of one New York self-insured group managed by the Company and reduced commissions on excess policies placed with Majestic.

<div align="center">*      *      *</div>

. . . The Company's group membership in New York increased 4% to 2,099, but premiums under management decreased by 19% $98.4 million, mainly due to member attrition in one trust.

<div align="center">*      *      *</div>

CRM expects its results for the full year to reflect further progress from its risk-based businesses. Its fee-based business will continue to experience soft market conditions in California and must absorb an impending rate cut in New York and the weakness of some of its managed trusts in the current legislative and rate environment. Based largely on the results in the reinsurance and primary insurance segments, CRM has raised its guidance range for the full year to $1.20 to $1.25 per fully diluted share.

136.    On November 7, 2007, the Company held a conference call with investors, industry analysts, and other market participants, to discuss the Company's Q3 2007 financial results (the "Q3 2007 Conference Call").  Defendants Hickey and Scardino were present.  During the Q3 2007 Conference Call, Defendant Scardino (who was not corrected by Defendant Hickey), in relevant part, stated:

Overall group membership in the New York Trust increased slightly, but revenues there down 15.6%. This was primarily caused by attrition in one group that had some larger insurers. ***The background here is that for a number of mainly regulatory reasons, many self-insured trusts in New York are no longer operating profitably.*** In fact, more than half of the New York trusts are deemed under funded by the Workers' Comp Board. As we have already disclosed, our largest New York trust, known as HITNY, ceased operations in October and will close at the end of this month. Two other smaller trusts will have closed by the end of the year. As I'll discuss in a moment, our guidance now takes account of all these events.

(Emphasis added).

137.    During the Q3 2007 Conference Call, Defendant Hickey (who was not corrected by Defendant Scardino), in relevant part, noted that in New York, the Company would have to "evaluate the viability of the trust model given the rate reduction and completely different regulatory environment" and, further noted:

> The New York marketplace has some unique regulations that really deviate from the type of accounting and standards that typical insurance companies operate under. ***And as a result with rate cuts, there is a pricing challenge in New York State for trusts. With the funding requirements of the programs in New York***, ***that has primarily been part of the reason that some our trusts have voluntarily chose to close the programs down and move to an alternative source of comp funding***.

(Emphasis added).

138.    On November 8, 2007, CRMH filed its Q3 2007 Form 10-Q with the SEC, which was signed by Defendant Hickey.  Therein, the Company, in relevant part, stated:

> …[I]ncreased market competition and pricing pressure were significant factors, among others, that contributed to three of our New York self-insured groups electing to voluntarily terminate their active operations during the second half of 2007. The self-insured group product we offer is not as attractive during periods of low premium rates and excess underwriting capacity, as we are currently experiencing in New York, because of the risks associated with the joint and several liability of the members. There can be no assurance that other self-insured groups we manage will not elect to cease active operations, that the price erosion in New York will not become more widespread, or that our profitability will not deteriorate from the rate reductions. We are mitigating these risks, however, by constantly seeking out profitable opportunities through geographic and business diversification. This includes the geographic expansion of our primary insurance business into New York, by leveraging our strong broker distribution network to offer primary insurance policies for both new businesses as well as for former members of group self-insured programs.

139.    Further, the Company's Q3 2007 Form 10-Q, in relevant, purported to warn:

> Three of the self-insured groups we manage in New York are voluntarily terminating their active operations during 2007. The groups, the Healthcare Industry Trust of New York, the New York State Cemeteries Trust and the Public Entities Trust of New York, provided approximately 18%, 1% and 1%,

respectively, of our revenues from fee-based management services for the nine months ended September 30, 2007, and 23%, 1% and 1%, respectively, of our revenues from fee-based management services for the year ended December 31, 2006. *The groups' decisions to terminate stemmed from several factors that, when combined, would make the groups' remediation from underfunded to funded status difficult. The factors included significant reductions in the workers' compensation rates set by the New York State Workers' Compensation Board that are attributable to the employers of the groups, increased market competition and pricing pressure, past and anticipated member attrition, regulatory restrictions on discounts offered to the members, and regulatory restrictions against adding new members.* As a result of these voluntary terminations, our management service agreements with the groups will be automatically terminated and we will no longer derive fee-based management services revenue from the groups. The termination of other self-insured groups we manage in New York could have a material adverse effect on our business, financial condition and results of operations.

**A number of our New York self-insured groups are significantly underfunded.**

*Adverse claims development has caused a number of our self-insured groups in New York to become significantly underfunded. The estimated ratio of regulatory assets to total liabilities of the groups has decreased significantly due to, among other factors, adverse claims development.* Although these groups have not been deemed underfunded at this point, we expect that the New York Workers' Compensation Board may make such a determination following its review of the groups' financial statements. Accordingly, we will be working with the groups to develop remediation plans over the next several months, but are unable to predict with any certainty what the ultimate outcome of the discussions or the proposed plans will be.

Connected with HITNY's adverse claims development, the New York Workers' Compensation Board has conducted an inquiry into the actuarial work done by a third-party actuary. We provided testimony and copies of the underlying data that was submitted to the actuary to the New York Workers' Compensation Board. The New York Workers' Compensation Board also received testimony from the third-party actuary. We also understand that the actuary provided the New York Workers' Compensation Board with a written independent report from another qualified independent actuary that specializes in performing such reviews. This report verified that all actuarial methods used and actuarial judgments made were in accordance with sound actuarial principles and standards. *As of the date of this quarterly report, all testimony and discovery has been completed in the inquiry, and we are awaiting a final decision from the New York Workers' Compensation Board. Although we believe that the materials and testimony*

*provided to New York Workers' Compensation Board substantiates all underlying data, we cannot predict the ultimate outcome of inquiry.*

The New York Workers Compensation Board has the regulatory authority to require our underfunded groups to increase the premiums their members pay to such groups, cause their members to pay an additional assessment for the coverage provided by such groups during prior years, review all expenses of the group, including the management fees paid by such groups, request substantial reductions in such expenses and, in extreme circumstances, order the group to disband. In the past, we have been able to assist our underfunded groups to develop and implement successful remediation plans and restore such groups to funded status. However, we cannot assure you that any of the groups will be able to remediate their funding status successfully and in such an event, our business, financial condition and results of operations, as well as our reputation with respect to the provision of management services to self-insured workers compensation groups, could be materially and adversely affected. Furthermore, the groups may assert a claim against us, which we would vigorously defend. If any such claim results in payments to the groups or a reduction in the management fees the groups pay to us, our business, financial condition and results of operations could also be materially and adversely affected.

(Emphasis added).

140.    The above statements ¶¶135-39 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶¶87, 94, 99, 113, 118-120, 125, 128, 132, 134, and as evidenced by the PwC November 2007 Tier II reports issued to the WCB regarding CRM GSITs' loss reserves.  PwC again heavily criticized SGRisk, for example finding in connection with WRWCT that: no support was provided for certain expected loss ratios utilized by SGRisk when estimating the actuarial based loss reserves; the loss ratios did not appear appropriate based on WRWCT's historical results; the loss development factors utilized by SGRisk could have produced optimistic results and may have understated the loss reserves; no data was included in SGRisk's actuarial report to validate whether WRWCT was eligible for discounting; and the payment patterns used by the actuary to determine the discount rate were

not appropriate.  WRWCT000266-000300.  Likewise, PwC similarly criticized SGRisk's work in connection with TIWCT.  TRIWCT000407-000441.

141.    On January 29, 2008, CRM issued a press release entitled, "Elite Contractors Trust of New York Files Year Ended 9/30/07 Certified Financial Statements Which Meet the Regulatory Criteria for Classification as No Funding Issues."  Therein, the Company, in relevant part, stated:

> POUGHKEEPSIE, N.Y., Jan. 29 /PRNewswire/ -- Compensation Risk Managers, LLC (CRM), a full-service program manager and administrator of approved, group self insurance workers' compensation programs, today announced that the Elite Contractors Trust of New York (ECTNY) has submitted its 9/30/07 certified financial statements to the New York State Workers' Compensation Board (WCB) *showing that the Trust has had a very successful year and exceeds the regulatory criteria for classification by the WCB as having "no funding issues".*
>
> *Following a comprehensive audit conducted by an independent CPA firm, it was determined that the ECTNY program has a trust equity ratio exceeding the WCB regulatory guidelines for a "no funding issues" classification. While awaiting a review and confirmation of the findings of the WCB, it is important to note that the financials include utilization of actuarial forecasts substantially similar to those calculated by the actuarial firm performing preliminary reviews for the WCB.*
>
> "*We are proud of the high caliber businesses comprising the membership of ECTNY and we look forward to providing ECTNY members with the rates and services they have come to expect from CRM,*" said Daniel G. Hickey, Jr., CRM's Chief Executive Officer.

(Emphasis added).

142.    The above statements ¶141 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶¶87, 94, 99, 113, 118-120, 125, 128, 132, 134, 140, and, because, among others, ECTNY was actually significantly underfunded and, in fact, faced massive funding issues.  As a result of a decrease in membership, the WCB

subsequently determined that ECTNY was no longer viable and instructed the ECTNY Trustees to cease the current operations of the Trust by no longer providing ongoing workers' compensation coverage to the remaining active members after July 16, 2008, but to manage the incurred claims until their settlement (anticipated to be over several years).  Subsequently, the administration of  ECTNY was transferred to another administrator and a new actuary was engaged.  Immediately thereafter, ECTNY incurred significant losses, which resulted in net liabilities of $61,847,187 at September 30, 2008.  As a result of this change and a fresh look at the incurred claims, the liability for losses and loss adjustment expenses on claims incurred prior to September 30, 2007 was significantly increased in the amount of $35,196,919 at September 30, 2008.  In June 2009, at the direction of the WCB, ECTNY had to assess its members roughly $37,000,000 to increase cash flow and to reduce the net liabilities.  ECTNY000151.

143.   On February 20, 2008, the Company issued a press release entitled, "CRM Holdings, Ltd. Announces Changes at Self-Insured Group Management Subsidiary."  Therein, the Company, in relevant part, stated:

> ***In response to changes in market and business conditions that have reduced the volume of business in group self-insured trusts in its New York market***, CRM recently implemented a series of cost cutting and realignment measures. These measures are intended to ensure the organization is focused on its customers, is right-sized in view of these changing market conditions and is better positioned for strong future growth.
>
> ***The actions being taken reflect the results of an internal assessment of CRM's fee-based segment and better align the resources of the organization with the best opportunities in the workers' compensation marketplace.*** The realignment has resulted in the elimination of 34 positions at Compensation Risk Managers' headquarters in Poughkeepsie and the transfer of 6 positions to the Company's Majestic Insurance Company subsidiary. The actions are expected to yield annualized pre-tax expense savings of approximately $2.2 million.

"The adjustments that we have made align our resources with the current needs of our New York fee-based business," said Daniel G. Hickey Jr., Chairman and Chief Executive Officer of CRM Holdings.

(Emphasis added).

144.    The above statements ¶143 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶142.

145.    On March 5, 2008, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Fourth Quarter Results."  Therein, the Company, in relevant part, stated:

For the fourth quarter of 2007, net income was $4.9 million, or $0.30 per diluted share . . . . Total revenues increased 58.5% to $42.2 million . . . . *These results were aided by the inclusion of the results of Majestic Insurance Company ("Majestic"), which was acquired November 14, 2006, and the overall growth of the Company's primary insurance business*.

\*      \*      \*

Fee-based management services revenues were $8.2 million during the fourth quarter, compared to $10.3 million a year ago. The decline resulted from a decline in membership of the New York self-insured groups managed by the Company, lower insurance rates in California, and reduced commissions on excess insurance policies placed with Majestic.

\*      \*      \*

"*The fourth quarter completes a year that has demonstrated the resilience of the CRM business model*," said Daniel G. Hickey, Jr., CEO of CRM Holdings Ltd. "Our management has executed our core strategies of geographic diversification and increased efficiency. *The tremendous efforts of the whole CRM team have enabled us to transform CRM into a true full service provider of workers' compensation risk management services. We have integrated Majestic's primary insurance business into the overall organization, utilized it as an admitted carrier for reinsurance business, and expanded its activities into the New York and New Jersey markets. By year end, 36% of its premiums written for the year were generated outside the California market compared to 8% in 2006. This strong base of primary workers compensation risk underwriting has allowed us to continue to offer the very important self-insured group product to our customers in California while right-sizing our fee-based operations as we reduce our exposure to the New York self-insured market, and to maintain the*

*diversified offering which we believe the market will demand over the long term. Our whole team is to be congratulated for these achievements which have put CRM on a sound footing of profitability for 2007, and the upcoming year."*

\*     \*     \*

Concluded Mr. Hickey, "**CRM is in a very strong position today in its major markets where the rate environment is still in the softening phase of the cycle. We have positioned and right-sized the business to be ideally placed in the markets as we see them**. *We plan to be prudent but competitive underwriters and cost-effective group plan administrators. Underwriting discipline, selective partnerships in the distribution chain, and targeted industry and geographic writings are the keys to success in this soft market. In that way, we are in the best position to grow our business while providing great value for our brokers and their clients and consistently strong return on equity for our shareholders.* At no time since I founded this company have I felt more confident that we have the range of product offerings that our markets require and that we will prosper throughout all insurance cycles. I am looking forward to reporting on our performance in the year ahead."

(Emphasis added).

146.    On March 5, 2008, the Company held a conference call with investors, industry analysts, and other market participants to discuss the Company's FY/Q4 2007 financial results (the "Q4 2007 Conference Call").  Defendants Hickey and Scardino were present.  In responding to a question, Defendant Hickey (who was not corrected by Defendant Scardino), in relevant part, stated:

*So, we've realized that and thankfully put ourselves in a position to handle the insurance needs of the industries and brokers that we select to work with. In the instance of HITNY we were able to write a significant portion of that business. We had to be selective in that process, there were some material rate cuts in that book of business. We've transitioned a good portion of our transportation business effective January 1, our real estate business, our manufacturing business. Today premium writings in New York are north of $20 million in written premiums, that's in a period of less than 90 days and doesn't account new business that we've written beyond January 1, and are seeing very active volume on a submission activity.*

(Emphasis added).

147.    On March 7, 2008, CRMH filed its 2007 Form 10-K with the SEC, which was signed by Defendant Hickey, Hickey Sr., Scardino.   Therein, the Company, in relevant part, stated:

> We believe that the self-insured group product that is offered by the self-insured groups which we manage is not as attractive during periods of low premium rates and excess underwriting capacity, as we are currently experiencing in New York, because of the risks associated with the joint and several liability of the members as well as for former members of New York group self-insured programs. This increased market competition and pricing pressure were significant factors, among others, that contributed to seven of our New York self-insured groups electing to voluntarily terminate their active operations during the second half of 2007. We have ceased to manage these self-insured groups which are now being managed by a third-party administrator appointed by the New York Workers' Compensation Board. Additionally, in the course of run-off, our New York self-insured groups that have ceased active operations may undergo forensic audits and depending on the results of such audits, the groups' former members may be assessed for any deficits, in which case we may be subject to claims by the groups or their former members regarding our prior management.
>
> There can be no assurance that the remaining New York self-insured group which we manage will not elect to cease active operations, particularly in the event that the price erosion in New York becomes more widespread. We expect that revenues from our fee-based management services in New York will be significantly reduced in 2008. We do not currently intend to form any additional self-insurance groups in New York nor are we actively seeking to add additional members to our remaining New York group.
>
> We are currently in the process of mitigating the impact of these trends by constantly seeking out profitable opportunities through further business diversification. This includes the geographic expansion of our primary insurance business into New York, by leveraging our strong broker distribution network to offer primary insurance policies for both new businesses as well as for former members of group self-insured programs. In instances where a member or a broker representing a member or former member requests a quote from our Majestic subsidiary, we are able to offer such a quote to businesses which meet Majestic's underwriting profile. In this manner, we are able to retain as customers certain of the membership of our former self-insured groups who would otherwise seek insurance coverage from other insurance providers.

In connection with adverse claims development experienced by the Healthcare Industry Trust of New York, or HITNY, prior to the group's ceasing active operations, the New York Workers' Compensation Board conducted an inquiry into the actuarial work done by a third-party actuary retained by HITNY. We provided testimony and copies of the underlying data that was submitted by the actuary to the New York Workers' Compensation Board. The New York Workers' Compensation Board also received testimony from the third-party actuary. We also understand that the actuary provided the New York Workers' Compensation Board with a written independent report from another qualified independent actuary that specializes in performing such reviews. This report verified that all actuarial methods used and actuarial judgments made were in accordance with sound actuarial principles and standards. As of the date of this annual report, all testimony and discovery have been completed in the inquiry, we are awaiting a final decision from the New York Workers' Compensation Board and cannot predict the ultimate outcome of the inquiry. However, as a result of this inquiry, the New York Workers' Compensation Board required that the loss reserves for each of the self-insured groups that were reviewed by the third party actuary, including HITNY, undergo an actuarial review by an independent actuarial firm engaged by the New York Workers' Compensation Board.

After an exchange of correspondence in which the New York Workers' Compensation Board expressed dissatisfaction with our response to a request for certain information relating to the audit of the loss reserves for HITNY, the New York Workers' Compensation Board notified us on February 8, 2008 that a referral had been made for a formal investigation into whether disciplinary action should be taken with regard to our third-party administrator license. We vigorously disagree with the characterizations made by the New York Workers' Compensation Board. The procedure initiated by the New York Workers' Compensation Board is in an investigative stage. We are not able at this time to determine what the outcome of the investigation may be nor what, if any, financial or operational consequences may result form the proceeding. However, in the event that the New York Workers' Compensation Board imposes any restrictions with respect to our ability to manage self-insured groups within the state of New York as a result of either of the investigations discussed above, our ability to continue manage our remaining New York self-insured group or effectively re-enter the New York self-insurance group market in the future if market conditions improve may be materially impaired. Additionally, our reputation as a manager of self-insurance groups generally may be negatively impacted in such an event.

(Emphasis added).

148.     Further, with respect to Majestic and the Company' primary insurance segment, the Company, in relevant part, stated:

*Underwriting and Pricing*

Our underwriting strategy for primary workers' compensation insurance is to underwrite individual risks as opposed to focusing on a specific group of industries. We seek to identify businesses with, among other things, above average wage and benefit levels, below average employee turnover, low claims frequency and existing loss control and return-to-work programs.

149.     The above statements in ¶¶145-48 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶¶87, 94, 99, 113, 118-120, 125, 128, 132, 134, 140, 142, and, because, among other things, the February 8, 2008 "letter" from the WCB was actually a ***subpoena*** and CRM failed to disclose that they were underwriting unprofitable business selling primary insurance to former members of the New York trusts that as later admitted by Defendant Scardino in the 2008 Annual Report, it was "not appropriately governed by the judgments of our underwriters."

**The Truth Begins To Emerge**

150.     On April 17, 2008, CRMH issued a press release entitled, "Compensation Risk Managers, LLC Receives Notice of Administrative Action by New York Workers Compensation Board."   Therein, the Company, in relevant part, disclosed that "the WCB has determined to pursue an administrative action in order to revoke CRM's third party administrator's license to provide third party claims administrative services to self-insured works compensation groups in New York.  The Company also disclosed that CRM had received a subpoena from the New York Attorney General.

151.    The letter, dated April 15, 2008 (*see* CRMMISC000372-377), in relevant part, indicates:

> CRM routinely set inadequate individual claim reserves and failed to adjust the reserves in response to new information regarding the claim. Specifically, CRM under-reserved dozens of HITNY claims that were still open at the time the WCB assumed responsibility for administering the HITNY trust in February 2008. The most egregious examples of improperly reserved claims are listed in Exhibit A.
>
> *        *        *
>
> In 2007, the WCB engaged Alan Hines of PriceWaterhouseCoopers (PwC) to perform Tier II audits of seven group self-insurance trusts administered by CRM. CRM repeatedly failed to cooperate with PwC's review of the trusts. First, CRM requested that PwC change its project scope from performing an independent estimate of liabilities to reviewing new actuarial estimates prepared by EMB America, Inc. Although PwC had already done significant work towards performing its own estimates, PwC and the Board agreed to CRM's request and changed PwC's contract. After PwC informed CRM that the data did not confirm CRM's claims about strengthening reserves and aggressively closing claims, CRM refused to provide PwC with the EMB reports. As a result, the WCB had to return to its original plan of having PwC prepare its own loss estimates, after significant delay and additional expense to the trusts.
>
> Second, CRM failed to provide accurate claims information to PwC in a timely manner. PwC requested standard claim data from CRM to perform its actuarial reviews. Initially, CRM provided data in an unusable PDF format. PwC then worked extensively with CRM to arrange the electronic transfer of necessary data in an agreed upon format. However, after nearly a month and multiple attempted data transfers, CRM was unable to provide accurate data in the appropriate format. Specifically, CRM provided erroneous claim counts and incomplete development history of large losses. In the end, CRM's lack of cooperation with the WCB and PwC resulted in delays and additional costs born by the trusts themselves.
>
> *        *        *

8.    CRM submitted false information to the WCB and to its clients in connection with HITNY's 2005 annual audited financial statements.

Group self-insurance trusts are required to submit an audited financial report each year. 12 NYCRR § 317.19. As HITNY's group administrator and

TPA, CRM assisted in the preparation and submission of HITNY's 2005 audited financial report, dated December 13, 2005 (HITNY 2005 Report). In connection with the preparation of this report, CRM made materially false statements about HITNY's settlement of claims and its claim reserving practices, which seriously distorted HITNY's financial health.

a. Approved Section 32 Settlements

In connection with HITNY's 2005 Report, CRM represented that it had recently resolved 69 HITNY claims by Section 32 agreements for total payments of more than $3 million. As of the filing of HITNY's 2005 Report, a small portion of the claims allegedly settled by Section 32 had in fact settled. As of April 2008, many of the claims on the list still had not been settled by Section 32.

The false statements about Section 32s obscured HITNY's true liabilities. Based on the Section 32 report, SG Risk excluded the value of those claims from loss development, resulting in a reduction of millions of dollars in stated liabilities. In addition, SG Risk used the older 2002 loss development factors (2002 LDF) based on CRM's representation of specific Section 32 settlements, thereby further understating HITNY's liabilities.

b. Strengthening Reserves

In connection with HITNY's 2005 Report, CRM also represented that it had substantially strengthened reserves over the previous several years. In fact, as of December 13, 2005, CRM had not engaged in substantial reserve strengthening. This false statement, however, led SG Risk to the use the 2002 LDFs that severely understated the potential liability of HITNY and forestalled the imposition of corrective measures to address the shortfall. The use of 2002 LDFs understated HITNY's ultimate losses by tens of millions of dollars.

CRM's false financial representations in connection with HITNY's 2005 Report are grounds for termination of CRM's TPA license. See 12 NYCRR §317.19. CRM's submission of false information regarding HITNY's financial status demonstrates CRM's failure to comply with the WCL and the WCB's rules and regulations and therefore warrants license revocation. See 12 NYCRR §§302-1.9, 302-2.1(d).

152.    On this news, shares of CRMH declined $1.58 per share, or 32.24%, to close on

April 17, 2008 at $3.32 per share, on unusually heavy volume.

153.    On May 6, 2008, CRMH issued a press release entitled, "CRM Holdings, Ltd.

Announces First Quarter Results."  Therein, the Company, in relevant part, stated:

> "*The first quarter represents a positive start to the year in our risk based businesses. We are growing profitably in California and now in New York and New Jersey*," said Daniel G. Hickey, Jr., CEO of CRM Holdings Ltd. "Our fee-based business in New York is in run-off mode as trusts in the state close down in response to declining rates and difficult economics. The self-insured group business in California turned in a solid performance in a very competitive market. We were able to renew 97% of the expiring policies as of January 1. Overall, an increase in book value of more than 30% compared to the end of the first quarter last year and an 18% annualized return on average equity for the quarter is gratifying in these markets."
>
> \*     \*     \*
>
> The Company continues to see the opportunity to build on its risk-based and fee-based services in California, and *on its risk-based business in New York*. The Company continues to face competitive market conditions in both states. In California, despite the state regulator's zero rate cut advisory for January 1, prices have continued to decline for policies renewed in 2008. In New York, rates on January 1 reflected the mandatory 20.5% reduction that became effective on October 1, 2007.

(Emphasis added).

154.    On May 12, 2008, CRMH filed Q1 2008 Form 10-Q with the SEC, which was signed by Defendant Hickey.  Therein, the Company, in relevant part, stated:

> Net Premiums Earned. Total net premiums earned increased 4%, or $0.6 million, to $17.5 million for the three months ended March 31, 2008, from $ 16.9 million for the three months ended March 31, 2007. The increase was primarily attributable to the development of primary insurance business in New Jersey and New York . . . . Our Majestic east coast operations are continuing to develop business in selected states, focusing on New Jersey and New York. The east coast operations contributed approximately $4.8 million, or 27%, of our net primary insurance premiums earned for the three months ended March 31, 2008.

155.    The above statements ¶¶153-54 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶149.

156.    On June 2, 2008, CRMH issued a press release entitled, "Compensation Risk

Managers, LLC Reaches Settlement Agreement With the New York Workers' Compensation

Board." Therein, the Company, in relevant part, stated:

> CRM Holdings, Ltd., . . . announced its wholly-owned subsidiary Compensation Risk Managers, LLC ("CRM") has reached a resolution with the New York State Workers' Compensation Board ("WCB").
>
> No fines, no penalties and no admission of wrongdoing were important elements of an agreement signed today between the WCB and CRM. Under the terms of the agreement, CRM, which had voluntarily exited the New York self-insured group market during the second half of 2007 and first quarter of 2008, will voluntarily surrender its third party administrator's license to provide third party claims administrative services to self-insured workers compensation groups in New York.
>
> "I would like to thank the Workers' Compensation Board and Chairman Weiss for working with us to resolve this matter quickly. The group self-insured trust industry is facing some tremendous challenges in the months ahead and we are committed to helping them find solutions wherever we can," said Mr. Daniel G. Hickey Jr., the Company's Chairman and Chief Executive Officer.
>
> Mr. Hickey continued, "An end to this dispute benefits our shareholders, as well as clarifies our defense of the allegations. The resolution of this matter allows us to turn our focus to meeting the needs of our brokers and end users as we continue to selectively expand our business."
>
>                     \*      \*      \*
>
> The hearing originally scheduled for May 20, but postponed last week, has been canceled. Both sides consider the matter resolved. As part of the ongoing transfer of CRM's self-insured groups that voluntarily closed, it will continue to assist the WCB in the transfer of the administration of the groups still being managed by CRM to a new third party administrator appointed by the WCB under the Workers' Compensation Law and the WCB's regulations. In a separate matter, CRM agreed to pay $55,000 to satisfy all penalties that previously had been assessed by the WCB.

     157.    On August 6, 2008, CRMH issued a press release entitled, "CRM Holdings, Ltd.

Announces Second Quarter Results." Therein, the Company, in relevant part, stated:

> Growth of the risk based business. Combined revenues from CRM's wholly owned primary insurance subsidiary, Majestic, and its wholly owned reinsurance

business, Twin Bridges, increased 27% over the same quarter last year. *Following a successful launch of workers' compensation underwriting in New York and New Jersey last year, premiums earned outside California are now 38% of total and have been a significant driver of growth*.

\*     \*     \*

Net earned premiums from primary insurance and reinsurance rose 22.9% to $41.2 million from $33.5 million the prior year. Majestic accounted for the bulk of the increase, generating $34.9 million of net earned premium, up 26.8% from $27.5 million a year ago, *driven largely by expansion in New York* and New Jersey. Twin Bridges generated $6.3 million of net earned premium, up from $6.0 million in the same quarter the prior year. . . .

\*     \*     \*

"The markets remained very competitive during the second quarter. *However, we have made notable steps forward in our risk-based business, including what we expect to be profitable growth outside California*. Within California, we see a competitive market, but one that is still providing excellent underwriting opportunities. *The overall business remains profitable as we transition out of the fee-based business in New York, and we remain set for prudent growth in the rest of our business*," said Daniel G. Hickey Jr., CEO of CRM Holdings, Ltd. "We are also very pleased to move forward with our reaffirmed A.M. Best rating, which will enable us to compete for superior-quality business. We recognize there will be costs to the new arrangements, but we believe they benefit CRM by securing its longer-term future and competitive position. We are also pleased to have two pieces of litigation behind us. First, with the New York Workers Compensation Board, where we were able to reach a settlement without admission of wrongdoing or financial penalty, and second, settlement of a contingency with Contractors Access Program of California, Inc. ("CAP") related to the Cornerstone litigation, which is now closed."

\*     \*     \*

*In terms of the business environment, CRM continues to see the opportunity to build on its risk-based business in California, New Jersey, New York and Florida. All markets are experiencing competitive conditions but continue to present underwriting opportunities consistent with the Company's required returns. The Company expects its emphasis on a focused approach in those markets, driven by high levels of service to a targeted broker community with an emphasis on markets it already understands, to yield reasonable, prudent, manageable growth that is adequately supported by its current capital position*.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(Emphasis added).

158.   On August 6, 2008, the Company held a conference call with investors, analysts, and other market participants, to discuss the Company's Q2 2008 financial results (the "Q2 2008 Conference Call").  Defendants Hickey and Scardino were present.

159.   On August 7, 2008, CRMH filed its Q2 2008 Form 10-Q with the SEC, which was signed by Defendant Hickey.  Therein, the Company, in relevant part, stated, "We are seeking to replace lost revenue by identifying profitable opportunities through geographic and business diversification.  This includes the geographic expansion of our primary insurance business into New York, by leveraging our strong broker distribution network to offer primary insurance policies for both new businesses as well as for former members of group self-insured programs."

160.   The above statements ¶¶156-59 were knowingly and/or recklessly materially false and/or misleading for the same reasons contained in ¶149.

161.   On October 3, 2008, the Company filed a Current Report on Form 8-K with the SEC. Therein, the Company, in relevant part, stated:

> On September 30, 2008, CRM Holdings, Ltd. (the "Company") received a letter from the New York State Workers' Compensation Board (the "WCB") indicating its intention to initiate legal proceedings against the Company on behalf of eight self-insured groups previously administered by Compensation Risk Mangers, LLC ("CRM") as it relates to CRM's actions while acting as the administrator and broker of record for the eight self-insured groups. ***The WCB has indicated that it is investigating CRM's administration of the self-insured groups, and upon information and belief, it is alleging that CRM breached certain duties to the self-insured groups and engaged in certain self-dealing and deceptive practices.***

(Emphasis added).

162.    On this news, over the next two days of trading, shares of CRMH declined $0.61 per share, or 24.31%, to close on October 7, 2008 at $1.91 per share, on high volume.

**Disclosures At The End Of The Class Period**

163.    On November 5, 2008, CRMH issued a press release entitled, "CRM Holdings, Ltd. Announces Third Quarter Results." Therein, the Company, in relevant part, stated:

> Results from continuing operations were a loss of $(0.18) per diluted share. Results for the third quarter were influenced by several unusual items. These items included, on an after-tax basis: $(0.03) of impairment charges relating to a previously-announced $1 million Lehman Brothers debt security owned by the Company; a $(0.04) charge relating to reserves created against potentially uncollectable receivables; *and a $(0.12) reserve adjustment to bring reserves for losses in the 2008 accident year accrued in the first and second quarters in line with the Company's higher third quarter reserve ratio for certain primary insurance risks*.
>
> *        *        *
>
> In the third quarter of 2008, the Company's net loss from continuing operations was $2.9 million, or $(0.18) per diluted share. The Company exited the business of providing services to workers' compensation self-insured groups in the State of New York in the third quarter. As a result, it closed its New York subsidiary responsible for this business, Compensation Risk Managers, LLC. The Company also closed its medical review business carried out through its subsidiary Eimar, LLC. The costs and remaining revenues from the businesses occurring during the third quarter have been classified as discontinued operations in the Company's financial statements.
>
> *        *        *
>
> Total expenses increased to $34.5 million from $27.6 million a year ago, as a result of several factors, including the unusual items described above: *namely, a change in the Company's accounts receivable reserves, a cumulative adjustment to the loss ratio applied to the 2008 accident year in the Company's primary business, somewhat offset by reductions in prior years' loss reserves*.
>
> *        *        *
>
> Based on the effects of third quarter results and other factors, the Company is reducing its profit expectations for the 2008 fiscal year. The Company now

> expects earnings per share from continuing operations for the full year to be in the range of $0.58 to $0.63.

(Emphasis added).

164. That day, CRMH held a conference call with investors, securities analysts, and other market participants to discuss the Company's financial results for the 2008 fiscal third quarter. Defendants Hickey and Scardino were present. Therein, in relevant part, Defendants Hickey and Scardino stated:

> <Q - Paul Newsome - Analyst>: Okay. The next big one and then I'll let someone else [inaudible] a couple of questions is the reserve adjustment, could you go into why you felt you needed to increase the accident year for this year in particular?
>
> <A - Defendant Scardino>: Yes. The view that our actuary took was that the pricing environment in California was such that they caution while our underlying losses are not showing any significant deterioration. The amount of premium that we are getting relative to payroll was down by an amount – percentage sufficient that the estimated ultimate loss ratio for this particular accident year – for 2008 accident year went up 4% – went up 400 basis points, let's say. But it was a function of the perceived pricing environment not of any kind of deficiencies in where we're actually carrying our reserves.
>
> <Q - Paul Newsome>: ***I don't understand that. Obviously your reserve charge means that your reserves were deficient for the first half of the year.***
>
> <A - Defendant Scardino>: ***Yes, Paul***.
>
> <Q - Paul Newsome>: ***Is this just an under pricing? Did you essentially under priced the business? Or we now assume that you didn't get a reserve charge, can you either set the reserves too low for a given level of exposure or you – and have an unexpected change in the expected claim trends for exposure...***
>
> * * *
>
> <A - Defendant Scardino>: We started the year – if we just give you easy numbers, we started the year thinking that 60% of the premiums we were seeing would give us an ultimate loss sufficient to meet our obligations. As we looked at where pricing was coming in, the ratio that needed to be charged – needed to be applied to our premiums to get to that same number of 64%. So, in effect, we had

to increase reserves by that difference for the full year. So we have 64% ultimate loss ratio versus 60.

<A - Defendant Hickey >: This is a selected loss ratio by the third-party actuary and that's driven primarily by industry price change. Our loss frequency or loss severity, as Jim mentioned, does not in anyway indicate that potentially those losses will materialize to that level. But the actuary is looking at an industry-wide figure – in any industry-wide figure is saying that pricing is down in the current year and therefore he felt it was conservative and prudent to look at the current year. It's not in anyway an indication of an under reserve or under pricing adjustment.

<Q - Paul Newsome>: I am sorry. That doesn't really make any sense to me, because you don't say your reserves according to what you think the rest of the industry is going to lose, you set your reserves according to what you think [inaudible]. Right?

<A - Defendant Scardino>: *Okay. That – Paul, we needed to be at 64% based on the actuarial ultimate and we had some development in increasing our loss reserve in New York as well. So the combination of those two things, net of movements in the other states, was such that during Q3, we had about $2.5 million of loss reserve increases that would have otherwise been reflected in Q1 and Q2.*

(Emphasis added).

165. On this news, over the course of the following three days of trading, shares of CRMH declined $0.58 per share, more than 36%, to close on November 7, 2008 at $1.03 per share, on high volume.

### Disclosures/Events After the Class Period

166. Attached to the Company's 2008 Annual Report to shareholders was a letter to shareholders signed by Defendant Scardino. Therein, Defendant Scardino and the Company, in relevant part, admitted:

In contrast to California, *we produced unacceptable underwriting results in New York. We established our primary insurance premium base in New York in large part by offering insurance through Majestic to members of some of the self insured trusts formerly managed in our fee-based operation. Our desire was*

*to step in and support the members and their brokers in the transition from the trust market while bringing geographic diversification to our primary business segment.* We did this at a time when market reforms in New York had imposed substantial rate cuts in many classes of business. At the time, it was not clear how the reforms would mitigate loss costs. *Looking back, our response was rushed and not appropriately governed by the judgments of our underwriters. We made a poor decision that contributed significantly to a severe operating loss for the fourth quarter and nearly offset our entire profit for the year.*

<div align="center">*     *     *</div>

*In 2009, we will look to reemphasize the central importance of sound underwriting principles and practices.* Quite simply, the core of an insurance company is underwriting. *We will seek profits, and not necessarily volume*. *We must have the opportunity to earn an underwriting profit on any risk we accept*. So, why do I, with 29 years experience in this business, maintain optimism in this environment? Quite simply, I believe in the skills and loyalty of our people. *Our underwriting team in New York has taken appropriate action, resulting in the cancellation or nonrenewal of a third of our business in the state. All decisions on the acceptability and pricing of business will be determined by our underwriting team*.

(Emphasis added).

167.    The WCB commenced its lawsuit against CRMH and CRM, on its own behalf and in its capacity as successor in interest to the Trusts, which were previously managed by CRM, alleging that CRMH, its subsidiaries and certain directors and officers breached fiduciary duties owed to the Trusts, breached contracts between CRM and the Trusts, breached duties of good faith and fair dealing owed to the Trusts, engaged in fraudulent activities in administering the Trusts, engaged in deceptive business practices and advertising, and were unjustly enriched. The WCB alleges that the WCB and the Trusts have suffered damages in an amount that is not currently ascertainable, but which is believed to exceed $405 million.

168.    Specifically, the WCB Complaint alleged that, from 1999 to September 2008, CRM acted as a group administrator and third-party administrator representing the Trusts before the WCB, and upon the WCB's information and belief:

(a)    CRM drafted all of the Trusts' Service Agreements and all of the Trusts' trust agreements (the "Trust Agreements");

(b)    CRM, for extended periods of time, exercised dominion and/or control over aspects of the Trusts' operations and flow of information;

(c)    CRM and its employees and representatives, among other things, participated in board meetings, made investment decisions, and appointed trustees;

(d)    the actions, as well as the inactions, of CRM, its affiliates, and managers, caused the Trusts to become underfunded and/or insolvent; that as of September 30, 2009, HITNY had a member deficit of approximately *$220,000,000*; as of July 23, 2009, WRWCT had a member deficit of approximately *$41,000,000*; as of June 23, 2009, TRIWCT had a member deficit of approximately *$66,000,000*; as of September 1, 2009, TIWCT had a member deficit of approximately *$7,000,000*; as of March 1, 2009, REMTNY had a member deficit of approximately *$2,500,000*; as of September 30, 2009, PETNY had a member deficit of approximately *$4,600,000*; and as of March 1, 2009, NYSCT had a member deficit of approximately *$770,000*.

169.    According to the WCB Complaint, "[a]s a result of, *inter alia*, the above deficits, the Trusts were unable to properly administer their liabilities and the WCB assumed administration and final distribution of the Trusts' assets and liabilities, and directed CRM to transfer all of its records pertaining to the administration of the Trusts to the WCB."

170.    According to the WCB Complaint, upon the WCB's information and belief:

(a)    CRM did not maintain adequate reserve levels for the Trusts because, in doing so, CRM would have been required to raise member contribution rates, making the Trusts a less financially attractive workers' compensation coverage option to current and potential trust members, thereby decreasing CRM's revenues;

(b)    CRM exerted control over actuarial analyses of the Trusts and manipulated actuarial estimates prepared on behalf of the Trusts;

(c)    there was a financial incentive for CRM to influence, control, and manipulate the Trusts' actuarial estimates;

(d)    the more favorable the Trusts' actuarial estimates appeared, the better chance CRM had to retain and attract new members to each of the Trusts; and

(e)    by the end of 2006, many of the Trusts reported drastic deficits, including HITNY, which reported a $75,783,819.00 deficit, and such deficits were caused by, among other things, CRM's breaches of duties to the Trusts, fraud, deceptive acts, and mismanagement.

171.    According to the WCB Complaint:

(a)    the Service Agreements entered into between the Trusts and CRM all contain provisions that are highly favorable to CRM, including, among other things, each Service Agreement provided for a five-year term that automatically renewed for successive five-year terms and precluded the trustees from discharging CRM for any reason other than a very limited set of circumstances enumerated within the Service Agreements;

(b)    the fee earned by CRM under the initial Service Agreements was a

percentage of the total members' stated manual premium, and not based on what the Trust actually collected in premiums;

(c)     based on its fee structure, CRM had a financial incentive to accept Trust applicants with poor loss histories and high experience modifiers, and to continue the memberships of Trust members with high actual losses, since CRM collected its fee up front based on manual premiums;

(d)     CRM improperly charged the Trusts for expenses that should have been borne by CRM, pursuant to the Service Agreements; and

(e)     CRM engaged in inadequate underwriting practices that resulted in underpricing of contributions paid by Trust members.

172.     According to the WCB Complaint, pursuant to the Service Agreements, "CRM was responsible for choosing a certified public accountant and an actuary to conduct such annual audits" and "CRM was responsible for choosing a certified public accountant and an actuary to conduct such annual audits."

173.     According to the WCB Complaint, upon the WCB's information and belief:

(a)     CRM knowingly submitted to the WCB annual reports that inaccurately portrayed the financial conditions of the Trusts;

(b)     CRM did not take sufficient remedial actions to mitigate the losses sustained by the Trusts, even after they were identified;

(c)     CRM had an incentive to compel or encourage its actuary to underestimate the liabilities of the Trusts;

(d)     CRM improperly offered unreasonable discounts to many Trust members;

(e)     CRM failed to timely disclose to the Trusts' members and trustees its relationships with affiliated entities;

(f)     CRM brokered excess insurance to the Trusts through Compensation Risk Managers Agency, Captive, LLC ("CRM Captive"), an affiliated entity and CRM Captive held the agency license that CRM used to place excess coverage on behalf of the Trusts managed by CRM; and

(g)     brokerage commissions then were remitted to CRM upon receipt by CRM Captive, and prior to CRM Captive holding the agency license, the license was held by Defendant Hickey individually.

### The June 2010 "Report to Governor Paterson and the New York State Legislature" Issued By The Task Force on Group Self-Insurance

174.     Legislation signed into law by New York Governor Paterson on June 30, 2008 created a Task Force on Group Self-Insurance in order to understand the reasons for rampant GSIT defaults and to assess the long term viability of the group self-insurance model.  The culmination of the Task Force's extensive work through May 2010 was the "Report to Governor Paterson and the New York State Legislature" dated June 2010.

175.     According to the Task Force Report, prior to the 2006/2007 fiscal year, there had never been a GSIT default in the state of New York. *E.g.,* CRMMISC000008.  While describing the emerging state-wide debacle of underfunded GSITs, the Task Force Report specifies that CRM-administered trusts constituted the vast majority of the state's underfunded trusts.  As of June 2010, the total known funding shortfall or deficit of New York GSITs was projected at $498 million, ***of which 76% or $379.1 million is attributable to groups formerly administered by CRM***.  CRMMISC000010; CRMMISC000041-000042.  Furthermore, another 6% or $30.6

million of the funding shortfall is attributable to trusts formerly administered by Consolidated

Risk Services – a company that was partly owned by and employed Defendant Rakoff prior to

June 1999 and worked with Hickey-Finn in enrolling members in the CRS-administered trusts.

CRMMISC000010; CRMMISC000041-000042.

176.    The Task Force Report illustrates how the CRM GSITs' sudden spikes in funding

deficits were not the result of unlucky, unforeseen industry-wide developments, but rather were

the result of the manipulation of financials that suppressed the true financial condition of the

Company.  The Task Force Report distinguishes the eight insolvent CRM GSITs from the other

seven insolvent New York GSITs, noting that the sudden and unexpected insolvency of CRM

GSITs were the result of under-reserving for claims, which understated liabilities:

> [T]he bulk of the deficit shown is attributable to the CRM GSITs.  In contrast to
> those [non-CRM GSITs] noted above, none of the CRM GSITs were initially
> identified as significantly under funded.  In fact, each of CRM's GSITs had
> funding levels in excess of 90% for virtually all fiscal periods.  The GAAP
> financials that were submitted did not bring to light the severe funding issues until
> the 2006 financials were filed with the WCB in 2007.
> …
> The dramatic decrease in the funding position for the majority of these trusts,
> from 2005 to 2006, was the result of the failure of the GSITs administered by
> CRM to recognize adequate reserves which understated liabilities in the prior
> years.  The total CRM trusts' GAAP assets reported to the WCB in 2005 and
> 2006 remained virtually unchanged at $93 million and $96 million, respectively.
> Contrarily, the total CRM trusts' GAAP liabilities reported in 2005 were $101
> million and increased to $194 million in 2006.

CRMMISC000041-000043.

## ADDITIONAL SCIENTER ALLEGATIONS

177.    As alleged herein, Defendants acted with scienter in that Defendants knew that

the public documents and statements issued or disseminated in the name of the Company were

materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CRMH, his control over, and/or receipt and/or modification of CRMH's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CRMH, participated in the fraudulent scheme alleged herein.

178.    Defendants knew or were reckless as to the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

**Insider Sales**

179.    From the outset of the Class Period beginning with the Company's IPO, the Individual Defendants took advantage of the inflated value of CRMH stock prices – inflated that is, by their false and misleading statements – and unloaded massive quantities of their stock for millions of dollars in proceeds.

180.    Defendant Hickey unloaded over 36% of his holdings during the Class Period, with proceeds from the stock sales exceeding $8 million:

| **Transaction Date** | **No. Shares Sold** | **Price** | **Proceeds from Sale** |
| --- | --- | --- | --- |
| (IPO) 12/27/2005 | 509,000 | $13.00 | $6,617,000 |
| 5/22/2007 | 5,200 | $8.51-$8.83 | $44,545 |
| 5/23/2007 | 300 | $8.71-$8.75 | $2,618 |
| 5/23/2007 | 8,400 | $8.50-$8.69 | $71,873 |
| 5/24/2007 | 3,900 | $8.25-$8.52 | $32,881 |

| | | | |
|---|---|---|---|
| 9/20/2007 | 216,454 | $6.00 | $1,298,724 |
| | **743,254** | | **$8,067,641** |

181.    Defendant Rakoff dumped ***100%*** of his holdings during the Class Period, with proceeds from the stock sales exceeding ***$21 million***:

| Transaction Date | No. Shares Sold | Price | Proceeds from Sale |
|---|---|---|---|
| (IPO) 12/27/2005 | 509,000 | $13.00 | $6,617,000 |
| (Secondary) 2/8/2007 | 1,934,691 | $7.55 | $14,606,917 |
| | **2,443,691** | | **$21,223,917** |

182.    The 1,934,691 shares sold by Rakoff on February 8, 2007 constituted 12.45% of ***all*** of the Company's outstanding shares at the time.

183.    Defendant Hickey Sr. also unloaded over 26% of his holdings during the Class Period, with proceeds from the stock sales exceeding $8.3 million:

| Transaction Date | No. Shares Sold | Price | Proceeds from Sale |
|---|---|---|---|
| (IPO) 12/27/2005 | 630,000 | $13.00 | $8,190,000 |
| 5/22/2007 | 5,100 | $8.51-$8.84 | $43,737 |
| 5/23/2007 | 8,700 | $8.50-$8.67 | $74,367 |
| 5/23/2007 | 300 | $8.68-$8.72 | $2,611 |
| 5/24/2007 | 4,669 | $8.25-$8.52 | $39,219 |
| | **648,769** | | **$8,349,934** |

184.    Not only did these Defendants sell large portions of their CRMH holdings – if not all – the timing of these purchases were suspicious as the sales came at times when, unbeknownst to investors, the Trusts were massively underfunded.  For example, at the time of the IPO, when Defendants Hickey, Hickey Sr., and Rakoff, unloaded huge amounts of stock, HITNY, the heart and soul of the Company's fee-based business, was deemed underfunded. Thereafter, in the midst of the WCB questioning the work of the Company's actuary with respect

to HITNY and multiple reports casting doubt on the actuarial work, Defendant Rakoff unloaded all of his stock.  Thereafter, while unbeknownst to investors that the WCB had serious questions about the actuary work of SGRisk and had retained PWC to review several of the other Trusts, Defendants Hickey and Hickey Sr. proceeded to unload stock before PWC released its reports in June of 2007.  Moreover, Defendant Hickey thereafter.

185.   Furthermore, while Defendants Hickey's and Hickey Sr.'s May 2007 stock sales were made pursuant to Rule 10b5-1 stock trading plans, the circumstances surrounding the 10b5-1 plans themselves were suspicious.  First, as indicated in a Form 8-K filed with the SEC on May 22, 2007, both Hickey and Hickey Sr. adopted their 10b5-1 trading plans only as of May 21, 2007, and quickly unloaded their shares in the days thereafter.  Second, after dumping thousands of shares immediately after their adoption of 10b5-1 trading plans, both Hickey and Hickey Sr. quickly terminated their respective stock trading plans on June 13, 2007, *less than 1 month after adopting them*.  Third, the June 13, 2007 terminations of the stock trading plans coincided precisely with PwC's draft reports to the WCB issued, as part of a Level II Tier I actuarial review directed by the WCB, ***that very day*** reporting on the loss reserves of CRM GSITs including NYSCT, REMTNY, TIWCT and WRWCT.  *See* NYSCT000031-000034; NYSCT000114-000130;          REMTNY000040-000043;          REMTNY000112-000128; TRIWCT000014;   TRIWCT000387-000403;   WRWCT000046-000047;   WRWCT000248-000264.  These June 13, 2007 PwC reports, among other things, highlighted serious flaws with the actuarial reports of SG Risk, the GSITs' actuary selected for them by CRM.

**Denials**

186.    Further demonstrating the scienter of Defendants is the crescendo of their denials of misconduct despite intensifying scrutiny throughout the Class Period.  For example, despite numerous indications from multiple actuaries calling into question the actuary and financial reports of the Trusts, Defendants continued to wholeheartedly deny wrongdoing and repeatedly blamed a tough regulatory environment and adverse claims developments for the Company's potential operational and financial issues that slowly coming to light.  In fact, as illustrated fully above, what was being revealed to the public was actually the materialization of the risks taken by Defendants' undisclosed under-reserving for claims and over-reporting of income, and it was the manipulated actuarial reports, among other things, that had suppressed the true condition of the Company.

187.    Indeed, even in the years leading up to the IPO, Hickey sought to discredit objective assessment that cast CRM in a negative light.  For example, as set forth in the HITNY Forensic Audit report, when PwC issued a report in 2003, commissioned by the Workers' Compensation Board, finding that the "loss and loss expense reserves reported by HITNY as of September 30, 2002 are inadequate by $4,912,943," Hickey hired his own auditor, Jeffrey Kadison of PAS, who issued a report attempting to discredit PwC's report.  HITNY000049. Hickey also indicated to Kadison that he wanted Kadison to "make sure the door didn't close," *i.e.* to make sure that HITNY was deemed solvent.  HITNY000011; HITNY000049.

**<u>Core Operations</u>**

188.    The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over

a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants. Additionally, as the administration of the underlying Trusts was the core business of the Company and as administration of the eight underlying Trusts represented a significant share of the Company's operations[9] the Individual Defendants, as senior officers and/or directors, are particularly charged with knowledge of those operations.  The Company was relatively small (CRM had 110 employees as of December 31, 2006, for example) and the Individual Defendants boasted of significant expertise and decades of management experience in the insurance industry. *See* ¶¶31-34.  Both facts magnify the likelihood, if not assure, that the Individual Defendants knew and/or recklessly disregarded the falsity of their public representations.

189.   The Individual Defendants were high-level executives and/or directors at the Company as well as the Company's subsidiaries and affiliates – including CRM, CRM CA, Eimar, and Twin Bridges.  The Individual Defendants not only exercised nearly absolute control over the operations of CRMH and its subsidiaries and affiliates from the top to bottom, but they also exercised substantial control over the underlying Trusts.  For example, Defendants Hickey and Rakoff controlled the formation of the underlying Trusts, drafted the Trust Agreements to be unfairly favorable to CRMH and its subsidiaries and affiliates, ran the early board meetings of the Trusts, controlled the actuarial firm to be utilized by the Trusts, and signed critical Trust documents.

**Short-term Incentive Compensation and Other Financial Motives**

---

[9]  For example, the NYSCT Forensic Audit report issued by Bollam, Sheedy, Torani & Co. LLP, CPAs notes that "one of the more critical factors contributing to the success of  the IPO would be the revenues derived by the financial viability of the group self-insured trusts managed by CRM in New York State" as "the New York State group self-insured trusts accounted for *78.95%* of CRM's (and CRM California's) management fee and commission income and *66.46% of CRM's total revenues* as of June 30, 2005."  NYSCT000029 (emphasis added).

190.    Both Defendants Hickey and Rakoff were motivated to report inflated revenues for the Company, as their employment agreements provided for immensely lucrative, if not out-sized, performance-based short-term incentive awards.  Both were eligible for "annual incentive" bonuses targeted at 100% to 200% of their base salaries based on certain performance criteria, and both were eligible for "producer incentive" bonuses of 2.5% of the Company's net income above $25 million.  The potential bonus payouts were significant.  For example, as set forth in the Company's definitive proxy filed March 26, 2008, at 21, Defendant Hickey received $1.04 million (or 160% of his base salary for the year) as an "annual cash bonus payment" based, in large part, on the Company's reported $1.24 EPS for 2007.  In comparison, Hickey would have received only $650,000 as an "annual cash bonus" had the Company reported EPS of $1.15; and *no* "annual cash bonus" had the Company reported EPS of $1.00 or lower.

191.    Furthermore, the Individual Defendants also had a specific financial incentive to make it appear that the GSITs remained financially viable.  According to NYSCT's auditor's work papers for the year ended January 31, 2005, the Company had loans with debt covenants ***requiring*** earnings to increase over the life of the loans, which also were ***personally guaranteed*** by the owner/manager.  NYSCT000029 (emphasis added). Thus, the Individual Defendants were motivated to, and did, overstate Company earnings and under-reserve for claims to avoid breaching the debt covenants, which could threaten to immediately unravel Defendants' fraudulent scheme.

**Insider Departures from the Company**

192.    Insiders began fleeing the Company as the scrutiny over the Company's operations, the extent of which the public was unaware, intensified during the Class Period.  The

first to depart the Company was Defendant Rakoff, who announced his resignation on December 28, 2006.  His resignation was suspiciously timed, as HITNY was at the time increasingly questioning the loss reserve assessments of SGRisk, the actuarial firm hired by CRM, culminating in Milliman's draft report to HITNY just one month prior to Rakoff's resignation on November 29, 2006 indicating that HITNY's loss reserve requirements were in excess of $110 million, *or approximately $63 million more than SGRisk's most recent actuarial report*.  *See* HITNY000014; HITNY000055; HITNY000289-000384.

193.    Additionally, non-defendant director Edmund N. Pascoe submitted his resignation as directors of CRMH and Twin Bridges on March 13, 2008.  While the Company indicated in a press release that Pascoe resigned "for personal reasons," the timing of the departure is suspicious in light of the swirl of negative developments at CRMH at the time.  Not only did the WCB dissolve HITNY on December 31, 2007 due to HITNY's financial condition and assume administration of HITNY on February 14, 2008, *see, e.g.,* HITNY000015, but the WCB and New York Attorney General were targeting CRMH for misconduct.  Indeed, in March 2008 the New York Attorney General issued a subpoena to CRMH and only a month after Pascoe's resignation, on April 15, 2008 the WCB announced its intent to revoke CRM's license to represent group self-insured employers and/or carriers.

194.    Defendant Hickey also left the Company ahead of the Company's imminent demise, his resignation effective as of March 13, 2009.  Hickey resigned in infamy immediately after it came to light that he had directed the Company's chief marketing officer and vice president of corporate communications to instruct the Company's consultant to post messages

favorable to the Company on the Yahoo! message boards without disclosing the source of those messages. *See supra* note 5.

## CLASS ACTION ALLEGATIONS

195.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased CRMH's securities between December 21, 2005 and November 5, 2008, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

196.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CRMH's securities were actively traded on National Association of Securities Dealers Automated Quotations Market ("NASDAQ").  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of CRMH shares were traded publicly during the Class Period on the NASDAQ and as of November 4, 2008, shortly near the end of the Class Period, the Company had 16,085,235 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by CRMH or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

197.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

198.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

199.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of CRMH; and (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

200.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

<u>**UNDISCLOSED ADVERSE FACTS**</u>

201.    The market for CRMH's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, CRMH's securities traded at artificially inflated prices during the Class Period.

Plaintiff and other members of the Class purchased or otherwise acquired CRMH's securities relying upon the integrity of the market price of the Company's securities and market information relating to CRMH, and have been damaged thereby.

202.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of CRMH's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about CRMH's business, operations, and prospects as alleged herein.

203.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CRMH's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL ALLEGATIONS OF
## LOSS CAUSATION/ECONOMIC LOSS

204.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the economic loss suffered by Plaintiffs and the Class.

205.    During the Class Period, Plaintiffs and the Class purchased CRMH securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

206.    The market for CRMH's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, CRMH's securities traded at artificially inflated prices during the Class Period.  On February 6, 2006 the price of the Company's common stock closed at a Class Period high of $15.00 per share.   Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of CRMH's securities and market information relating to CRMH, and have been damaged thereby.

207.    During the Class Period, the artificial inflation of CRMH's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CRMH's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of CRMH and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the

Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices and the price of the Company's securities fell when the fraud was revealed, and each of them has been damaged as a result.

208.   At all relevant times, the market for CRMH's securities was an efficient market for  the following reasons, among others:

(a)   CRMH stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, CRMH filed periodic public reports with the SEC and the NASDAQ;

(c)   CRMH regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   CRMH was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

209.   As a result of the foregoing, the market for CRMH's securities promptly digested current information regarding CRMH from all publicly available sources and reflected such information in CRMH's stock price.  Under these circumstances, all purchasers of CRMH's

securities during the Class Period suffered similar injury through their purchase of CRMH's securities at artificially inflated prices and a presumption of reliance applies.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

210.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

211.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase CRMH's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

212.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CRMH's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

213.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about CRMH's financial well-being and prospects, as specified herein.

214.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CRMH's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CRMH and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

215.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

216.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CRMH's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

217.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of CRMH's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class

acquired CRMH's securities during the Class Period at artificially high prices and were damaged thereby.

218.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that CRMH was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their CRMH securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

219.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

220.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

<div align="center">

**SECOND CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against Defendants Hickey, Hickey Sr., and Rakoff**

</div>

221.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

222.    During the Class Period, Defendants Hickey, Hickey Sr., and Rakoff, maintained positions with CRMH that allowed access to confidential information concerning the Company, its operations, finances, financial condition and future business prospects.  These defendants' public representations on these subjects set forth herein were materially false and/or misleading.

223.    Notwithstanding their duty to refrain from trading in CRMH common stock unless they disclosed the material adverse facts alleged herein, and in violation of their fiduciary duties to Plaintiffs and other members of the Class, Hickey, Hickey Sr., and Rakoff, each sold millions of dollars worth of CRMH common stock during the Class Period.

224.    Defendants Hickey, Hickey Sr., and Rakoff, sold their shares of CRMH common stock, as alleged above, at market prices artificially inflated by the nondisclosure and misrepresentations of material adverse facts in the public statements released during the Class Period.

225.    Defendants Hickey, Hickey Sr., and Rakoff, knew that they were in possession of material adverse information which was not known to the investing public, including Plaintiffs and other members of the Class.  Before selling their stock to the public, Defendants Hickey, Hickey Sr., and Rakoff, were obligated to disclose that information to Plaintiffs and other members of the Class.

226.    By reason of the foregoing, Defendants Hickey, Hickey Sr., and Rakoff, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who purchased CRMH common stock.

227.    Plaintiffs and other members of the Class who purchased CRMH common stock: (1) have suffered substantial damages because they relied on the integrity of the market and paid artificially inflated prices for CRMH common stock as a result of the violations of Section 10(b) and Rule 10b-5 alleged herein; and (2) would not have purchased CRMH common stock at the

prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and concealment.  At the time of the purchases by Plaintiffs and other members of the Class, the fair and true value of CRMH common stock was substantially less than the prices paid by them.

228.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of CRMH securities during the Class Period.

<div align="center">

**THIRD CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

</div>

229.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

230.    The Individual Defendants acted as controlling persons of CRMH within  the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

231.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

232.   As set forth above, CRMH and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: September 10, 2010

**MURRAY, FRANK & SAILER LLP**

By: _Gregory Linkh_

Gregory B. Linkh (GL 0477)
Brian P. Murray (BM 9954)
275 Madison Avenue, Suite 801
New York, New York 10016
Telephone:   (212) 682-1818
Facsimile:   (212) 682-1892

*Liaison Counsel for Lead Plaintiffs*


**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy (*pro hac vice*)
Michael Goldberg
Ex Kano S. Sams II
Andy Sohrn
Robert V. Prongay
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Lead Plaintiffs*


**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel for Lead Plaintiffs*

# EXHIBIT A

| Trust or Miscellaneous | Document | Bates Number |
|---|---|---|
| Elite Contractors (ECTNY) | | |
| | Financial Statement 2000 | ECTNY000001 |
| | Financial Statement 2001 | ECTNY000009 |
| | Financial Statement 2002 | ECTNY000019 |
| | Financial Statement 2003 | ECTNY000036 |
| | Financial Statement 2004 | ECTNY000054 |
| | Financial Statement 2005 | ECTNY000073 |
| | Financial Statement 2006 | ECTNY000093 |
| | Financial Statement 2007 | ECTNY000114 |
| | Financial Statement 2008 | ECTNY000139 |
| | Actuarial Report 2001 | ECTNY000155 |
| | Actuarial Report 2002 | ECTNY000169 |
| | Actuarial Report 2003 | ECTNY000197 |
| | Actuarial Report 2004 | ECTNY000216 |
| | Actuarial Report 2005 | ECTNY000243 |
| | Actuarial Report 2006 | ECTNY000273 |
| | Actuarial Report 2007 | ECTNY000317 |
| | Actuarial Report 2008 | ECTNY000340 |
| | Conference Call Followup Letter (7-31-2009) | ECTNY000410 |
| | Attorney Letter to Non-Responding Members | ECTNY000411 |
| | Update to Members (2009 12 10) | ECTNY000412 |
| | Assessment Billing Package Schedule (6-30-09) | ECTNY000414 |
| | Audit Report (9-30-2008) | ECTNY000419 |
| | Actuarial Report (10-19-09) | ECTNY000435 |
| | Transfer to WCB (2-22-2010) | ECTNY000505 |
| | Member Roster | ECTNY000506 |
| | Estimated Defficiency FAQ | ECTNY000567 |
| | Membership Meeting (3-2-2010) | ECTNY000572 |
| | Trust Agreement Amendements | ECTNY000585 |
| | Trust Agreements | ECTNY000590 |
| | Trustee History | ECTNY000601 |
| | Trust Resolutions | ECTNY000603 |
| | | |
| Health Insurance (HITNY) | | |
| | Forensic Analysis | HTNY000001 |
| | Forensic Analysis Exhibits | HITNY000095 |
| | Financial Statement 2000 | HITNY000618 |
| | Financial Statement 2001 | HITNY000626 |
| | Financial Statement 2002 | HITNY000636 |
| | Financial Statement 2003 | HITNY000659 |
| | Financial Statement 2004 | HITNY000678 |
| | Financial Statement 2005 | HITNY000698 |
| | Financial Statement 2006 | HITNY000718 |
| | Financial Statement 2007 | HITNY000740 |

| | |
|---|---|
| Financial Statement 2008 | HITNY000753 |
| Financial Statement 2009 | HITNY000767 |
| Actuarial Report 2000 | HITNY000778 |
| Actuarial Report 2001 | HITNY000794 |
| Actuarial Report 2002 | HITNY000808 |
| Actuarial Report 2003 | HITNY000836 |
| Actuarial Report 2004 | HITNY000865 |
| Actuarial Report 2005 | HITNY000880 |
| Actuarial Report 2006 | HITNY000896 |
| Actuarial Report 2007-2008 | HITNY000967 |
| Actuarial Report 2009 | HITNY001068 |
| Deficit Reconstruction (2009) | HITNY001143 |
| FAQ | HITNY001159 |
| Trsut Amendments | HITNY001163 |
| Bylaws | HITNY001166 |
| Bylaws Amendments | HITNY001184 |
| Trust Agreement | HITNY001186 |
| Trustee History | HITNY001201 |
| Membership Meeting (1-23-2008) | HITNY001215 |
| Schedule 6 Redacted | HITNY001233 |

**NY Cemetaries (NYSCT)**

| | |
|---|---|
| Forensic Analysis | NYSCT000001 |
| Forensic Analysis Exhibits | NYSCT000064 |
| Financial Statement 2003 | NYSCT000167 |
| Financial Statement 2004 | NYSCT000182 |
| Financial Statement 2005 | NYSCT000197 |
| Financial Statement 2006 | NYSCT000213 |
| Financial Statement 2007 | NYSCT000229 |
| Financial Statement 2008 | NYSCT000246 |
| Financial Statement 2009 | NYSCT000257 |
| Financial Statement 2010 | NYSCT000269 |
| Actuarial Report 2003 | NYSCT000280 |
| Actuarial Report 2004 | NYSCT000297 |
| Actuarial Report 2005 | NYSCT000316 |
| Actuarial Report 2006 | NYSCT000331 |
| Actuarial Report 2007 | NYSCT000346 |
| Actuarial Report 2008-2009 | NYSCT000384 |
| Actuarial Report 2010 | NYSCT000449 |
| Deficit Reconstruction (2010) | NYSCT000503 |
| DO Policy | NYSCT000518 |
| CRM Amended Compaint | NYSCT000544 |
| Loss Run as of 6-30-2010 | NYSCT000719 |
| Membership Meeting (7-31-2008) | NYSCT000746 |
| Amendment to Trust Agreement | NYSCT000760 |
| FAQ | NYSCT000767 |

|  |  |
|---|---|
| Deficit Assessment Contractual Agreement (DACA) | NYSCT000774 |
| DACA Instructions | NYSCT000783 |
| Member Roster | NYSCT000785 |
| Trustee History | NYSCT000799 |
| Redacted Schedule 6 | NYSCT000801 |

**Public Entity (PETNY)**

|  |  |
|---|---|
| Forensic Analysis | PETNY000001 |
| Financial Statement 2002 | PETNY000184 |
| Financial Statement 2003 | PETNY000199 |
| Financial Statement 2004 | PETNY000215 |
| Financial Statement 2005 | PETNY000231 |
| Financial Statement 2006 | PETNY000248 |
| Financial Statement 2007 | PETNY000265 |
| Financial Statement 2008 | PETNY000276 |
| Actuarial Report 2002 | PETNY000287 |
| Actuarial Report 2003 | PETNY000301 |
| Actuarial Report 2004 | PETNY000316 |
| Actuarial Report 2005 | PETNY000331 |
| Actuarial Report 2006 | PETNY000347 |
| Actuarial Report 2007-2008 | PETNY000387 |
| CRM Amended Compaint | PETNY000452 |
| DO Info | PETNY000627 |
| Deficit Reconstruction (2010) | PETNY000655 |
| Amendments to Trust Agreement | PETNY000668 |
| DACA (4-29-2010) | PETNY000674 |
| Member Roster | PETNY000682 |
| Trust Agreement | PETNY000683 |
| Trustee History | PETNY000694 |
| Redacted Schedule 4 | PETNY000696 |

**Real Estate Management (REMTNY)**

|  |  |
|---|---|
| Forensic Analysis | REMTNY000001 |
| Forensic Analysis Exhibits | REMTNY000074 |
| Financial Statement 2001 | REMTNY000166 |
| Financial Statement 2002 | REMTNY000175 |
| Financial Statement 2003 | REMTNY000191 |
| Financial Statement 2004 | REMTNY000207 |
| Financial Statement 2005 | REMTNY000223 |
| Financial Statement 2006 | REMTNY000243 |
| Financial Statement 2007 | REMTNY000264 |
| Financial Statement 2008 | REMTNY000275 |
| Financial Statement 2009 | REMTNY000287 |
| Actuarial Report 2001 | REMTNY000298 |
| Actuarial Report 2002 | REMTNY000313 |
| Actuarial Report 2003 | REMTNY000326 |
| Actuarial Report 2004 | REMTNY000340 |

| | |
|---|---|
| Actuarial Report 2005 | REMTNY000356 |
| Actuarial Report 2006 | REMTNY000373 |
| Actuarial Report 2007 | REMTNY000417 |
| Actuarial Report 2008 | REMTNY000438 |
| Actuarial Report 2009 | REMTNY000505 |
| Deficit Reconstruction (2010) | REMTNY000562 |
| By-Laws | REMTNY000576 |
| CRM Amended Complaint | REMTNY000582 |
| FAQs | REMTNY000757 |
| Loss Run as of 5-31-2010 | REMTNY000763 |
| Membership Meeting (7-17-2008) | REMTNY000848 |
| Membership Roster | REMTNY000862 |
| DACA | REMTNY000865 |
| DACA Instructions | REMTNY000874 |
| Trust Agreement | REMTNY000876 |
| Trust Agreement Amendments | REMTNY000888 |
| Trustee History | REMTNY000892 |

Transportation Industry (TRIWCT)

| | |
|---|---|
| Forensic Analysis | TRIWCT000001 |
| Forensic Analysis Exhibits | TRIWCT000094 |
| Financial Statement 2001 | TRIWCT000461 |
| Financial Statement 2002 | TRIWCT000470 |
| Financial Statement 2003 | TRIWCT000486 |
| Financial Statement 2004 | TRIWCT000504 |
| Financial Statement 2005 | TRIWCT000523 |
| Financial Statement 2006 | TRIWCT000544 |
| Financial Statement 2007 | TRIWCT000566 |
| Financial Statement 2008-2009 | TRIWCT000584 |
| Actuarial Report 2001 | TRIWCT000603 |
| Actuarial Report 2002 | TRIWCT000618 |
| Actuarial Report 2003 | TRIWCT000632 |
| Actuarial Report 2004 | TRIWCT000648 |
| Actuarial Report 2005 | TRIWCT000659 |
| Actuarial Report 2006 | TRIWCT000677 |
| Actuarial Report 2007-2008 | TRIWCT000720 |
| Actuarial Report 2009 | TRIWCT000803 |
| Deficit Reconstruction (2010) | TRIWCT000864 |
| Amended Compaint | TRIWCT000879 |
| DACA | TRIWCT001054 |
| DACA Instructions | TRIWCT001063 |
| FAQs | TRIWCT001065 |
| Membership Meeting (8-7-2008) | TRIWCT001071 |
| Open Loss Run (7/2010) | TRIWCT001085 |
| Redacted Schedule 6 | TRIWCT001105 |
| Total Loss Run (7/2010) | TRIWCT001113 |

| | |
|---|---|
| Amendment to Trust Agreement | TRIWCT001289 |
| Member Roster | TRIWCT001295 |
| Trust Agreement | TRIWCT001315 |
| Trustee History | TRIWCT001326 |

**Wholesale and Retail (WRWCT)**

| | |
|---|---|
| Forensic Analysis | WRWCT000001 |
| Forensic Analysis Exhibits | WRWCT000094 |
| Financial Statement 2000 | WRWCT000510 |
| Financial Statement 2001 | WRWCT000518 |
| Financial Statement 2002 | WRWCT000528 |
| Financial Statement 2003 | WRWCT000545 |
| Financial Statement 2004 | WRWCT000564 |
| Financial Statement 2005 | WRWCT000584 |
| Financial Statement 2006 | WRWCT000604 |
| Financial Statement 2007 | WRWCT000625 |
| Financial Statement 2008 | WRWCT000650 |
| Financial Statement 2009 | WRWCT000668 |
| Actuarial Report 2001 | WRWCT000687 |
| Actuarial Report 2002 | WRWCT000701 |
| Actuarial Report 2003 | WRWCT000727 |
| Actuarial Report 2004 | WRWCT000742 |
| Actuarial Report 2005 | WRWCT000757 |
| Actuarial Report 2006 | WRWCT000772 |
| Actuarial Report 2007 | WRWCT000787 |
| Actuarial Report 2008 | WRWCT000811 |
| Actuarial Report 2009 | WRWCT000876 |
| Deficit Reconstruction (2010) | WRWCT000937 |
| Amended Complaint | WRWCT000952 |
| Membership Meeting (6-26-2008) | WRWCT001127 |
| FAQs | WRWCT001141 |
| Schedule 6 | WRWCT001147 |
| Wholesale Loss Run - All (6-10-2010) | WRWCT001160 |
| Wholesale Loss Run - Open (6-10-2010) | WRWCT001422 |
| Membership Roster | WRWCT001437 |
| DACA | WRWCT001458 |
| DACA Instructions | WRWCT001466 |
| Trust Agreement Amendments | WRWCT001468 |
| Trust Agreement | WRWCT001476 |
| Trustee History | WRWCT001488 |
| Trust Resolution | WRWCT001490 |

**Miscellaneous Files**

| | |
|---|---|
| CRM Imminent Action Letter | CRMMISC000001 |
| NY Self-Insurance Task Force | CRMMISC000006 |
| WCB CRM Amended Complaint | CRMMISC000195 |
| BoardCRMLetter (Initiating Proceedings) | CRMMISC000370 |

| | |
|---|---|
| CRM Investigation (WCB) | CRMMISC000372 |
| CRMDeal (Settlement) | CRMMISC000378 |
| 2006 Shareholders Letter | CRMMISC000384 |
| 2007 Shareholders Letter | CRMMISC000387 |
| 2008 Shareholders Letter | CRMMISC000391 |
| 2009 Shareholders Letter | CRMMISC000396 |

## CERTIFICATE OF SERVICE

I am an attorney admitted to practice in this district.  I hereby certify, under penalty of perjury, that on this 10th day of September 10, 2010, I caused a true and correct copy to be served on the persons listed below by e-mail:

Arthur H. Aufses III, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: 212-715-9234
Fax: 212-715-8234
aaufses@kramerlevin.com

Gregory Linkh