UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                              :
IN RE CRM HOLDINGS, LTD.           :            10 Civ. 975 (RPP)
SECURITIES LITIGATION              :
                                              :            **OPINION & ORDER**
                                              :
--------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On September 19, 2010, Plaintiffs, a proposed class composed of stockholders of CRM

Holdings, Ltd. ("CRMH" or the "Company"), filed a Consolidated Amended Complaint

("CAC") against Defendant CRMH, as well as several officers (and one board member) of the

company, namely Daniel G. Hickey, Jr.,  Daniel G. Hickey, Sr., Martin D. Rakoff, and James J.

Scardino (collectively, the "Individual Defendants"), alleging violations of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78 et seq.

On January 7, 2011, Defendants filed a motion to dismiss the CAC.  On February 22,

2011, Plaintiffs filed a memorandum in opposition to Defendants' motion, and on March 29,

2011, Defendants filed a reply.  On September 7, 2011 the Court held oral argument in this

matter.  At the outset of the argument, counsel for Defendants informed the Court that Defendant

CRMH has filed for bankruptcy court protection.  (Tr. of Sept. 7, 2011 Oral Argument ("Tr.") at

2.)  Accordingly, the entire action with respect to CRMH is stayed, and this decision is confined

to the claims levied against the Individual Defendants in this matter.[1]

### I. PROCEDURAL HISTORY

**A.      Parties**

--------

[1] The Court's decision in this matter was delayed as it had to await the production of numerous documents which
had been cited by Plaintiffs in the CAC, but were not made available to the Court on submission of the motion.
These documents were provided to the Court on February 17, 2012.

Lead Plaintiffs Brett Brandes and Beverly L. Munter represent a proposed class of stockholders, including Plaintiff B&B Investors, LP (collectively, "Plaintiffs"), who purchased the common stock of CRMH between December 21, 2005, the date of the Company's Initial Public Offering ("IPO"), and November 5, 2008 (the "Class Period").  (CAC ¶¶ 1, 28-29.) Plaintiffs allege that they "suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions" made by the Individual Defendants.  (Id. ¶¶ 28-29.)

Defendant CRMH[2] is a Bermuda corporation and a provider of workers compensation insurance products.  Its main activities are (1) underwriting primary workers' compensation policies, reinsurance, and excess insurance policies and (2) providing fee-based management services for group workers' compensation self insurance trusts ("GSITS") in New York and California.  (Id. ¶¶ 2, 30.)  Individual Defendants were officers and/or board members of the Company during the Class Period.

Defendant Daniel G. Hickey, Jr. ("Mr. Hickey, Jr.") was a co-founder of CRMH, and co-Chief Executive Officer ("co-CEO") of CRMH at all relevant times until December 28, 2006. (Id. ¶ 31.)  He was the sole CEO from December 28, 2006 until his resignation on March 13, 2009.  (Id.)  At all relevant times until March 13, 2009, he was also Chairman of the Board of Directors of CRMH, Chairman of the Board of Twin Bridges (a CRMH subsidiary and reinsurance provider), and President of Compensation Risk Managers, LLC ("CRM," a CRMH subsidiary), CRM CA (a California CRMH subsidiary), and Eimar, LLC (a CRM affiliate that provided medical claims services for the GSITs that CRM administered).  (Id. ¶¶ 3, 31, 47, 51.)

---

[2] On May 5, 2010, shareholders of CRMH voted to change the Company's name to Majestic Capital, Ltd.  (CAC ¶ 1 n.2.)

Defendant Martin D. Rakoff ("Mr. Rakoff") co-founded CRMH with Mr. Hickey, Jr., and was co-CEO of CRMH at all relevant times until his resignation from the Company on December 28, 2006.  Until that time, he was also CEO of CRM, CRM CA, and Eimar, as well as Deputy Chairman of the Board of Twin Bridges.  (Id. ¶ 32.)

Defendant James J. Scardino ("Mr. Scardino") was Chief Financial Officer ("CFO") of CRMH at all relevant times.  (Id. ¶ 33.)  He also served as CFO of CRM, CRM CA, and Eimar from August 2005 to May 2009.  (Id.)  From July 2007 to May 2009, Mr. Scardino also served as Executive Vice President, CFO of Majestic Insurance Company (a CRMH subsidiary). (Id. ¶¶ 33, 145.)

Defendant Daniel G. Hickey, Sr. ("Mr. Hickey, Sr.") is Defendant Mr. Hickey, Jr.'s father, and was a member of the Board of Directors of CRMH at all relevant times.  (Id. ¶ 34.) Mr. Hickey, Sr. has been a member of the Board of Directors of Majestic since 2006 and was, at all relevant times, a director of Twin Bridges.  (Id.)  He was a member of the Board of Managers of CRM, CRM CA and Eimar until December 2005.  (Id.)

## B.    Plaintiffs' Claims and Relief Sought

The 115-page CAC alleges three claims against Defendants.  The first claim charges all the Defendants with violations of Section 10(b) of the Exchange Act ("Section 10(b)"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  (Id. ¶¶ 210-20.)  Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b-5, promulgated under authority of Section 10(b), states:

3

> It shall be unlawful . . . by the use of . . . any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements . . . not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Plaintiffs' second claim asserts violations of the same statute and rule – Section 10(b) and SEC Rule 10b-5 – against Defendants Mr. Hickey, Jr., Mr. Hickey, Sr. and Mr. Rakoff (but not Mr. Scardino), for insider trading of CRMH stock.  (Id. ¶¶ 221-28.)

The third claim is lodged against all four Individual Defendants pursuant to Section 20(a) of the Exchange Act ("Section 20(a)"), 15 U.S.C. § 78t(a).  (Id. ¶¶ 229-32.)  Section 20 is entitled "Liability of controlling persons and persons who aid and abet violations" and provides in pertinent part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  In this claim, Plaintiffs allege that,

> [b]y virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

(CAC ¶ 230.)

4

Plaintiffs seek damages for their losses "in an amount to be proven at trial," and legal expenses.  (Id. ¶ 233.)

## C.    Motion to Dismiss

Defendants move to dismiss the CAC on two grounds.  First, Defendants move to dismiss pursuant to the particularity requirement articulated in both the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  Second, Defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that the CAC fails to state a claim under Section 10(b).  Defendants allege that Plaintiffs have not adequately pleaded (1) loss causation; (2) scienter; and (3) misrepresentation or omission of material facts.  Defendants also argue that the Section 20(a) claims should be dismissed because the CAC does not make sufficient allegations to extend "control person liability" to the Individual Defendants.

The Court finds that the CAC does not contain an adequate showing of loss causation or scienter with respect to the Individual Defendants, and thus it must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity.

## II. BACKGROUND[3]

## A.    New York State Workers' Compensation Laws and the Workers Compensation Board

---

[3] Due to the disorganized nature of the CAC, the facts in this opinion are not set out in the order that they are alleged, but rather in chronological order, to give a clearer sense of how the events unfolded.  Additionally, the Court is mindful that, on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), it may only consider "the facts stated on the face of the Complaint and in documents appended to the Complaint or incorporated in the Complaint by reference, as well as [] matters of which judicial notice may be taken."  Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1994); see infra p. 36.  Thus, citations to documents in this section are to those documents which the Court has determined have been incorporated by reference in the CAC, or that deal with matters of which judicial notice can be taken.

New York State employers are required to provide workers' compensation coverage for their employees pursuant to the New York Workers' Compensation Law ("WCL").  (CAC ¶ 36.) There are three ways an employer can do this: (1) by subscribing for such coverage by the State Insurance Fund pursuant to WCL § 50.1; (2) by subscribing for such coverage by an insurance carrier authorized in New York pursuant to WCL § 50.2; or (3) by becoming a self-insurer pursuant to WCL 50.3.  N.Y. Workers' Comp. Law § 50 (McKinney 2011).   An employer that wishes to self-insure, but lacks the financial ability to do so alone, may join with other employers in a related field to form a GSIT.[4]  See id.

GSITs are regulated pursuant to Title 12 of the New York Codes, Rules and Regulations ("N.Y.C.R.R.") § 317, and are overseen by the New York State Workers' Compensation Board ("WCB"), a governmental agency created by the WCL, charged with administration of the WCL, and having all the powers and duties set forth in WCL § 142.  (CAC ¶ 41.)  One purpose of the regulations is to ensure adequate financial strength of the GSIT, and minimize the risk of an interruption in the flow of benefits to injured workers.  (Id. ¶ 41.)  The WCB regulations require each GSIT to submit financial reports, including independently certified audited financial

---

[4] "Since 1966 employers with related activity in a particular industry who conduct related activities, may choose to organize together for group self-insurance under § 50(3-a) WCL.  This type of arrangement may result in reduced administrative costs, and a cost savings to its members.  However, if the group fund fails to pay benefits the individual employer will still be liable to make such payments."  Minkowitz, McKinney Practice Commentary, N.Y. Workers' Comp. § 50 (2006).

"The first groups approved to operate were required to post a security deposit . . . .  However, over time, there occurred a shift in the policy of the WCB related to the amount of security required of the groups.  In lieu of a security deposit that was equal to the GSIT's ultimate liabilities, the focus was for each group self-insurer to maintain a trust which is dedicated to the payment of the workers' compensation obligations for the group members. . . .  In addition to the dedicated trust fund, an underlying premise of group self-insurance is that the employer members who participated in a GSIT are joint and severally liable for all of the GSITs obligations incurred during their period of membership."  (Task Force on Group Self-Insurance, Report to Governor Patterson and the New York State Legislature (June 2010), Declaration of Marjorie E. Sheldon, Esq. dated Jan. 7, 2011, Ex. L at 15.)

statements and actuarial reports, to the WCB within 120 days of the close of each fiscal year.[5]

12 N.Y.C.R.R. § 317.19(a).  The WCB uses this information to make a "final determination"

concerning the trust's regulatory asset-to-liability ratio.  (CAC ¶ 41.)  In making this

determination, the WCB applies its own regulatory criteria, which differ from those that are part

of generally accepted accounting principles ("GAAP").  (See Declaration of Marjorie E.

Sheldon, Esq. dated Jan. 7, 2011 ("Sheldon Decl."), Ex. F at 1.)  Thus, "a [GSIT's] regulatory

funding position may differ, in some cases significantly, from the financial statements prepared

in accordance with GAAP" and submitted to the WCB pursuant to 12 N.Y.C.R.R. §

317.19(a)(2).  (Id.)

The WCB permits GSITs to grow memberships and use appropriate discounts if their

audited financial statements show a trust equity ratio of 90% or more.  (CAC ¶ 39.)  If the WCB

determines that the asset-to-liability ratio is less than 90%, the trust is deemed to be

"underfunded," and, pursuant to 12 N.Y.C.R.R. § 317.9(b), the WCB has discretion to subject

the GSIT to any or all of seven codified provisions.  (Id. ¶ 41.)  The provisions are methods of

varying intrusiveness by which the WCB attempts to restore the GSIT to health.[6]  (Id.)  If the

---

[5] 12 N.Y.C.R.R. § 317.19 states, in pertinent part:

  (a) Group self-insurers, with the exception of groups consisting exclusively of municipal
  corporations, shall file the following reports, evidencing proper capitalization and integrity of trust
  funds, with the Workers' Compensation Board no later than 120 days after the close of the fiscal
  year of the group: . . .

  (2) audited financial statements prepared in accordance with GAAP, for the preceding fiscal year,
  certified by an independent certified public accountant;

  (3) an actuarial report certified by an independent qualified actuary verifying claims as defined in
  section 317.2(c) of the Part, and the method of calculating such claims, based upon accepted
  actuarial standards of practice . . . .

[6] Defendants, in their papers, accurately summarize the codified remedial provisions:

WCB determines that an underfunded trust "cannot be restored in a timely and appropriate manner," then pursuant to § 317.9(c) the WCB can terminate the GSIT.  (Id. ¶ 42.)

The board of trustees of a GSIT has responsibility for ensuring that the GSIT adheres to the WCL and all applicable rules and regulations.  (Sheldon Decl., Ex. L at 15.)  The trustees must coordinate and oversee the services of any parties providing services to the group.  (Id.)  A GSIT may hire licensed third-party administrators ("TPAs"), group administers, and various professionals to help the GSIT to carry out its program and to comply with the WCB regulations. The TPA "is responsible for the administration and defense of workers' compensation claims of members of a[ GSIT]."  12 N.Y.C.R.R. § 317.2(d).  The group administrator "is responsible for ensuring compliance with the provisions of these rules and the coordination of outside services including but not limited to claims processing, loss control and legal, accounting, and actuarial services."  12 N.Y.C.R.R. § 317.2(g) (definition of "group administrator").

B.      **CRMH's Business and Business Practices**

CRMH was a provider of workers' compensation insurance products, operating two main lines of business: one fee-based, and one risk-based.  In the risk-based business, subsidiaries of CRMH – like Twin Bridges – underwrote workers' compensation insurance policies.  (Id. ¶ 51.) However, this lawsuit focuses primarily on the "fee-based" side of CRMH's business in New York, a business that CRMH has since left.

---

The WCB may meet with the trust's board or [third-party administrator], conduct an audit, request additional financial or actuarial documentation, require a written remediation plan, restrict membership, require the trust to raise premiums, or require the trust to levy an assessment on group members to make up the shortfall.  Depending on the degree of underfunding, the WCB has the option to take any, all, or none of these steps.

(Mem. of Defs. in Supp. of Mot. to Dismiss at 8.)

CRM provided a broad range of fee-based services to the GSITs CRMH administered.[7] "These services included, among others, general management, underwriting, risk assessment, medical bill review and case management, general recordkeeping, regulatory compliance . . . and claims management services."  (Id. ¶ 48.)  By 2002, CRM was providing fee-based TPA and group administration services to eight GSITs in New York, covering a variety of industries.[8]  (Id. ¶¶ 3, 46.)

The fee-based business was very important to CRMH.  (Id. ¶ 49.)  For example, in the first nine months of 2005, fees for management-based services accounted for approximately 83% of CRMH's total revenues and approximately 74% of its net income.  (Id.)  Furthermore, one trust, the Healthcare Industry Trust of New York ("HITNY"), accounted for about half of CRMH's New York trust administration business.  (Id. ¶ 8.)  The fees from two other trusts – the Elite Contractors Trust of New York ("ECTNY") and the Transportation Industry Workers' Compensation Trust ("TRIWCT") – provided a significant portion of the balance of CRMH's net income, so that a large amount of CRMH's business was dependent on these three trusts.  (Id. ¶ 50.)

CRMH did not perform all of the services that each GSIT needed.  Independent of CRM, as required by 12 N.Y.C.R.R. § 317.19(a)(3), actuary Charles Gruber ("Gruber") of the actuarial

---

[7] CRM was formed by Mr. Rakoff, Mr. Hickey, Jr., Mr. Hickey, Sr., and Robert Finn in 1999 in order to provide administrative services to GSITs in New York.  (CAC ¶¶ 45-46.)  In December 2005, CRMH completed its initial public offering and acquired CRM and its affiliates through a share exchange by CRMH.  (Sheldon Decl., Ex. C at 6.)  CRM thus became a wholly-owned subsidiary of CRMH.

[8] The trusts were: Elite Contractors Trust of New York ("ECTNY"), Healthcare Industry Trust of New York ("HITNY"), Wholesale and Retail Workers' Compensation Trust ("WRWCT"), Transportation Industry Workers' Compensation Trust ("TRIWCT"), Trade Industries Workers' Compensation Trust for Manufacturers ("TIWCT"), Real Estate Management Trust of New York ("REMTNY"), Public Entity Trust of New York ("PETNY") and New York State Cemeteries Trust ("NYSCT").  All eight were founded between August 1999 and February 2002, and all eight were terminated between August 2007 and July 2008.  (CAC ¶ 3.)

firm SGRisk, LLC ("SGRisk") performed actuarial services for each of the trusts.  (Id. ¶¶ 7, 52.)

Upon notification and examination of the injury claims filed by the trusts' members, CRM did

establish initial loss reserve amounts.  (Id. ¶ 52.)  These initial loss reserve amounts were relied

upon by the trusts' independent actuary in estimating the trusts' future claim liability.  (Id.)  In

addition, by virtue of its administrative role for the GSITs, CRM was responsible for

coordinating the preparation of each trust's financial statements and corresponding financial

footnotes, which were audited by an independent certified public accountant.  See 12 N.Y.C.R.R.

§§ 317.2 & 317.19(a)(2).  UHY LLP ("UHY") acted as an independent accountant for the trusts

administered by CRM.  (Id. ¶¶ 7, 52.)  It was UHY's responsibility to ensure that the claims

liability/expense amounts reported by CRM were accurate.[9]  (Id. ¶ 53.)

## C.     Significant Events Before, During, and After the Class Period

### 1.     Events Before the Class Period

In December of 2002 the WCB reached a determination that HITNY was "under-

funded."  (Sheldon Decl., Ex. C at 9.)  On January 29, 2003 PriceWaterhouseCoopers ("PwC")

issued a report on GSIT HITNY that had been commissioned by the WCB.  (Sheldon Decl., Ex.

Q.)  The report found that the "loss and loss expense reserves reported by HITNY as of

September 30, 2002 are inadequate by $4,912,943."  (Id. at 3.)  The CAC alleges that, in

response to the PwC report, Mr. Hickey, Jr. hired Jeffrey Kadison of Practical Actuarial

Solutions to perform an audit on HITNY that would discredit PwC's audit, and indicated to

Kadison that he wanted to "make sure that the door didn't close" on HITNY.  (CAC ¶¶ 87(b),

---

[9] Despite Plaintiffs' conclusory statements to the contrary (see, e.g., Pl.'s Opp'n to Defs.' Mot. to Dismiss at 3
("With the assistance of [Gruber and UHY], defendants produced false and misleading financial and actuarial
reports for the Trusts.")), there are no facts alleged which suggest that SGRisk or UHY worked in concert with
CRMH, or that they were anything other than independent companies, as required by 12 N.Y.C.R.R. §§ 317.19(a)(2)
& (3).

187; Sheldon Decl., Ex. C at 9.)  Still, CRMH worked with the WCB to cure the problem, and in

June 2003, HITNY agreed to a Consent Order and Consent Agreement with the WCB that placed

certain restrictions on HITNY for an eleven-month period ending on March 31, 2004.  (Sheldon

Decl., Ex. C at 10.)  HITNY ended its 2004 fiscal year ("FY") with a 95% asset-to-liability ratio.

(CAC ¶ 54.)

At the September 27, 2005 HITNY Board of Trustees meeting, attended by Mr. Scardino,

internal statements were distributed from August 31, 2005 showing an 87.4% asset ratio in the

trust.  (Sheldon Decl., Ex. D.[10])  At the meeting, Gruber stated that "[o]n older claims, the

incurred losses are higher than had been previously calculated.  However there have been other

improvements in the underwriting process and newer claims appear to be developing and closing

at decreased amounts than previous claims."  (Id.)  Additionally, "CRM admitted that the

assurances made in years past that '[CRM's] development factors would be better than New

York State averages' were incorrect."  (Id.; CAC ¶ 87(d).)  On motion, the board of HITNY

approved an 8% member assessment for the 2004-2005 fiscal year.  (Sheldon Decl., Ex. D.)

At the November 1, 2005 HITNY Board of Trustees meeting, attended by Mr. Scardino,

CRM distributed preliminary year-end statements to the HITNY Board of Trustees which

indicated that HITNY had a funding level of 83.4% including the 8% assessment proposed to

members for the fiscal year.  (Id.)  "It was noted that the board expressed their concern at the

drastic decrease of the funding status from the immediate past period interim financial statements

as presented by CRM."  (Sheldon Decl., Ex. D.)

**2.      The December 21, 2005 CRMH IPO**

---

[10] Exhibit D contains the minutes of several meetings of the HITNY Board of Trustees, held between September 27,
2005 and September 5, 2006.  The exhibit is not consecutively paginated, but the meeting minutes are in
chronological order.

On December 21, 2005 – the first day of the putative Class Period – CRMH became a public company, selling 8,850,000 shares of common stock in their Initial Public Offering ("IPO").  (CAC ¶ 31.)  The stock sold at $13.00 per share and returned a gross of $115,050,000. (Id.)  Three of the Individual Defendants sold a significant amount of stock at the December IPO: Mr. Hickey, Jr. sold 509,000 shares for proceeds of $6.617 million, (id. ¶ 180); Mr. Hickey, Sr. sold 630,000 shares for proceeds of $8.19 million, (id. ¶ 183); and Mr. Rakoff sold 509,000 shares for proceeds of over $6.6 million, (id. ¶ 182).

The IPO Registration Statement, which the Individual Defendants signed, included CRMH's financial results[11] for FYs 2000-2004, and the first nine months of FY 2005.  (Id. ¶ 81.) In the IPO Underwriting Agreement, which was attached to the Registration Statement, CRMH stated that none of the GSITs except PETNY "is currently deemed 'underfunded' as determined by the [WCB]."  (Id. ¶ 86.)

The Registration Statement highlighted the extent to which CRMH's business was dependent on HITNY, ECTNY, and TRIWCT, and noted the potential harm if the Company were to lose one of these trusts or if the Company were to underestimate liabilities.  (Id. ¶¶ 83, 85.)  Specifically, it stated:

> To the extent the loss reserves for any of our managed groups is insufficient to cover such group's actual losses and loss adjustment expenses, the group will have to adjust its loss reserves and it may incur charges to its earnings, which could have a material adverse effect on its financial condition and cash flows and could require the group to assess its members. This could expose us to liability for our management of the group, have a negative impact on our future management of the group, and adversely affect our reputation as a manager.

---

[11] CRMH's published financial information did not include specific financial statements of each of the individual GSITs.  Each GSIT has a Board of Directors which had the ultimate authority to make decisions for the trust.  (See Sheldon Decl., Ex L.)  While the WCB performs an annual review of this data and issues a report to each GSIT's trustees and, upon request, to its members, the details are not released to the general public, as much of the specified financial and programmatic information is considered proprietary to the GSIT.  (Id.)

(Id. ¶ 85.)  In addition, CRMH cited its practice of "individually analyzing the appropriate premium for each member of a group . . . [in] attempts to determine premiums that are sufficient to cover the expected losses . . . ."  (Id. ¶ 63.)  CRMH also represented that, "[w]e attempt to make contact with the injured worker, treating physician and employer with 24 hours after receiving a claim [so as to] mitigate claims and loss adjustment expenses and identify potential fraud," (id. ¶ 75), and stated that that it provided "Independent Medical Examinations . . . for verification of the medical diagnosis and treatment plan for injured workers" (id. ¶ 79).

### 3.  Events Preceding the February 8, 2007 CRMH SPO

At the January 10, 2006 HITNY Board of Trustees Meeting the board of HITNY agreed by common consent to do a complete review of actuarial services for HITNY.[12]  (Sheldon Decl., Ex. D.)

On or about March 17, 2006 New York Marine and General Insurance Co. and Midlands Claim Administrators, Inc. performed an audit on CRM for HITNY and two other CRM GSIT accounts.  (CAC ¶ 94.)  It found that (1) after the initial reserve, many reserves were changed in small amounts (stair-stepping) as the file progressed[13]; (2) CRM had a practice of reserving

---

[12] Plaintiffs allege that at the time of the December 21, 2005 IPO, "HITNY was *already underfunded* with a funding level (regulatory assets/liabilities) of 81.6%, as indicated in HITNY's 2005 GAAP financial statements audited by UHY and presented to the HITNY Board of Trustees on January 10, 2006."  (CAC ¶ 94 (emphasis in original).)  However, this allegation is contradicted by the minutes of the January 10, 2006 HITNY board meeting, which state that the financial audit had not yet been completed at that time, and would be submitted sometime before February 1, 2006.  (See Sheldon Decl., Ex. D.)  In fact, the HITNY audited financial statements, prepared by UHY and showing an 81.6% trust equity ratio, were not received by the WCB until January 31, 2006.  (See Sheldon Decl., Ex. E.)

[13] According to The University of Wisconsin System's webpage on Worker's Compensation Policies & Procedures:

> The appropriate reserve is the amount (based on current information, medical records and claim facts) needed to cover all medical, indemnity and expense costs.  Reserves should not be increased repeatedly for a few payments, this is known as stair step reserving.  The Claim Examiner should anticipate the final cost of the claim.  Case reserves are intended to reflect the ultimate exposure, or cost of a claim, from creation through the life of a claim.

claims in which non-scheduled permanent disability is anticipated for two years of disability benefits, which delayed the setting of proper permanent disability reserves; (3) there was little evidence that the adjusters were making a decision regarding the final reserves necessary early in the claim files; and (4) in most of the claim files, the loss reserve at 180 days was inadequate. (Id.)

On March 27, 2006, CRMH issued a press release announcing its fourth quarter ("Q4") 2005 and FY 2005 financial results.  Therein, Mr. Hickey stated that "[w]e could not be more excited about our future prospects given the market opportunities in front of us and the strong financial condition in which we have placed ourselves."  (Id. ¶ 88.)

On March 29, 2006, CRMH filed its 2005 10-K form with the SEC, which was signed by each of the Individual Defendants.  (Id. ¶ 89.)  The 10-K once again highlighted the fact that a significant amount of the Company's existing business was dependent on a relatively small number of GSITs, including HITNY, (id. ¶ 90), and noted the potential harm to the Company if it were to underestimate GSIT liabilities (id. ¶ 91).  A copy of the IPO Underwriting Agreement for the December 2005 IPO was attached to the 10-K, and was signed by Mr. Hickey, Jr., Mr. Hickey, Sr., and Mr. Rakoff.  (Id. ¶ 93.)  It repeated the assertion that none of the trusts except PETNY "is currently deemed 'underfunded' as determined by the [WCB]."  (Id. ¶¶ 86, 93.)

On April 13, 2006, the WCB sent a letter to CRM stating its final determination with respect to HITNY's 2005 GAAP financial statements.  (Sheldon Decl., Ex. F.)  The WCB found that with regulatory adjustments, the trust's final ratio was 81.6%, and as a result, deemed the trust underfunded.  (Id.; CAC ¶ 87(e))

_____

 Worker's Compensation, The University of Wisconsin System, http://www.wisconsin.edu/oslp/wc/polpro/
wcguide1.htm (last visited May 2, 2012) (emphasis added).

At the April 26, 2006 HITNY Board of Trustees meeting, attended by Mr. Scardino, the Trustees discussed with CRM the possibility of changing actuarial services, by replacing SGRisk with Milliman, Inc. ("Milliman").  (CAC ¶ 99; Sheldon Decl., Ex. D.)  They also discussed the WCB's determination that HITNY was underfunded.  (Sheldon Decl., Ex. D.)

On May 9, 2006, CRMH issued a press release announcing its Q1 2006 financial results. (CAC ¶ 95.)  Therein, Mr. Rakoff stated, "[i]n the first quarter of 2006, our fee-based workers' compensation businesses in both New York and California grew more slowly than anticipated." Mr. Hickey, Jr. added that, "[t]hus far 2006 has presented some challenges to the growth of our fee-based business.  Nonetheless, the fundamentals of our business model remain sound and we believe the longer term prospects remain similar to those we envisioned at the start of the year . . . ."  (Id.)  On the same day, CRMH held a conference call with industry analysts to discuss the Company's Q1 2006 financial results.  (Id. ¶ 96.)  Defendants Mr. Hickey, Jr., Mr. Rakoff, and Mr. Scardino were present.  (Id.)  During the call, Mr. Hickey, Jr. described underwriting as one of the Company's "core disciplines," (id. ¶ 65(a)), and stated, "[w]e have the utmost confidence in the fundamentals of our [business] model and recognize that the key to successful and profitable growth is increasing both the number of programs and the number of brokers."  (Id. ¶ 97.)

On May 12, 2006, CRMH filed its Q1 2006 10-Q form with the SEC, which was signed by Mr. Hickey, Jr., Mr. Rakoff, and Mr. Scardino.  (Id. ¶ 98.)  Therein, the Company, in relevant part, stated that "New York is in the process of reevaluating regulations relating to the formation of new [GSITs].  This has led to a temporary moratorium on the formation of new groups."  (Id.) It went on to state, "[w]e believe growth in our New York business will occur as a result of increases in the number of members in our existing groups and recently approved manual rate

increases" by the WCB averaging 5%, effective October 2005.  (Id.)  In addition, "manual rates across the industries in which we have formed self-insured groups will increase by approximately 8% on average commencing in 2006.  Some of the prospective revenue growth created by the rate increases was offset by attrition in group membership due to underwriting actions and competitive business conditions."  (Id.)

On August 7, 2006, CRMH issued a press release announcing its Q2 2006 financial results.  (Id. ¶ 100.)  Therein, Mr. Rakoff stated: "In the second quarter of 2006, our fee-based workers' compensation businesses in New York and California were affected by difficult market conditions which resulted in slower than anticipated growth. . . .  In order to meet the earnings expectations that we have, we are working strenuously but responsibly to expand our business."  (Id.)  On the same day, the Company held a conference call with investors, industry analysts, and other market participants to discuss the Company's Q2 2006 financial results.  (Id. ¶ 101.)  Defendants Mr. Hickey, Jr., Mr. Rakoff, and Mr. Scardino were present.  During the call, Mr. Hickey, Jr. asserted that "CRM will not compromise our underwriting integrity for short-term fee based gains."  (Id. ¶¶ 65(b), 101.)

On August 8, 2006, CRMH filed its Q2 2006 10-Q form with the SEC, which was signed by Mr. Hickey, Jr., Mr. Rakoff, and Mr. Scardino.  (Id. ¶104.)  The form repeated much of the information contained in the Q1 10-Q form, submitted on May 12, 2006.

On August 11, 2006, the WCB released a report entitled "Level I Review of [TIWCT] as of December 31, 2005," which indicated that TIWCT's funding level after necessary adjustments of the financial statements was 84.19%, and not the 95.12% that had been reported in the FY 2005 financial statements submitted to the WCB.  (Id. ¶ 87(i).)

16

At an August 17, 2006 HITNY Board of Trustees meeting, attended by Mr. Rakoff and Mr. Scardino, the Trustees expressed that they were "frustrated by the poor financial performance of [HITNY] due to lack of reliable forecasts and actuarial projections being provided by the administrator [CRM]."  (Id. ¶ 113; Sheldon Decl., Ex. D.)  At the meeting, Gruber of SGRisk made a presentation and stated that HITNY may be "severely under-funded." (CAC ¶ 113.)  On August 25, 2006, the HITNY Board of Trustees retained Milliman to perform an independent loss assessment.  (Id. ¶ 9.)

On November 7, 2006, CRMH issued a press release announcing CRMH's Q3 2006 financial results.  Therein, Mr. Hickey, Jr. stated that, "[r]evenues in New York fell 2%, which was due to the combined effect of a 6% increase in group membership offset by reduced reinsurance commissions overall, and a lower fee structure at two of the Company's managed [GSITs]."  (Id. ¶ 106.)  He concluded, "our New York market remains steady.  We are prospering in these market conditions and will continue to do so with a business model that is appropriate for the short term and thrives in the long term."  (Id. ¶ 106.)  On the same day, the Company held a conference call with investors, industry analysts, and other market participants to discuss the Company's Q3 2006 financial results.  (Id. ¶ 107.)  Mr. Hickey, Jr., Mr. Rakoff, and Mr. Scardino were present.  (Id.)  During the call, Mr. Hickey, Jr. asserted that:

> The increase in group membership that we continued to experience is proof that we are gaining market share and gives us encouragement that our model will work in other states across the country.  CRM is now a strong, well capitalized Company that is positioned to succeed and drive both today and into the future.

(Id. ¶ 108.)

On November 9, 2006, CRMH filed its Q3 2006 10-Q form with the SEC, which was signed by Mr. Hickey, Jr., Mr. Rakoff, and Mr. Scardino.  (Id. ¶104.)  The form repeated much of the information contained in the Q1 and Q2 10-Q forms.

On November 29, 2006, Milliman issued a draft actuarial report on HITNY.  (Sheldon Decl., Ex. G.)  It found that, to stay adequately funded, HITNY needed to maintain a reserve in excess of $110 million – $63 million more than the $47 million figure that SGRisk had reported previously.  (Id.)

In the beginning of December 2006, the WCB sent letters to the trustees of other trusts administered by CRM, including PETNY and REMTNY, indicating serious concerns with the accuracy of SGRisk's actuary reports.  (Id. ¶¶ 10, 119(b)-(c).)  The trusts subsequently sought independent actuarial evaluations and found similar – if less extreme – disparities.  (Id. ¶ 11.)

On December 20, 2006, an independent audit by Harry G. Kickey Consulting Services ("Kickey") – hired by CRM to perform a claim file audit of cases handled by CRM on behalf of WRWCT – found that WRWCT's reserves showed an inadequacy of $4.5 million.  (Id. ¶¶ 11, 76)  In addition, the audit found that in terms of "overall handling" only 7% of the claims were rated as having been handled as "good" with 40% being graded as "poor"; that in terms of reserving only 3% of the claims were rated as having been handled as "good" with 80% being graded as "poor"; that "in a number of instances there is no contact with the injured worker for a significant period of time"; and that "there appears to be a significant delay in recognizing significant exposure on cases, reserving for the exposure and settling them in a timely fashion." (Id. ¶ 76.)  Kickey found that CRMH "stair stepped" reserves, making adjustments "to cover paid to date amounts or payments scheduled for the immediate future" instead of "the ultimate expected cost of the case."  (Id. ¶ 77.)  He determined that "the biggest problem area of the entire

18

audit" was claims reserves, and concluded that "[w]hen you fail to meet your guidelines for reserving practices in 80% of the cases, something is very wrong."  (Id. ¶¶ 77, 119(d).)

On December 28, 2006, a CRMH press release announced that Defendant Mr. Rakoff, co-CEO of CRMH, would be resigning, effective that day.  (Id. ¶¶ 12, 114.)  On December 29, 2006 (in accordance with the terms of a separation agreement entered into between the Company and Mr. Rakoff, dated December 19, 2006), the Company filed a Registration Statement with the SEC for a Secondary Public Offering ("SPO") of Mr. Rakoff's shares in the Company.  (Id. ¶¶ 12, 32, 114; Sheldon Decl., Ex. H.)  In the SPO Registration Statement, CRMH acknowledged that adverse claims development had caused HITNY's estimated ratio of regulatory assets to total liabilities to decrease significantly, and that HITNY had been deemed underfunded by the WCB:

> As a result of HITNY's underfunded status, HITNY's Board of Trustees has determined that the group will not accept any new members until the underfunding has been substantially corrected.  We are presently in discussions with HITNY's Board of Trustees and the [WCB] to develop a remediation plan to resolve HITNY's funding status.

(CAC ¶ 116; Sheldon Decl., Ex. H.)

On January 9, 2007, PwC issued a report to the WCB entitled "A Review of SGRisk Actuarial Reports Prepared for Healthcare Industry Trust of New York."  PwC reviewed a number of reports prepared by SGRisk relating to the loss reserves of HITNY, including a report dated December 13, 2005 which analyzed HITNY's loss reserves as of September 30, 2005. PwC concluded that SGRisk's report was not adequately documented, and was based in part on incomplete, or potentially misleading information.  (CAC ¶ 119(e).)   PwC further criticized SGRisk's report, finding that SGRisk's report utilized a flawed methodology, did not reflect

HITNY's actual experience, and lacked appropriate statistical analysis to validate or measure the impact of CRM's claimed reserve strengthening.  (Id.)

On February 7, 2007, CRMH filed a Prospectus in which it once again acknowledged that HITNY was underfunded, and also disclosed that one of its GSITs, accounting for less than 7% of the Company's fee-based revenue, likely would be deemed underfunded in the near future, and that CRM had proposed a remediation plan to that group's board of trustees.  (CAC ¶ 116.) In addition, CRMH disclosed that the WCB was "conducting an inquiry into the actuarial work done by a third-party actuary," in relation to HITNY, and provided, in pertinent part:

> We understand that the actuary provided the [WCB] with a written independent report from another qualified independent actuary that specializes in performing such reviews.  This report verified that all actuarial methods used and actuarial judgments made were in accordance with sound actuarial principles and standards.  Although we expect that the materials and testimony that are being asked of us will substantiate all underlying data, we cannot predict the outcome of the [WCB's] inquiry.

(Id.)  It continued:

> The [WCB] has the regulatory authority to require underfunded groups to increase the premiums their members pay to such groups, cause their members to pay an additional assessment for the coverage provided by such groups during prior years, review all expenses of the group, including the management fees paid by such groups, request substantial reductions in such expenses and, in extreme circumstances, order the group to disband. In the past, we have been able to assist our underfunded groups, including HITNY, to develop and implement successful remediation plans and restore such groups to funded status. However, we cannot assure you that either of the groups will be able to remediate their funding status successfully and in such an event, our business, financial condition and results of operations, as well as our reputation with respect to the provision of management services to [GSITs], could be materially and adversely affected. Furthermore, either of the groups may assert a claim against us, which we would vigorously defend; if any such claim results in payments to the groups or a reduction in the management fees the groups pay to us, our business, financial condition and results of operations could also be materially and adversely affected.

(Sheldon Decl., Ex. I.)

20

The SPO concluded on February 8, 2007, resulting in the sale of 100% of Mr. Rakoff's

1,934,691 shares in CRMH at $7.55 per share, yielding proceeds to Mr. Rakoff of more than

$14.6 million.  (Id. ¶¶ 12, 115.)  The shares Mr. Rakoff sold in the SPO represented 12.45% of

all of CRMH's outstanding shares at the time.  (Id. ¶ 182.)  Combined with the $3.3 million cash

severance he received, Mr. Rakoff left CRMH with almost $18 million.  (Id.)

### 4. Events Preceding Mr. Hickey, Jr. and Mr. Hickey, Sr.'s Sale of Stock in May and June of 2007

On March 8, 2007, CRMH issued a press release announcing its Q4 2006 and FY 2006

financial results.  Therein, Mr. Hickey, Jr. stated, in pertinent part:

> Disciplined underwriting of increasing amounts of workers compensation
> insurance with very favorable loss experience is enhancing profitability. . . .  The
> addition of Majestic will create a powerful strategic combination with our fee-
> based and reinsurance businesses that we expect to perform well over the long
> term. . . .  Fee-based management services revenues increased 10%, to $40.0
> million.  The rise in fee-based business was due to an increase in group members
> both in New York, where membership increased 7% to 2,080, and in California,
> where membership increased by 37%, to 402. . . .  We are very enthusiastic about
> our prospects in another challenging insurance marketplace in 2007.  Our . . .
> continued excellent operating standards place us in a good position for another
> year of revenue and earnings growth.

(Id. ¶ 121.)  On the same day, the Company held a conference call with investors, industry

analysts, and other market participants, to discuss the Company's Q4 2006 and FY 2006

financial results.  (Id.)  Mr. Hickey, Jr. and Mr. Scardino were present.  (Id.)  During the call, Mr.

Hickey, Jr. asserted that HITNY was in "its final stages of an active remediation plan," that the

plan would "call for some minimal premium adjustments to the trust," but that "we expect to

continue to retain our membership."  (Id.)

On March 9, 2007, CRMH filed its 2006 10-K form with the SEC, which was signed by

Mr. Hickey, Jr., Mr. Hickey, Sr., and Mr. Scardino.  (Id. ¶ 123.)  It contained the same statements

made in the SPO Registration Statement, as well as an update on the HITNY remediation plan. (See id. ¶ 124.)  In a signed letter to shareholders contained in the Company's 2006 Annual Report, Mr. Hickey, Jr. stated that "[w]riting profitable business to achieve superior underwriting results, as opposed to simply growing our top line, is our overriding rule."  (Id. ¶ 65(c).)

On May 2, 2007, the CRMH issued a press release announcing its Q1 2007 financial results.  (Id. ¶ 126.)  Therein, Mr. Hickey, Jr. stated, "CRM plans to remain competitive while maintaining high underwriting standards."  (Id.)

On May 14, 2007, CRMH filed its Q1 2007 10-Q form with the SEC, which was signed by Mr. Hickey, Jr.  (Id. ¶ 127.)  It contained much of the same information as the 2006 10-K about the WCB remediation process, and stated that:

> Adverse claims development has caused a number of our groups, including HITNY, which was previously our largest group, to become significantly underfunded.  HITNY's estimated ratio of regulatory assets to total liabilities has decreased significantly due to adverse claims development. As a result of HITNY's underfunded status, the [WCB] has determined that the group will not accept any new members until the underfunding has been substantially corrected. In addition to this, HITNY experienced 18% attrition in the number of its members when the group policies renewed on April 1, 2007. . . .  We have also recently determined that adverse claims development has similarly caused the estimated ratio of regulatory assets to total liabilities to decrease significantly for a number of our other groups in New York.

(Id.)

On May 22, 2007, CRMH filed an 8-K form with the SEC, indicating that Mr. Hickey, Jr. and Mr. Hickey, Sr. had each adopted a Rule 10b5-1 stock trading plan as of May 21, 2007.  (Id. ¶ 185.)  Between May 22 and 24, 2007, Defendant Mr. Hickey, Jr. sold 17,800 shares of his stock at approximately $8.50 per share for proceeds of $151,917.  During the same time period, Mr. Hickey, Sr. sold 18,769 shares of his stock at approximately $8.50 per share for proceeds of $159,934.  (Id. ¶¶ 180, 183.)

On June 13, 2007, PwC issued a series of reports to the WCB regarding the loss reserves of certain GSITs administered by CRM, including REMTNY, NYSCT, TRIWCT, and WRWCT. (Id. ¶ 132.)  In these reports, PwC criticized SGRisk for utilizing unsupported, inappropriate and/or incorrect actuarial methods in calculating loss reserves.  (Id.)  On that same day, Mr. Hickey, Jr.'s and Mr. Hickey, Sr.'s 10b5-1 trading plans ended.  (Id. ¶ 185.)

**5.      Events Preceding Mr. Hickey, Jr.'s September 20, 2007 Sale of Stock**

On August 2, 2007, PETNY was terminated.  (Id. ¶ 3.)

On August 7, 2007, CRMH issued a press release announcing its Q2 2007 financial results.  (Id. ¶ 129.)  On the same day, the Company held a conference call with investors, industry analysts, and other market participants, to discuss the Company's Q2 2007 financial results.  (Id. ¶ 130.)  Mr. Hickey, Jr., and Mr. Scardino were present.  (Id.)  During the call, Mr. Hickey, Jr. asserted that:

> I think that the reform [in the workers' compensation market] that has been proposed presents opportunity for CRM, both in a fee-based self insured model and certainly in the selective primary model.  Early indication is that possibly the market can harden . . . but we think that the tide will turn on the self-insured model in the state.

(Id.)

On August 8, 2007, CRMH filed its Q2 2007 10-Q form with the SEC, which was signed by Mr. Hickey, Jr.  (Id. ¶ 131.)  Therein, the Company stated that "29% of the trust members representing 34% of expired premiums of what had been the largest New York self-insured group we manage chose not to renew on April 1, 2007."

On September 17, 2007, CRMH issued a press release announcing that HITNY's trustees had notified CRMH that the Board of HITNY had "voted to solicit HITNY's membership for the

voluntary termination of HITNY, effective 60 days after member votes are tallied" (which would

be "on or about November 30, 2007").  (Id. ¶ 133.)  Therein, CRMH stated that:

> The Board's decision to terminate stems from several factors that, when combined, would make remediation from underfunded to funded status difficult. The factors include a significant reduction in the workers' compensation rates set by the [WCB] that are attributable to the healthcare industry, increased competitive market pricing pressure, past and anticipated member attrition, regulatory restrictions on discounts offered to the members, and regulatory restrictions against adding new members.  The Board believes these issues indicate that it is more likely than not that the viability of HITNY going forward will be compromised.

> "We are disappointed that HITNY, which has been a major option for workers' compensation risk management for many brokers and their healthcare clients, was faced with this difficult set of circumstances," said Mr. Daniel G. Hickey Jr., CRM's Chairman and CEO.  "We at CRM have been in the business of providing reliable and responsible workers' compensation risk management services and solutions for our broker customers since our foundation.  We will continue to support and offer workers' compensation insurance solutions in the healthcare market in every state in which we operate.  And we will do so in a measured and prudent fashion.  Our primary insurance company, Majestic, which has been approved to write workers' compensation in New York, is able to offer a standard insurance product for all viable risks, including those HITNY members in good standing."

> Despite the potential termination of HITNY, management reconfirms its current fiscal year 2007 guidance of between $1.10 per share and $1.20 per share. The Company anticipates that any impact on earnings from HITNY's termination will be offset by other business activities, but cannot provide any assurances that it will achieve such plans, intentions or expectations.

(Id.)

On September 20, 2007, Mr. Hickey, Jr. sold 216,454 shares of his stock at $6.00 per

share, for proceeds of approximately $1.3 million.  (Id. ¶ 180.)

**6.    Events Preceding Mr. Hickey, Jr.'s December 12, 2007 Purchase of Stock**

On November 7, 2007, CRMH issued a press release announcing its Q3 2007 financial

results.  (Id. ¶ 135.)  Therein, the Company, in relevant part, stated:

> Fee-based management services revenues decreased to $8.7 million from $10.1 million in the prior year.  The decline was due to lower insurance rates in California, attrition in the membership of one New York [GSIT] managed by the Company and reduced commissions on excess policies placed with Majestic.
>
> \*       \*       \*
>
> . . . The Company's group membership in New York increased 4% to 2,099, but premiums under management decreased by 19% to $98.4 million, mainly due to member attrition in one trust.
>
> \*       \*       \*
>
> CRM expects its results for the full year to reflect further progress from its risk-based businesses.  Its fee-based business will continue to experience soft market conditions in California and must absorb an impending rate cut in New York and the weakness of some of its managed trusts in the current legislative and rate environment.   Based largely on the results in the reinsurance and primary insurance segments, CRM has raised its guidance range for the full year to $1.20 to $1.25 per fully diluted share.

(Id.)

On the same day, the Company held a conference call with investors, industry analysts,

and other market participants, to discuss the Company's Q3 2007 financial results.  (Id. ¶ 136.)

Mr. Hickey, Jr. and Mr. Scardino were present.  (Id.)  During the call, Mr. Scardino asserted that:

> Overall group membership in the New York Trust increased slightly, but revenues there [sic] down 15.6%.  This was primarily caused by attrition in one group that had some larger insurers.  The background here is that for a number of mainly regulatory reasons, many self-insured trusts in New York are no longer operating profitably.  In fact, more than half of the New York trusts are deemed under funded by the [WCB].  As we have already disclosed, our largest New York trust, known as HITNY, ceased operations in October and will close at the end of this month.  Two other smaller trusts will have closed by the end of the year.  As I'll discuss in a moment, our guidance now takes account of all these events.

(Id.)  Later, Mr. Hickey, Jr., stated that, "there is a pricing challenge in New York State for

trusts.  With the funding requirements of the programs in New York, that has primarily been part

of the reason that some our [sic] trusts have voluntarily chose to close programs down and move to an alternative source of comp funding." (Id. ¶ 137)

On November 8, 2007, CRMH filed its Q3 2007 10-Q form with the SEC, which was signed by Mr. Hickey, Jr. (Id. ¶ 138; Sheldon Decl., Ex. J.) Therein, the Company stated that "three of our New York self-insured groups elect[ed] to voluntarily terminate their active operations during the second half of 2007," and that "[t]here can be no assurances that other self-insured groups we manage will not elect to cease active operations, that the price erosion in New York will not become more widespread, or that our profitability will not deteriorate from rate reductions." (Sheldon Decl., Ex. J.) The Company acknowledged that HITNY, NYSCT, and PETNY (18%, 1%, and 1%, respectively, of fee-based management revenues for the nine months ended September 30, 2007) were voluntarily terminating their active operations during 2007, explaining that:

> The groups' decisions to terminate stemmed from several factors . . . includ[ing] significant reductions in the workers' compensation rates set by the [WCB] that are attributable to the employers of the groups, increased market competition and pricing pressure, past and anticipated member attrition, regulatory restrictions on discounts offered to members, and regulatory restrictions against adding new members.

(Id. ¶ 139.)

In November 2007, PwC issued reports to the WCB regarding the loss reserves of WRWCT and TRIWCT. (Id. ¶ 140.) Therein, PwC criticized SGRisk for the actuarial services it provided. (Id.)

On or around December 12, 2007, Mr. Hickey, Jr. bought 12,000 shares of CRMH stock for $84,085. (Sheldon Decl., Ex. P.)

**7.      GSITS Begin to Terminate**

On December 31, 2007, the WCB dissolved HITNY.  (Id. ¶¶ 3, 133, 193.)  On January 31, 2008, TRIWCT, TIWCT, and REMTNY were terminated, and on March 31, 2008, the same fate befell NYSCT.  (Id. ¶ 3.)  Overall, seven of the eight trusts administered by CRM in New York defaulted by March 31, 2008.  (Id. ¶¶ 3, 54.)

On January 29, 2008, CRMH issued a press release regarding ECTNY's FY 2007 financial statements.  (Id. ¶ 141.)  Therein, the Company stated that ECTNY had submitted its FY 2007 GAAP financial statements to the WCB, and that a comprehensive independent audit utilizing "actuarial forecasts substantially similar to those calculated by the actuarial firm performing preliminary reviews for the WCB," showed "that the Trust has had a very successful year and exceeds the regulatory criteria for classification by the WCB as having 'no funding issues.'"  (Id.)

### 8.    Investigation by the WCB

On February 8, 2008, the WCB notified CRMH that a referral had been made for a formal investigation into whether disciplinary action should be taken with regard to the Company's TPA license.  (Id. ¶ 147.)  On February 14, 2008, the WCB assumed administration of HITNY.  (Id. ¶ 193.)

On February 20, 2008, CRMH issued a press release announcing certain cost-cutting measures being taken by CRM.  (Id. ¶143.)  The Company stated, in relevant part, that the measures were being taken "[i]n response to changes in market and business conditions that have reduced the volume of business in [GSITs] in its New York market."  (Id.; Sheldon Decl., Ex. K.[14])

---

[14] Exhibit K contains copies of several press releases issued by CRMH between February 20, 2008 and December 10, 2009.

On March 5, 2008, CRMH issued a press release announcing its Q4 2007 financial results.  (Id. ¶ 145.)  On the same day, the Company held a conference call with investors, industry analysts, and other market participants, to discuss the Company's Q4 2007 financial results.  (Id. ¶ 146.)  Mr. Hickey, Jr., and Mr. Scardino were present.  (Id.)

On March 7, 2008, CRMH filed its 2007 10-K form with the SEC which was signed by Mr. Hickey, Jr., Mr. Hickey, Sr., and Mr. Scardino.  (Id. ¶ 147.)  Therein, the Company disclosed that on February 8, 2008, the WCB had notified it that a referral had been made for formal investigation into whether disciplinary action should be taken with regard to its TPA license, and that, "[t]he procedure initiated by the [WCB] is in an investigative stage."  (Id.)

On March 13, 2008, Edmund N. Pascoe ("Pascoe") submitted his resignation as a director of CRMH and Twin Bridges.  (Id. ¶ 193.)  The Company indicated in a press release that Pascoe resigned for "personal reasons."  (Id.)

In a letter to CRM dated April 15, 2008, the WCB notified CRM that it would be pursuing an administrative action against the Company in order to revoke CRM's TPA license in New York.  (Id. ¶ 150.)[15]

**9.     Alleged Disclosure of Concealed Risk**

According to the CAC, "The Truth Beg[an] to Emerge" on April 17, 2008.  (Id. ¶ 150.)  On that day, CRMH issued a press release announcing that the WCB was taking administrative action to revoke CRM's TPA license.  (Id. ¶¶ 13, 150.)  CRMH also disclosed that it had

---

[15] The specific allegations of wrongdoing contained in the WCB letter and paragraph 151 of the CAC are not recited here, as they are unproven allegations and thus have no evidentiary bearing in this proceeding.  See RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (citing Lipsky, 551 F.2d at 892-94) ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)."); see infra, p. 45-46.

received a subpoena from the New York State Attorney General's Office ("NYAG") requesting documents related to CRM's administration of HITNY.  (Id. ¶¶ 13, 150.)  CRMH stock opened that day at $4.90 per share.  (Id. ¶ 14.)  Following these announcements stock prices fell to $3.32 per share, a loss of $1.58 per share, more than 32%.  (Id. ¶ 152.)

On April 29, 2008, WRWCT terminated.  (Id. ¶ 3.)

On May 6, 2008, CRMH issued a press release announcing its Q1 2008 financial results. (Id. ¶ 153.)  Therein, Mr. Hickey, Jr. stated, in relevant part, "[t]he first quarter represents a positive start to the year in our risk based businesses.  We are growing profitably in California and now in New York and New Jersey. . . .  The Company continues to see the opportunity to build on its . . . risk-based business in New York."  (Id.)

On May 12, 2008, CRMH filed its Q1 2008 10-Q form with the SEC, which was signed by Mr. Hickey, Jr.  (Id. ¶ 154.)

On June 2, 2008, CRMH issued a press release announcing that CRM had reached a settlement with the WCB.  (Id. ¶ 156.)  Therein, the Company stated in pertinent part:

> No fines, no penalties and no admission of wrongdoing were important elements of an agreement signed today between the WCB and CRM.  Under the terms of the agreement, CRM, which had voluntarily exited the New York [GSIT] market during the second half of 2007 and the first quarter of 2008, will voluntarily surrender its [TPA] license . . . .

(Id.; Sheldon Decl., Ex. K.)

On July 16, 2008, ECTNY was terminated.  (CAC ¶ 3.)

On August 6, 2008, CRMH issued a press release announcing its Q2 2008 financial results.  (Id. ¶ 157.)  On the same day, the Company held a conference call with investors, industry analysts, and other market participants, to discuss the Company's Q2 2008 financial results.  (Id.)  Mr. Hickey, Jr., and Mr. Scardino were present.  (Id.)

On August 7, 2008, CRMH filed its Q2 2008 10-Q form with the SEC, which was signed by Mr. Hickey, Jr.  (Id. ¶ 154.)

On September 30, 2008, CRMH received a letter from the WCB, indicating the WCB's intention to initiate legal proceedings against CRMH on behalf of the eight GSITs it had administered.  (Id. ¶¶ 15, 161.)

On October 3, 2008, CRMH filed an 8-K form with the SEC.  (Id. ¶ 161.)  Therein, the Company revealed that it had received the letter from the WCB indicating the WCB's intention to initiate legal proceedings against CRMH.  (Id. ¶¶ 15, 161.)  It stated that, "upon information and belief, [the WCB] is alleging that CRM breached certain duties to the [GSITs] and engaged in certain self-dealing and deceptive practices."  (Id. ¶ 161.)  Over the next two days of trading, CRMH stock prices fell $0.61 per share, or 24.31%, closing on October 7, 2008 at $1.91 per share.  (Id. ¶¶ 16, 162.)

The Class Period ends on November 5, 2008.  On that date, CMRH issued a press release announcing its Q3 2008 financial results.  (Id. ¶ 163.)  Therein, the Company stated that during the third quarter, CRMH raised loss reserves by $0.12 per diluted share in order "to bring reserves for losses in the 2008 accident year accrued in the first and second quarters in line with the Company's higher third quarter reserve ratio for certain primary insurance risks."  (Id.; Sheldon Decl., Ex. K.)  On the same day, the Company held a conference call with investors, industry analysts, and other market participants, to discuss the Company's Q3 2008 financial results.  (CAC ¶ 164.)  Mr. Hickey, Jr., and Mr. Scardino were present.  (Id. ¶ 164.)  Stock prices fell $0.58 per share over the next three days of trading, a loss of more than 36%, to close on November 7, 2008 at $1.03 per share.  (Id. ¶¶ 18, 165.)

**10.     Disclosures Made After the Class Period**[16]

In the 2008 CRMH Annual Report to shareholders, Mr. Scardino admitted that CRMH's

underwriting policies in the risk-based side of the business had been unsound.  (Id. ¶ 166.)  He

stated that the Company acquired clients and set premiums in a manner that, looking back, was

"rushed and not appropriately governed by the judgment of our underwriters."  (Id.)  He also

acknowledged that correcting those practices required the nonrenewal or cancellation of a third

of the Company's underwriting contracts in New York.  (Id.)

On February 27, 2009, an internal investigation by CRMH's office of general counsel

revealed a scandal involving Mr. Hickey, Jr.  (Id. ¶¶ 31 n.5, 194.)  Special counsel was retained

to conduct an investigation, which revealed that in June and November of 2008, Mr. Hickey, Jr.

directed two high ranking CRMH officials to instruct a CRMH agent to post favorable messages

on a Yahoo! message board, to counter negative messages posted there by others.[17]  (Id.)  This

discovery led to Mr. Hickey, Jr.'s resignation less than a month later, on March 13, 2009.  (Id. ¶¶

31, 194.)  Mr. Hickey, Jr. received a $3.3 million cash severance, and accelerated vesting of over

46,000 shares of restricted CRMH stock.  (Id. ¶ 31.)

On December 9, 2009, CRMH issued a press release announcing receipt of a 'Notice of

Imminent Enforcement Action" from the NYAG.  (Id. ¶ 19; Sheldon Decl., Ex. K.)  The

Company disclosed that the NYAG intended to file civil claims against CRMH, several of its

subsidiaries, and certain CRMH officers, seeking redress for allegedly fraudulent practices done

---

[16] Such disclosures are only relevant insofar as they relate to alleged wrongdoing by the Defendants during the Class Period.

[17] No further details about the content of these messages are alleged in the CAC.

in connection with CRM's administration of the trusts, as well as in connection with the IPO.[18]

(CAC ¶ 19; Sheldon Decl., Ex. K.)

On December 10, 2009, CRMH issued a press release announcing that the WCB had filed

a lawsuit against CRM, in which the WCB alleged that:

> CRM, its subsidiaries and certain directors and officers breached fiduciary duties
> owed to the Trusts, breached contracts between CRM and the Trusts, breached
> duties of good faith and fair dealing owed to the Trusts, engaged in fraudulent
> activities in administering the Trusts, engaged in deceptive business practice and
> advertising, and were unjustly enriched.

(CAC ¶ 21; Sheldon Decl., Ex. K.)[19]

Finally, in June 2010, CRM's alleged unlawful practices were recounted by the Task

Force on Group Self-Insurance in its "Report to Governor Patterson and the New York State

Legislature" (the "Task Force Report").  (Sheldon Decl., Ex. L; CAC ¶ 55, 174.)  The Task

Force Report found that CRM,

> was able to manipulate the data so that the GSITs appeared more funded [than
> they actually were].  These types of manipulations included: suppressing claims
> reserves; recording questionable accounting transactions; using unsupported
> discount rates; failing to terminate chronic non-performing members; and
> providing questionable data to actuaries and accountants when generating year-
> end financial statements.

(CAC ¶ 57; Sheldon Decl., Ex. L.))  The Task Force found that, of the $498 million deficit

plaguing New York GSITs in 2010, 76% of that amount was attributable to groups formerly

administered by CRM.  (CAC ¶ 175; Sheldon Decl., Ex. L.)

**D.    Alleged Misrepresentations During the Class Period**

---

[18] The specific allegations contained in the NYAG Notice and paragraph 20 of the CAC are not recited here, as they
are unproven allegations and thus have no evidentiary bearing in this proceeding.  See supra, n.15; infra, p. 45-46.

[19] The specific allegations contained in the WCB Complaint and paragraph 168 of the CAC are not recited here as
they are unproven allegations and thus have no evidentiary bearing in this proceeding.  See supra, n.15; infra, p. 45-
46.

The CAC charges that CRMH's business model was to expand membership in the GSITs in order to raise fee-based revenue, and they accomplished this by offering employers "steep [insurance] premium discounts relative to commercial rates." (Id. ¶ 6.) This increased membership in the trusts led to an increased volume of management services and fee-based revenue for the trusts' administrator, CRMH, but the steep discounts "actually reduced net paid premium income to the point that trust assets became insufficient to cover liabilities." (Id.) To avoid the heightened scrutiny that an underfunded GSIT attracts from the WCB, CRMH allegedly made HITNY and the other underfunded trusts "appear more financially sound than [they were] in reality" by underestimating the trusts' claims liabilities. (Id. ¶ 8.) CRMH is alleged to have artificially lowered projected liabilities by "under-reserving individual claims, and using improper actuarial and accounting methodologies . . . ." (Id. ¶ 7.) Plaintiffs allege that, in support of this scheme, Defendants made four categories of "knowingly and/or recklessly materially false and/or misleading" statements during the Class Period. (CAC, passim.)

### 1.    Misrepresentations of Fee-Based Underwriting Services

CRMH claimed to exercise "[d]isciplined underwriting standards." (Id. ¶ 65(c).) For example, in its December 2005 IPO and February 2007 SPO Registration Statements, among other public disclosures, CRMH touted a practice of "individually analyzing the appropriate premium for each member of a group . . . [in] attempts to determine premiums that are sufficient to cover the expected losses." (Id. ¶ 63.) Plaintiffs, however, contend that CRM's underwriting practices were far from disciplined, as CRM was allegedly "providing excessive premium discounts with no correlation to losses incurred by the individual member and admitting risky

members into the Trusts without requiring higher premiums to correspond to the heightened risks."[20]  (Id. ¶¶ 66-74.)

### 2. Misrepresentations of Claims Management and Group Reserving Services

CRMH claimed to manage claims efficiently, and to exercise accepted accounting practices in assessing the Trusts' reserves.  In its IPO and SPO Registration Statements, among other public disclosures, CRMH stated: "We attempt to make contact with the injured worker, treating physician and employer with 24 hours after receiving a claim [so as to] mitigate claims and . . . identify potential fraud."  (Id. ¶ 75.)  Plaintiffs, however, allege that CRM continually ignored the need for timely reporting and proper claim management.  (Id. ¶ 76.)  As evidence, they point to the December 20, 2006 Kickey Report, which was critical of CRM's claims management with respect to WRWCT.  (Id.)

### 3. Misrepresentations of Medical Bill Review and Case Management Services

CRM often scheduled claimants for independent medical examinations ("IMEs"), purportedly "for verification of the medical diagnosis and treatment plan for injured workers." (Id. ¶ 79.)  But Plaintiffs allege that "[i]nstead, CRM scheduled excessive and often unnecessary IME's in order to have Eimar – a CRMH company – pocket the excessive IME fees."  (Id. ¶ 80.) Plaintiffs allege the IMEs are an example of what the WCB asserted was CRM's practice of making contracts with affiliate companies "to redirect more money from the trust to the administrator," while in the process collecting high fees for brokering those contracts.  (Id. ¶ 56.)

### 4. Misrepresentations of the Funding of the Trusts

---

[20] In making these allegations, Plaintiffs rely heavily on a report entitled "Forensic Analysis of the Healthcare Industry Trust of New York for The New York State Workers' Compensation Board," prepared by Bollam, Sheedy, Torani & Co. LLP, CPAs and issued on December 18, 2009 (Sheldon Decl., Ex. C).

CRMH acknowledged, in the December 2005 IPO Registration Statement, the extent to which its business was dependent on HITNY, ECTNY, and TRIWCT.  (Id. ¶ 83.)  It also acknowledged the potential harm that would befall the Company if one of the trusts were to fail, or if CRMH were to underestimate liabilities.  (Id. ¶¶ 83, 85.)  Plaintiffs allege, however, that "Defendants failed to disclose that CRM GSITs were *already* in dire straits.  These trusts were *already* plagued with substantial member deficits and were either already deemed underfunded, or were underfunded in truth but disguised by Defendants . . . to appear adequately funded."  (Id. ¶ 87 (emphasis in original).)  As evidence of this, Plaintiffs cite to a number of "Deficit Reconstruction" reports, prepared in 2009 and 2010 by Bollam, Sheedy, Torani & Co. LLP, CPAs at the request of the WCB, which calculated each of the Trusts' 2005 deficits.[21]  In addition, they allege that in November 2005, Gruber and CRM informed the HITNY Board of Trustees that HITNY was underfunded with a funding level of 83.4%.  (Id. ¶ 87(c).)

Plaintiffs also allege that, although in numerous public statements they expressed confidence in their model, Defendants' were in fact aware that the actuarial work performed on their behalf by SGRisk was inaccurate, and thus that their loss reserve estimates were inadequate. (Id. ¶¶ 99, 119.)  Plaintiffs further allege that Defendants created a misleading impression that the deteriorating financial conditions of HITNY and the other GSITs managed by CRM was due to adverse claims developments rather than their own mismanagement.  (Id. ¶ 120.)

---

[21] According to the HITNY Deficit Reconstruction and 2009 Assessment, HITNY had a reconstructed members' deficit total of over $161 million as of September 30, 2005.  (Id. ¶ 87(f).)  According to the WRWCT Deficit Reconstruction and 2010 Assessment, WRWCT had a reconstructed members' deficit total of over $44 million as of September 30, 2005.  (Id. ¶ 87(g).)  According to the TIWCT Deficit Reconstruction and 2010 Assessment, TIWCT had a reconstructed members' deficit total of over $66 million as of December 31, 2005.  According to the REMTNY Deficit Reconstruction and 2010 Assessment, REMTNY had a reconstructed members' deficit total of over $5 million as of December 31, 2005. (Id. ¶ 87(j).)  According to the PETNY Deficit Reconstruction and 2010 Assessment, PETNY had a reconstructed members' deficit total of over $5 million as of December 31, 2005.  (Id. ¶ 87(k).)  ECTNY had a reconstructed members' deficit total of over $24 million as of September 2005.  (Id. ¶ 87(l).)  NYSCT had a reconstructed members' deficit total of over $1 million as of January 31, 2006.  (Id. ¶ 87(m).)

## III. LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a claim if the plaintiff fails to state a claim upon which relief may be granted.  A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint.  In coming to its decision, the court must accept as true all of the allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A claim will survive a motion to dismiss only if it has "facial plausibility" – meaning that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

On a motion to dismiss, the Court may consider "the facts stated on the face of the Complaint and in documents appended to the Complaint or incorporated in the Complaint by reference, as well as [] matters of which judicial notice may be taken."  Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1994).  "Although for the purposes of a motion to dismiss [the court] must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation."  Iqbal, 556 U.S. at 678 (internal quotations and citations omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not 'show[n]' – 'that the pleader is entitled to relief.'"  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d

36

87, 99 (2d Cir. 2007); Lentell v. Merrill Lynch, 396 F.3d 161, 168 (2d Cir. 2005) ("Any fraud must be pled with particularity, but the rule is applied assiduously to securities fraud.")  "[A] complaint alleging securities fraud must satisfy Rule 9(b), which requires that 'the circumstances constituting fraud . . . shall be stated with particularity.'"  ATSI, 493 F.3d at 99 (quoting Fed. R. Civ. P. 9(b)).  "The particularity requirement of Rule 9(b) serves to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."  Rombach v. Chang, 355 F.3d 164, 171 (2d Cir.2004) (internal quotation and citation omitted).  "In order to satisfy Rule 9(b), the plaintiff must: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 347 (S.D.N.Y. 2011) (quoting Rombach, 355 F.3d at 170).  "Allegations that are conclusory or unsupported by factual assertions are insufficient."  ATSI, 493 F.3d at 99.

### IV. DISCUSSION

**A.      Section 10(b) Claims**

Plaintiffs assert a Section 10(b) claim against all Defendants, and a separate Section 10(b) claim against Mr. Hickey, Jr., Mr. Hickey, Sr., and Mr. Rakoff for insider trading.  To state a claim under Section 10(b) of the Exchange Act and the corresponding SEC Rule 10b-5, Plaintiffs must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) upon which plaintiff relied; and (5) which proximately caused plaintiff's injuries.  Lentell, 396 F.3d at 172.

**1.      Scienter**

"It is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 168-68 (2d Cir. 2000).  The requisite state of mind, or scienter, in an action under Section 10(b) and Rule 10b-5 is "an intent to deceive, manipulate, or defraud." <u>Id.</u> Proper pleading of the scienter element under the heightened pleading standards specified by the PSLRA requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 321 (2007).  To demonstrate a strong inference of scienter, Plaintiffs must allege facts showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." <u>ECA v. JP Morgan Chase Co.</u>, 553 F.3d 187, 198 (2d Cir. 2009).

In evaluating whether the pleaded facts give rise to a "strong inference" of scienter, a Court facing a Rule 12(b)(6) motion to dismiss must: (1) accept all factual allegations in the Complaint as true; (2) consider the Complaint in its entirety, and not scrutinize individual allegations in isolation; and (3) consider plausible, nonculpable explanations for Defendants' conduct. <u>Tellabs</u>, 551 U.S. at 323-24.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Id.</u> at 324.

a.      *Motive and Opportunity Prong*

To establish a strong inference of scienter against the Individual Defendants via the motive and opportunity prong, the complaint "must allege that [they] 'benefited in some concrete and personal way from the purported fraud.'" <u>ECA</u>, 553 F.3d at 198 (quoting <u>Novak v. Kasaks</u>, 216 F.3d 300, 307-08 (2d Cir. 2000)).  "Motives that are common to most corporate officers,

38

such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." Id. "The 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." Id. "[E]xecutive stock sales, standing alone," however, "are insufficient to support a strong inference of fraudulent intent." In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (citations omitted). Similarly, the fact that an officer bought shares during the class period does not necessarily negate scienter. See In re Guilford Mills, Inc. Sec. Litig., No. 98 Civ. 7739 (CLB), 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) ("the fact that Guilford Mills bought back approximately 2.44 million shares of its stock from public shareholders during the Class Period . . . does not in and of itself refute the strong inference of scienter raised by plaintiffs' other allegations of motive and opportunity.").

"[T]he inquiry of whether a sale of stocks by a company executive shows scienter is a factual, situation-specific inquiry." Woodward v. Raymond James Fin., Inc., 732 F. Supp. 2d 425, 438 (S.D.N.Y. 2010) (citing In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 75 (2d Cir. 2001)). The Second Circuit has suggested that "unusual insider trading activity during the class period may permit an inference of bad faith and scienter." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) (citation omitted). "Insider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount. Trades made a short time before a negative public announcement are suspiciously timed." In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (citing Acito, 47 F.3d at 54). As one consideration in determining whether stock sales indicate a motive to commit fraud, "courts should look at the

'percentage of shares sold in relation to the number held.'" Woodward, 732 F. Supp. 2d at 438

(quoting In re Scholastic, 252 F.3d at 75).

Plaintiffs argue that the sale of 100% (Mr. Rakoff), 36% (Mr. Hickey, Jr.) and 26% (Mr.

Hickey, Sr.) of Defendants' shares, for proceeds of over $37.3 million collectively during the

Class Period, is adequate proof of scienter.  The sale of a large volume of stock alone, however,

is not enough to adequately plead scienter.  See Acito, 47 F.3d at 54.  Instead, Plaintiffs must

plead facts charging that there was something "unusual" or "suspicious" about the *timing* of the

sale or sales.  See, e.g., Senn v. Hickey, No. 03-CV-4372 (DMC), 2005 WL 3465657 (D.N.J.

Dec. 19, 2005) (defendant's sale of 11.8% of his holdings in a week-long span for proceeds of $4

million occurred during the pendency of a legal proceeding, whose outcome resulted in a huge

drop in the value of the stock); In re Oxford Health Plans, 187 F.R.D. at 139-40 (individual

defendants' sale of between 11% and 100% of their shares for total proceeds of over $78 million

was evidence of scienter where defendants sold $33 million worth of their stock in the midst of

an investigation by the New York State Insurance Department, and just two months before a

"devastating" press release that resulted in a sharp decline in stock value); In re Guilford Mills,

1999 WL 33248953, at *4 (defendant's sale of 10% of his shares for over $1.6 million took place

within a month of the end of the Company's fiscal third quarter; when third quarter reports were

later released, they revealed accounting irregularities, leading to an abrupt drop in stock value).

Here the stock sales by the Individual Defendants were made (1) pursuant to an initial public

offering; (2) pursuant to a secondary public offering upon an officer's resignation; and (3) during

the Class Period of virtually two years, during which time the Company's stock price dropped

fairly steadily (See Sheldon Decl., Ex. M).

> i.  *Stock Sales at the December 21, 2005 IPO*

Plaintiffs allege that the timing of the Individual Defendants' sales in this case were "suspicious as they came at times when the Trusts were massively underfunded." (Pls.' Opp. to Defs.' Mot. to Dismiss ("Pls.' Mem.") at 33.)  Specifically, they allege that at the time of the IPO, when Mr. Hickey, Jr., Mr. Hickey, Sr., and Mr. Rakoff "unloaded large amounts of stock, HITNY was deemed underfunded and other Trusts were underfunded as well." (Pls.' Mem. at 33; CAC ¶ 87.)  As evidence of this, Plaintiffs allege, that "CRM informed the HITNY Board of Trustees in November 2005 that HITNY was underfunded with a funding level of 83.4%." As noted <u>supra</u>, p. 11, however, this 83.4% funding level was contained in a "preliminary year-end statement," and not a finalized report.   (CAC ¶ 87(c).)  Nevertheless, HITNY could not have been "deemed underfunded" in November 2005 as Plaintiffs assert. (<u>See</u> Pls.' Mem. at 33.)  As explained <u>supra</u>, p. 7, the term "underfunded" describes a specific determination made by the WCB regarding a GSIT's regulatory asset-to-liability ratio.  Only the WCB has the ability to make this determination after receiving a GSIT's GAAP financial report.  In the case of HITNY, the 2005 report was not even submitted to the WCB until January 31, 2006.  (Sheldon Decl., Ex. E).  It was not until April 2006 that the WCB deemed HITNY to be underfunded (Sheldon Decl., Ex. F), and not until December 2006 that the WCB first took regulatory action (CAC ¶ 10). CRMH had no duty to disclose SGRisk's preliminary determination as to HITNY's funding level prior to its own IPO.

Moreover, CRMH's IPO Registration Statement/Prospectus, which was issued on December 20, 2005 in conjunction with the IPO, stated that loss reserves are estimates, that the reserves might prove inadequate and such an outcome would be damaging to CRMH's business, that the GSITs were subject to extensive government regulation, and that the fee-based business provided most of CRMH's revenue.  (CAC ¶¶ 83-86; Sheldon Decl., Ex. B.)  Furthermore, in the

IPO Underwriting Agreement, which was attached to the IPO Registration Statement, CRMH disclosed that PETNY had been already been deemed underfunded by the WCB.  (CAC ¶ 86.) Thus, the Defendants' stock sales at the IPO were not unusual or suspicious in timing, as all of these disclosures were made prior to the IPO.

ii.        *Stock Sales at the February 8, 2007 SPO*

Plaintiffs also infer scienter from Mr. Rakoff's sale of 100% of his shares at the February 2007 SPO "in the midst of the WCB's inquiry of the Company's actuary with respect to HITNY, and multiple reports already casting doubt on its actuarial work."  (Pls.' Mem. at 33.)  There are simply no facts alleged, however, that would indicate that Mr. Rakoff profited on this sale as a result of material misrepresentations or omissions by the Individual Defendants or by CRMH. The SPO Registration Statement/Prospectus acknowledged that HITNY was deemed underfunded by the WCB, and also that the WCB was investigating a third-party actuary.  (CAC ¶ 116; Sheldon Decl., Exs. H, I.)  Furthermore, the timing of the sale was in no way "suspicious."  Two months prior to the SPO, the Company had announced that Mr. Rakoff would be selling his shares concurrent with his resignation in December 2006.  Furthermore, the SPO was not followed by any sort of negative announcement or sharp drop in stock value.  (See Sheldon Decl., Ex. M.)

iii.      *Stock Sales by Mr. Hickey, Jr. and Mr. Hickey, Sr. Pursuant to*
                *10b5-1 Trading Plan in May and June of 2007*

Plaintiffs also allege that Mr. Hickey, Jr. and Mr. Hickey, Sr.'s adoption of a 10b5-1 trading plan on May 21, 2007, and subsequent termination of the plan on June 13, 2007 – the same day PwC issued its draft report to the WCB – was "highly unusual" and "evidence of scienter."  (Pls.' Mem. at 34.)  Plaintiffs cite In re Countrywide Fin. Corp. Derivative Lit., 554 F.

Supp. 2d 1044 (C.D. Cal. 2008), for the proposition that an insider's amendment to a 10b5-1

plan can be probative of scienter.  However, in <u>Countrywide</u>, the defendant amended his plan "at

the height of the market," allowing him to capitalize on the inflated value of the stock.  <u>Id.</u> at

1069.  Mr. Hickey, Jr. and Mr. Hickey, Sr.'s cancellation of their plans did not occur near the

class period high, nor shortly before a significant drop.  (<u>See</u>, Sheldon Decl., Ex. M.)

Furthermore, no facts are alleged in the CAC demonstrating that Defendants were aware (at the

time that they sold their stock) of the contents of the June 13, 2007 PwC reports to the WCB, or

of when those reports were going to be released.

*iv.*     *Stock Sale by Mr. Hickey, Jr. on September 20, 2007*

Plaintiffs allege that Mr. Hickey, Jr.'s sale of 216,454 shares on September 20, 2007 is

evidence of scienter, as it took place three days after CRMH's September 17, 2007 press release

announcing the potential termination of HITNY.  (Tr. at 48.)  While the sale of stock "a short

time *before* a negative public announcement [is] suspiciously timed," <u>In re Oxford Health Plans</u>,

187 F.R.D. at 139 (emphasis added), trading that takes place *after* such an announcement is

hardly unusual.  While the Court inquired at argument as to when Mr. Hickey, Jr. contracted to

sell his shares, (<u>see</u> Tr. at 48-49), Plaintiffs have not alleged or responded that he did so prior to

the September 17, 2007 press release.  Therefore, the Court will not infer scienter on the basis of

these sales.

*v.*     *Performance-Based Bonuses*

Finally, Plaintiffs urge the Court to infer scienter from the fact that Mr. Hickey, Jr. and

Mr. Rakoff could earn performance-based bonuses, alleging that this motivated them to fail to

disclose adverse information to the public.  (Pls.' Mem. at 34 n.19.)  However, as the Second

Circuit has held, "[i]f scienter could be pleaded on that basis alone, virtually every company in

43

the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir. 2000); accord ECA, 553 F.3d at 198 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as . . . the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry.").

In short, Plaintiffs have failed to allege anything "unusual" or "suspicious" about the Individual Defendants' stock sales during the Class Period.  See In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (no inference of scienter where "trades occurred weeks before the principal allegation of material misstatement, and many months before the release of any negative information that caused [the company's] stock price to plummet.").  As Defendants point out in their brief, "[t]he inference that the Court is asked to draw – that Defendants had a 'motive' to conceal information, to drive up the stock price, and then to cash in before the truth became known – does not follow from [the facts alleged in the CAC]."  (Mem. of Defs. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 38.)  The stock sales simply do not demonstrate "an intent to deceive, manipulate, or defraud," as required by Section 10(b) and SEC Rule 10b-5.  See Ganino, 228 F.3d at 168.

> b.   *Circumstantial Evidence Prong*

To establish scienter through strong circumstantial evidence of recklessness, a plaintiff must allege facts showing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendants must have been aware of it."  In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted).  This high standard may be met where defendants "knew facts or had access to information suggesting that

their public statements were not accurate" or "failed to check information they had a duty to monitor." Novak, 216 F.3d at 311.  Plaintiffs, however, must "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements," id. at 308, and "specifically identify the reports or statements containing this information" id. at 309.  "In such situations, the scienter analysis and the determination of whether the defendant made false or misleading statements are essentially combined."  Coronel v. Quanta Capital Holdings, Ltd., No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *26 (S.D.N.Y. Jan. 26, 2009) (citations omitted).

According to Plaintiffs' brief, Defendants' conduct provides a strong inference of scienter (1) because Defendants have allegedly manipulated reserves of the GSITs, (Pls.' Mem. at 36-37); (2) because the facts alleged relate to the core of CRMH's business, (id. at 37-38); (3) because the alleged accounting and actuarial improprieties are of a high magnitude, (id. at 39); (4) because Defendants have admitted unsound underwriting practices, (id. at 39-40); (5) because confidential witnesses attested to the fraudulent nature of CRMH's business model, (id. at 40-41); (6) because CRMH violated its own policies, (id. at 42); and (7) because high ranking officials resigned from CRMH, (id. at 42-44).

As an initial matter, Plaintiffs' citation to "unproven allegations" made in the WCB or NYAG complaints do not constitute factual allegations.  See Lipsky v. Commonwealth United Corp., 551 F.2d 887, 894 (2d Cir. 1976) (holding that, absent adjudication on the merits, prior legal proceedings have no evidentiary bearing in future proceedings).  "Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)."  RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (citing Lipsky, 551 F.2d at 892-94).  "Similarly, references

to an Attorney General's conclusory report following a preliminary investigation in a case that never was presented for nor reached an adjudication upon the merits, are also immaterial under Rule 12(f)." In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 79 (S.D.N.Y. 2003). Thus, Plaintiffs may not rely on these sources as evidence of the alleged fraud.[22]

Defendants argue that when the WCB and NYAG complaints are removed from the CAC, Plaintiffs have little left to support a showing of scienter. (Defs.' Mem. at 40-41.) They contrast the dearth of incriminating documentation in the CAC with the numerous disclosures that CRMH did make, including their prompt reporting on all WCB action that was taken against the GSITs that they administered. (Id. at 41-42.)

The Court must examine the CAC "in its entirety," including "documents incorporated into the complaint by reference," and decide "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322. The Court, however, must examine each of Plaintiffs' allegations in order to determine whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

i.    *Defendants Manipulated the Reserves of the GSITs*

Plaintiffs urge the court to infer scienter based on its assurances that Defendants, in their role as administrator of the GSITs, manipulated the GSITs' financial results by "suppressing GSIT claim reserves; recording questionable accounting transactions; using unsupported

---

[22] As counsel for Defendants pointed out at oral argument, the NYAG had threatened to bring a claim against CRMH under the Martin Act, which has no scienter requirement. (Tr. at 53.) Furthermore, Plaintiffs do not allege that the NYAG has taken action against CRMH or any of the Individual Defendants as of this time.

discount rates; failing to terminate chronic non-performing members of the GSITs; and providing questionable data to actuaries and accountants when generating year-end financial statements."[23] (Defs.' Mem. at 36.)  Plaintiffs claim that Defendants attempted to conceal these manipulations, which supports a strong inference of scienter.  (Id.)

While allegations that Defendants manipulated the financial results of a company may lead to an inference of scienter, the Defendants here are not alleged to have manipulated CRMH's financial results.  Instead, all of the allegations involve the manipulation of the reserves of the GSITs that CRM (a subsidiary of CRMH) acted as a TPA for.  Plaintiffs provide no specific factual allegations to support their generalized claims regarding manipulation of the GSITs' reserves, and instead rely on conclusory statements.  (See CAC ¶ 57.)

Furthermore, Plaintiffs' allegation that Defendants "concealed" these "manipulations" is not supported by the facts alleged.  Indeed, the sort of disclosure that the Plaintiffs demand is not required as a matter of law, and thus Defendants failure to make these disclosures is not evidence of scienter.  "What is required is the disclosure of material objective factual matters."  Data Probe Acquisition Corp. v. Datalab, Inc., 722 F.2d 1, 6 (2d Cir. 1983).  "So long as a corporation makes disclosure of material objective factual matters, it need not characterize or editorialize on those facts in any particular way."  Kramer v. Time Warner, Inc., No. 89 Civ. 8234 (LBS), 1990 WL 166665, at *3 (S.D.N.Y. Oct. 24, 1990), aff'd 937 F.2d 767 (2d Cir. 1991) (internal quotations and citations omitted).  "Thus the antifraud provisions of the Exchange Act do not require disclosure of alleged ulterior motives for fully described corporate actions, or of disputed

---

[23] The Court notes that it would be against CRMH's interest as a provider of reinsurance coverage to the GSITs it administered to intentionally under-reserve claims.  (See CAC ¶ 51.)

legal theories regarding the legality of transactions approved by the Board." Id. (citing

Maldonado v. Flynn, 597 F.2d 789, 796 (2d Cir. 1979)).

In Kramer, the Court found that defendants were not required to disclose that a change in

an Equity Plan was unauthorized. Id. at *4. The Court found that this detail was a

characterization of the material objective fact that the Plan was altered, and that its disclosure

was not required under the federal securities laws. Id. In this case, the allegations contained in

the CAC that Defendants' concealed the fact that HITNY was already underfunded at the time of

the IPO are merely characterizations of the allegation that the trust had inadequate loss

reserves.[24] Defendants had no duty to disclose this alleged underfunding of it client HITNY, as

the WCB had not yet made a determination with respect to HITNY. See supra, p. 41. Indeed,

Plaintiffs make no specific factual allegations of intentional or knowing manipulation or

misrepresentation with regards to the Individual Defendants in this case.

>       *ii.*       *The Facts Alleged Relate to the Core of CRMH's Business*

Plaintiffs argue that the facts alleged support a strong inference of scienter because they

relate to "CRMH's core business, with administration of the eight underlying Trusts representing

a significant share of its operations." (Pls.' Mem. at 38). "When information is at the core of a

company's business, it may be properly ascribable to senior officers."[25] In re J.P. Morgan Chase

Sec. Litig., 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005). Plaintiffs argue that the Individual

Defendants, as senior officers/board members, were intimately familiar with the details of

CRMH's business at all times. (Pls.' Mem. at 37-38.) However, even if the Defendants are

---

[24] Similarly, the assertion made by CRM in its press release of January 29, 2008 that ECTNY "exceeds the regulatory criteria for classification by the WCB as having 'no funding issues,'" (CAC ¶ 141), is a characterization, and not a misrepresentation of objective fact as Plaintiffs argue (see Tr. at 35).

[25] It should be noted that Mr. Hickey, Sr. was not an officer of the company, but a board member.

"charged with knowledge of the Company's core operations," (CAC ¶ 77), Plaintiffs have failed to identify an actionable falsehood or misrepresentation made by any of the Individual Defendants relating to the "core business" of the company that would tend to indicate an intent to deceive, manipulate, or defraud.  See Ganino, 228 F.3d at 168.

> ### iii.   The Alleged Accounting and Actuarial Improprieties are of a High Magnitude

Plaintiffs allege that "[t]he magnitude of the reserve insufficiencies here supports a strong inference of scienter." (Id. at 39.)  However, as discussed supra, while CRM established initial loss reserve amounts for the trusts, it was the responsibility of an independent actuary and accountant to ensure that the claims liability/expense amounts reported by CRM were accurate. See, supra p. 9-10.  Insurance reserves "are, by their nature, 'extremely conjectural, and may need adjustment as time passes and their accuracy can be tested in retrospect.'"  Zirkin v. Quanta Capital Holdings Ltd., No. 07 Civ. 851 (RPP), 2009 WL 185940, at *11 (S.D.N.Y. Jan. 23, 2009) (quoting Stephens v. National Distillers & Chem. Corp., 6 F.3d 63, 65 (2d Cir. 1993)). Reserves are opinions, and the Complaint must allege facts showing "that defendants did not truly hold those opinions [either knowingly or recklessly] at the time they were made public." Fait v. Regions Fin. Corp., 712 F. Supp. 2d 117, 124-25 (S.D.N.Y. 2010).  Plaintiffs have not made any such allegations in the CAC.  Furthermore, the adequacy of a GSIT's reserves at a particular point in time is relevant to CRMH's financial practices only indirectly, since ultimately, it is up to the GSIT's board of directors to take adequate corrective measures in order to ensure the financial health of the GSIT.

> ### iv.   Defendants Have Admitted Unsound Underwriting Practices

"[A]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter." Hall v. Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 227 (S.D.N.Y. 2008) (quotations and citations omitted). Plaintiffs, however, do not allege any admissions by the Individual Defendants that would support a strong inference of scienter. (See Pls.' Mem. at 39-40.) The only admission cited by Plaintiffs in this regard is contained in a letter attached to the Company's 2008 Annual Report, and signed by Mr. Scardino, which states:

> In contrast to California, we produced unacceptable underwriting results in New York. . . . Looking back, our response was rushed and not appropriately governed by the judgments of our underwriters. . . . In 2009, we will look to reemphasize the central importance of sound underwriting principles and practices. . . . We will seek profits, and not necessarily volume.

(Id.; CAC ¶ 166.) This statement is simply not an admission of a misrepresentation; at the time it was made it was simply an admission of a prior mistake. Nor do Plaintiffs cite any other statements that constitute an admission of wrongdoing.

> v.   *Confidential Witnesses Attested to the Fraudulent Nature of CRMH's Business Model*

Even if the confidential witnesses cited in the CAC were described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," as required, Novak, 216 F.3d at 314, these witnesses do not provide information that would support a finding of scienter with respect to the Individual Defendants. While CW1, who worked for CRM from June 2006 to August 2007, apparently "confirmed the CRM executives' singular focus on growing the company," during that period (CAC ¶ 61), focusing on the Company's growth is not evidence of an intent to deceive, manipulate or defraud with respect to the company's financial well-being.

50

### vi.      CRMH Violated its own Policies

Plaintiffs allege that CRMH's "[v]iolation of [its] own policy supports a strong inference of scienter." (Pls.' Mem. at 42.)  Plaintiffs cite a December 2006 claim file audit on WRWCT conducted by Kickey Consulting Services at CRM's own request. (Id.)  The audit found, among other things, that CRM failed to meet its "own guidelines for reserving practices in 80% of the cases . . . ." (CAC ¶ 77.)  However, the findings of this audit relate to only one of the eight GSITs that CRM administered.  Furthermore, Plaintiffs fail to set forth a specific "expressed policy" – such as the "Statement of Accounting Standard 121" in In re Scholastic, 252 F.3d at 77, or the "markdown policy" in Novak, 216 F.3d at 311 – that Defendants are alleged to have violated.  Scienter cannot be inferred on this basis.

### vii.      High Ranking Officials Resigned from CRMH

Finally, Plaintiffs allegation that the resignation of three CRMH executives provides evidence of scienter is unfounded.  In order to plead scienter on this basis, Plaintiffs must allege "facts linking the [] resignations and the alleged fraud." In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005).  They have failed to do so here.  Mr. Hickey, Jr. left the company well after the end of the class period, and for reasons unrelated to Plaintiffs claims. (See CAC ¶ 194.)  Mr. Rakoff resigned during the class period, but his resignation was announced and occurred well before any revelations of wrongdoing.  Finally, director Edmund N. Pascoe, who resigned in March, 2008, is not a named defendant, and his resignation creates no inference of scienter on the part of any of the named defendants.  See In re BISYS, 397 F. Supp. 2d at 447.

### c.      Group Pleading

Throughout the lengthy and convoluted CAC, Plaintiffs rely on the "group pleading" doctrine in order to prove their case.  However, Plaintiffs fail to allege facts that adequately

address the scienter element with respect to each of the Individual Defendants – an element that

cannot be satisfied through group pleading.  See, e.g., The Pennsylvania Ave. Funds v. Inyx Inc.,

No. 08 Civ. 6857 (PKC), 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("'group pleading'

of scienter – as distinguished from collective authorship of a statement – runs afoul of the

PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong

inference that *the defendant* acted with the required state of mind.'" (emphasis in original)).

Here, Plaintiffs have failed to make out an adequate showing of scienter with respect to any of

the Individual Defendants.  Therefore, their Section 10(b) claims must be dismissed.

### 2.    Loss Causation

"[L]oss causation" is "a causal connection between" defendants' alleged fraud and

plaintiff's loss.  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 336 (2005).  "[A] misstatement or

omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within

the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed

investor."  Lentell, 396 F.3d at 173 (citation omitted) (emphasis in original).  Thus, to establish

loss causation, a plaintiff must allege "that the misstatement or omission concealed something

from the market that, when disclosed, negatively affected the value of the security."  Id.

Plaintiffs claim that, in this case, "[t]he concealed risk was the collapse of CRM's

business and loss of its license," and that this risk "began to materialize in April 2008."  (Pls.'

Mem. at 45.)  Specifically, Plaintiffs allege that "defendants concealed that CRM built a business

unit upon a house-of-cards, where already-too-small member payments were siphoned off to pay

unnecessary, excessive fees to related companies, and that numerous trusts were *already*

underfunded by year-end 2005 . . . ."  (Id.)  However, these risks were simply not concealed.  In

the IPO Prospectus, filed December 20, 2005, and in other documents thereafter, CRMH

highlighted the extent to which its business was dependent on a small number of trusts, and

noted the potential harm if the Company were to lose one of these trusts or if the Company were

to underestimate liabilities.  (Id. ¶¶ 83, 85.)  In addition, it warned that:

> To the extent the loss reserves for any of our managed groups is insufficient to cover such group's actual losses and loss adjustment expenses, the group will have to adjust its loss reserves and it may incur charges to its earnings, which could have a material adverse effect on its financial condition and cash flows and could require the group to assess its members. This could expose us to liability for our management of the group, have a negative impact on our future management of the group, and adversely affect our reputation as a manager.

(Sheldon Decl., Ex. B.)  In December of 2006, in its SPO Registration Statement, CRMH

disclosed the fact that HITNY had been deemed underfunded by the WCB, that the company was

presently involved in discussions with HITNY's Board of Trustees and the WCB to develop a

remediation plan, and that it could not ensure investors that the remediation plan would be

successful.  (Sheldon Decl, Ex. H.)  Moreover, in February of 2007, in its SPO Prospectus,

CRMH disclosed that another of its groups was likely to be deemed underfunded, that the WCB

was conducting an inquiry into the actuarially work done by a third-party actuary, and that

CRMH was asked to provide testimony and copies of the underlying data that was submitted to

the actuary.  (Sheldon Decl., Ex. I.)

Investors cannot establish loss causation merely by relying on an after-the-fact "negative

characterization of already-public information."  In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d

501, 512 (2d Cir. 2010).  Here, CRMH disclosed the inherent risks associated with the GSIT

business, the material facts pertaining to the WCB's determination of underfunding with regards

to the trusts that it administered, and all subsequent action taken by the WCB in a timely manner,

well before the April 2008 date when Plaintiffs allege that "the truth began to emerge."

Plaintiffs' allegations that "CRM built a business unit upon a house-of-cards" and that

"numerous trusts were *already* underfunded by year-end 2005" are nothing more than negative characterizations of information that had already been disclosed by Defendants.  See id. Plaintiffs have not adequately pleaded loss causation, an essential element of any Section 10(b) claim.

**B.     Section 20(a) Claim**

To establish controlling person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), plaintiffs must allege "a primary violation by the controlled person and control of the primary violator by the targeted defendant."  In re Guilford, 1999 WL 33248953, at *3 (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).  Plaintiffs allege that the Individual Defendants "had direct and supervisory involvement in the day-to-day operations of the Company," (Pls.' Mem. at 50) and argue that "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity"  (Id. (quoting In re Parmalat Sec. Litig., 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006))).  However, even if the "control prong" is met, Plaintiffs have failed to state an underlying Section 10(b) violation against CRMH, as they have failed to adequately allege scienter or loss causation, and have not pled fraud with particularity.  Thus, Plaintiffs' Section 20(a) claim must be dismissed as well.  See, e.g., Coronel, 2009 WL 174656, at *31.

### V. CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss (ECF No. 19) is granted with respect to the Individual Defendants.  Plaintiffs will not be given leave to replead, as the CAC is Plaintiffs' second complaint in this action, and Plaintiffs have already had the benefit of extensive discovery, which they relied on in crafting the CAC.

SO ORDERED.

Dated: New York , New York
        May 10, 2012


                                    Robert P. Patterson, Jr.
                                         U.S.D.J.


55

**Copies of this Order were sent by email to the following attorneys.  All other counsel of record notified by ECF:**

*Lead Counsel for Lead Plaintiffs:*
**Lionel Z. Glancy**
Glancy Binkow & Goldberg LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
(310) 201-9150
Fax: (310) 201-9160
Email: lglancy@glancylaw.com

*Liaison Counsel for Lead Plaintiffs*
**Brian Philip Murray**
Murray Frank LLP
275 Madison Avenue, Ste. 801
New York, NY 10016
(212) 682-1818
Fax: (212) 682-1892
Email: bmurray@murrayfrank.com

**Gregory Bradley Linkh**
Murray Frank LLP
275 Madison Avenue, Ste. 801
New York, NY 10016
(212) 682-1818
Fax: (212) 682-1892
Email: glinkh@murrayfrank.com

*Counsel for Defendants:*
**Arthur Harlod Aufses , III**
Kramer Levin Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9234
Fax: 212-715-8000
Email: aaufses@kramerlevin.com

**Jonathan Louis Fried**
Kramer Levin Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9493
Fax: (212) 715-8000
Email: jfried@kramerlevin.com

**Marjorie E. Sheldon**
Kramer, Levin , Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, NY 10036
212-715-9502
Fax: 212-715-9503
Email: MSheldon@kramerlevin.com